M. Shafi IRAVANI MOTTAGHI,
Plaintiff,
v.
BARKEY IMPORTING CO., Inc.,
Defendant.

United States District Court
S. D. New York.

Sept. 7, 1955.

Kaye, Scholer, Fierman & Hays, New York City, for plaintiff, Milton Kunen, New York City, of counsel.

Kresel & Meyerson, New York City, for defendant, Isidor Kresel, Saul Gordon, and Irving Weinberger, New York City, of counsel.

NOONAN, District Judge.

The trial of this action was commenced on October 4, 1954. At that time, a jury having been demanded, the jury was duly empaneled and sworn, and the trial proceeded before it for over two weeks.

On October 19, 1954, however, because of certain remarks made by several of the jurors and brought to the attention of the court, the jury, at the request of counsel, was then dismissed. The trial was continued before the court, without a jury, pursuant to a stipulation to that effect dictated on the record at that time

by the attorneys and to which they orally agreed in open court. Further, it was then stipulated that all of the proceedings had up to that point were to be deemed had before the court without a jury.

Upon the conclusion of the trial, the submission of briefs, reply briefs and analytical computations by both parties herein, and a detailed analysis of all of the arguments and evidence in the case, this court hereby renders the following opinion in lieu of more formal Findings of Fact and Conclusions of Law.

The opinion is a lengthy one because of the complexity of the case and the volume of the evidence. Since the multitude of exhibits in evidence and much of the testimony serves to indicate background and business methods as well as individual commitments by the writers thereof, much of the testimony and many of the exhibits are quoted in the opinion.

Prior to the start of the trial itself the plaintiff herein had thrice altered his complaint, so that the complaint which was the basis for this trial differed considerably from his original complaint.

This court normally would not find it necessary in the writing of its decision to comment upon the amendments to a pleading; we do so now, however, because the defendant has made it abundantly clear throughout the trial and at great length in all of its briefs that it believes that the amendments constitute evidence of bad faith or worse on the part of the plaintiff. It is the opinion of this court that those amendments signify nothing of the sort. The unusually complex and multitudinous series of transactions that gave rise to this lawsuit are a sufficient cause for the complications that arose in the pleadings.

Without going into the details of the complaint as finally amended, it will suffice for now to state that this suit is brought primarily for the alleged breach of certain contracts, and that the entire suit is broken down into ten causes of action by the plaintiff and two causes of action by the defendant by way of a counter-claim.

This court has jurisdiction over the controversy by reason of diversity of citizenship between the parties, since the plaintiff was and is a citizen and subject of the Kingdom of Iran, and the defendant was and is a corporation organized and existing by virtue of the laws of the State of New York, and was and is doing business in the County, City and State of New York, during all of the times pertinent to this action. The amount in controversy is well in excess of $3,000 exclusive of interest and costs.

█ Since the jurisdiction of this court rests on diversity of citizenship, the law of the State of New York will apply to this action to the same extent as it would if the suit were tried in a New York state court.

The action arises out of certain transactions in carpet wool between the plaintiff, an importer and exporter of divers commodities who maintained his place of business in Teheran, Iran, and the defendant, a New York corporation, whose president, Jacob A. Barkey had been engaged in the import, purchase, and sale of carpet wool for a considerable period of time in New York City.

Although the plaintiff had previously done business on a large scale, the transactions that gave rise to this controversy were his first efforts in the export of wool.

Two others of the more important dramatis personae in the earlier causes of action in this case were one Randolph Valensi (also known as "Randy"), an agent of the plaintiff, and one Robert N. Kitching, formerly an agent and employee of the defendant corporation, and now deceased.

During a portion of the period in which the transactions herein involved were pending, Kitching, as Barkey's agent, went to and stayed in Teheran to consult with and advise Iravani.

Valensi was engaged in the City of New York in the business of acting as a broker or agent for various exporters of wool and other commodities to the United

States; one of his clients was the plaintiff, Iravani.

Among the occasions wherein Valensi acted as Iravani's agent, were those involving his transactions with Barkey.

Among other of Valensi's duties with respect to his association with Iravani were the following: the making of agreements for the sale of Iranian carpet wool to be exported by Iravani, receiving pro forma or tentative as well as final statements of account in connection with the shipment of these wools to the defendant, receiving payments from the defendant for the wools so shipped, and communicating the oral and written communications of the parties to each other.

At all times during the negotiations that led to this suit, there was a general custom in the use of certain terms in the business of exporting and importing wool that was well known to and understood by both the plaintiff and the defendant. The terms hereinbelow set forth were understood by the parties and are intended by the court to have the following respective meanings:

(1) "Greasy wool" is wool that, at the time of its shipment to the United States, has not been washed or cleaned, and, therefore, is wool that contains a considerable quantity of impurities such as grease and dirt.

(2) "Washed wool" is a wool that, before its shipment to the United States, has had some portion of its impurities removed by washing, but not by any process of cleaning. Wool is considered washed when the sheep from which it will be shorn have been driven through a stream.

(3) "Clean wool" is a greasy or washed wool that, after its arrival in the United States, has been scoured and cleansed of all impurities that were present in the wool when shipped to the United States.

(4) "Net lb. clean basis", or "clean basis", means that payment for wool is to be calculated on each pound of wool that is actually yielded by the wool when, in the United States, it is transformed into clean wool as described above.

(5) "Cream wool" is wool that is not white but is a light gray in color. It is also referred to as "second white wool" or "No. 2 white wool".

(6) "Colored wool" is wool that is neither white nor cream white, but of dark color, such as black or brown.

On about December 8, 1949, in the City of New York, the plaintiff, through Mr. Valensi, and the defendant, through Jacob Barkey, entered into an agreement in writing, dated December 8, 1949, and accepted by Barkey on December 9, 1949, wherein the plaintiff agreed to sell and deliver to the defendant, and the defendant agreed to buy and accept from the plaintiff, about 350 tons of Iranian carpet wools, of Meshed white quality, each ton of 2,240 pounds net, consisting of 300 tons of greasy white wool and 50 tons of washed white wool at 60 cents (U. S. currency) per net pound clean basis. (Plaintiff's Exh. 1).

That contract, dated December 8, 1949, provided among other things as follows:

"Yields: Seller's estimate of yields as follows:

In the grease: Fifty Two Percent (52%)

Washed: Seventy Two Percent (72%)".

"Shipment: From Khorramshahr, Iran, or other Iranian port direct to Port of New York, U. S. A. not later than February 15, 1950; partial shipments permitted."

In February, 1950, the above contract was verbally modified by the plaintiff and the defendant to provide for the shipment thereunder by the plaintiff to the defendant of 40 tons of greasy cream Iranian carpet wool, in lieu of the 50 tons of washed white wools originally therein agreed to be shipped by the plaintiff to the defendant. This contract, as so modified, is hereinafter called the "First Written Contract". This modification did not change the price for white wool set forth in the earlier agreement.

About April 17, 1950, in the City of New York, the plaintiff, through Mr. Valensi, and the defendant, through Jacob Barkey, entered into an agreement in writing dated April 17, 1950, and accepted by Barkey on April 19, 1950, wherein the plaintiff agreed to sell and deliver to the defendant, and the defendant agreed to buy and accept from the plaintiff, 300 tons of Iranian carpet wools, of strictly white quality, each ton of 2,240 pounds net, consisting of 200 tons of greasy wool and 100 tons of washed wool, at 70 cents (U. S. Currency) per net pound clean basis. This contract is hereinafter called the "Second Written Contract". (Plaintiff's Exh. 25).

The Second Written Contract provided, among other things, as follows:

"Yields: Seller's estimate of yields as follows:

In the grease: Fifty Percent (50%)

Washed: Eighty Percent (80%)".

"Shipment: From Khorramshahr, Iran, or other Iranian port direct to Port of New York, U. S. A. not later than June 30, 1950; partial shipment permitted."

About April 21, 1950, in the City of New York, the plaintiff, through Mr. Valensi, and the defendant, through Jacob Barkey, entered into an agreement in writing dated April 21, 1950, and accepted by Barkey on April 25, 1950, wherein the plaintiff agreed to sell and deliver to the defendant, and the defendant agreed to buy and accept from the plaintiff, 100 tons of Iranian carpet wool, of second white quality, called "cream" per sample, each ton of 2,240 pounds net in the grease, at 60 cents (U .S. currency) per net pound clean basis. This contract is hereinafter called the "Third Written Contract". (Plaintiff's Exh. 27).

The Third Written Contract provided, among other things, as follows:

"Yields: Seller's estimate of yield —Fifty Percent (50%)".

"Shipment: From Khorramshahr, Iran, or other Iranian port direct to Port of New York, U. S. A. not later than June 30, 1950; partial shipments permitted."

About June 30, 1950, the plaintiff and the defendant, through its agent, Robert N. Kitching, entered into an agreement in writing, in the City of Teheran, Iran, dated June 30, 1950, wherein the defendant provisionally agreed to buy and accept from the plaintiff, and the plaintiff provisionally agreed to sell and deliver to the defendant 400 tons of Iranian greasy wool, consisting of two hundred (200) tons greasy white and two hundred (200) tons greasy cream, metric ton weight; this contract is hereinafter called the "Fourth Written Contract". (Plaintiff's Exh. 49).

The Fourth Written Contract contained among others, the following provisions:

"Price: Prices are cost and freight New York, clean basis, net shipping weights. White at eighty-five (85) cents per pound. Cream at seventy-five (75) cents per pound."

"Shipment: During July/August from Iran".

The Fourth Written Contract also contained certain other express provisos, to wit:

"Remarks: As mentioned above, this sale is contingent upon you completing your present outstanding contracts to us and credit for this purchase will not be opened until this condition has been met."

(The "credit" referred to a letter of credit).

"The matter of the amount of the letter of credit, whether 80% or 90%, will be discussed with Mr. Valensi and the amount which is finally agreed upon will then become one of the terms of this contract."

These four formal written contracts constitute the clearest of the agreements between the parties and form at least the basis for most of the causes of action herein. Up to this point, there is little

controversy as to what these contracts say or mean.

At this juncture, the court wishes to point out that, on the basis of the printed record in this case, both the plaintiff and the president of the defendant-corporation have made inconsistent statements. Accordingly, in reaching a decision, this court must rely to a relatively greater degree on the documentary evidence introduced at the trial, and on that testimony of the witnesses which is hostile to their own interests.

We turn now to the specific causes of action.

### First Cause of Action

The plaintiff's first cause of action is based on an alleged amendment of the First Written Contract as referred to earlier. The plaintiff asserts that this contract was further modified in August of 1950 by verbal agreement, as indicated by various documentary evidence, to provide for a higher price for certain of the shipments amounting to an additional 10 cents per net pound clean basis. This the defendant denies.

The shipments on which the plaintiff claims this extra ten cents per net pound clean basis are those which were shipped on the following voyages:

(1) S.S. Lemsterkerk-Westerdam which arrived in the port of New York on July 17, 1950;

(2) S.S. Steel Designer, which arrived in the Port of New York on July 20, 1950;

(3) S.S. Laackerk-Westerdam which arrived in the Port of New York on September 13, 1950;

(4) S.S. Lindekerk-Averdyk which arrived in the Port of New York on November 4, 1950.

In examining into the alleged contract modifications, the following evidence, is in the record:

(1–1) The contract of December 8, 1949, required shipment "not later than February 15, 1950". (Plaintiff's Exh. 1).

(1–2) A Letter of Credit was issued on December 12, 1949, pursuant to the abovementioned contract and specified the price at "60 cents per net lb. clean basis." It was numbered #82037, and, to procure payment upon it, the plaintiff was required to produce, among other papers, on board ocean bills of lading which "must be dated on or before February 15, 1950". (Plaintiff's Exh. 60).

(1–3) References in several communications from Barkey establish that Iravani was authorized to ship colored wool as well as the wool specifically covered by the contract. For example, the radiogram dated April 8, 1950, from Barkey to Kitching contained the following excerpt:

"Colors Prices Entirely Unworkable Mills Seldom Buying Colors Stop If Iravani Cannot Sell Locally Suggest Consigning Will Make Moderate Advances And Do Best Dispose". (Plaintiff's Exh. 20).

(1–4) Letter dated January 15, 1950, from Iravani to Valensi containing the following paragraph:

"We received your cable of January 13th wherein you urge us to ship the totality of this wool contract by early February. Since as stated, this is our first order from you and we are taking pains to make sure that the right goods are shipped, we are afraid that we will be unable to effect shipment within (sic) the required time." (parenthesis supplied) (Plaintiff's Exh. 8).

(1–5) Letter dated February 15, 1950, from Kitching to Barkey opens with the following sentence:

"I confirm telephone conversation had with Mr. Jack Barkey yesterday and from same I understand that you are extending letter of credit in favor of Iravani for an additional 60 days." (Plaintiff's Exh. 9).

(1–6) Radiogram dated April 7, 1950, from Kitching to Barkey contained the following excerpt:

"Balance Old Contract Shipment By May Fifteen Extend Credit Accordingly". (Plaintiff's Exh. 19).

(1–7) Radiogram dated April 8, 1950, from Barkey to Kitching commences:

"Yours Sixth Extending Credit." (Plaintiff's Exh. 20).

(1–8) A letter dated April 10, 1950, from Valensi to Iravani contained the following paragraph:

"Credit Extension: We understand that Barkey will proceed to extend the credit until May 15th according to the request which they received from Kitching." (Plaintiff's Exh. 21).

(1–9) A letter dated April 20, 1950, from Valensi to Iravani contained the following paragraph:

"Old Credit: We understand that the old credit covering the first contract for 350 tons has been extended thirty days by Barkey Importing Co., Inc." (Plaintiff's Exh. 26).

(1–10) Letter of credit numbered #83287 dated April 24, 1950, which was to cover shipments made pursuant to the Second Written Contract, and provided for payment of 70 cents per net pound clean basis for goods shipped pursuant to the Second Written Contract, contained a provision reading as follows:

"This credit is not available until credit Number 82037 has been fully utilized." (Plaintiff's Exh. 61).

(1–11) A letter dated April 28, 1950, from Kitching to Barkey contained the following excerpt:

"* * * Iravani has told me that the extension of the first credit had been made until the 30 May * * *". (Plaintiff's Exh. 28).

(1–12) A letter dated May 26, 1950, from Kitching to Barkey contained the following quote:

" * * * it may be necessary to again extend the first credit * * *". (Plaintiff's Exh. 37).

(1–13) A letter dated May 31, 1950, from Kitching to Barkey contained the following sentences:

"Since the Steel Designer is sailing in June this will either necessitate another extension of the credit or it will be necessary to amend the second First of Boston credit to allow him to use that and he will draw on you for whatever he ships on the first credit after expiration." (Plaintiff's Exh. 38).

(1–14) Letter dated June 6, 1950, from Valensi to Iravani contained the following sentence:

"*Extension Letters of Credit:* In accordance with your request, Barkey Importing Co. will extend the first credit covering the first order until June 30th." (Plaintiff's Exh. 41).

(1–15) Various communications between the parties and their agents attest to Iravani's attempt to have the restrictive clause in the Second Letter of Credit removed. (Plaintiff's Exhibits 38, 40, 41, 42, 44 and 45).

(1–16) Radiogram dated June 19, 1950, from Barkey to Kitching contained the following sentence:

"Complying Iravani Cable To Randy To Assist Are Deleting Objectionable Clause Second Credit Stop". (Plaintiff's Exh. 46).

(1–17) Radiogram dated June 21, 1950, from Kitching to Barkey opened with following words:

"Yours Nineteenth Received Thanks For Deletion". (Plaintiff's Exh. 47).

(1–18) Radiogram dated August 3, 1950, from Valensi to Iravani, began as follows:

"Kitching Returning Teheran Seventh Stop Intends Returning America Thirteenth Stop Barkey Instructing Kitching Accept All Remainder Unnegotiated Documents Stop Arrange Drawing Open Account as Heretofore Before Kitchings Departure With Understanding Wools Will Be Apportioned Equally Between Two Contracts And You Will Complete Balance Wools First Two Contracts First Available

Steamer * * * ". (Defendant's Exh. K₁).

(1–19) Letter dated August 4, 1950, from Valensi to Iravani contained the following paragraphs:

"* * * However, since Mr. Kitching, upon his return to Teheran intends to remain there until the 13th only, time has become very important. With that thought in mind, we were able to arrange to have Barkey inform Kitching to accept from you, all the unnegotiated documents still outstanding, which cover not only the shipments still afloat, but some of the wools shipped per S.S. Lemsterkerk and in fact a small quantity of wools shipped per S.S. Steel Designer. We cabled you to arrange for drawings on a cash basis as you have done in the past, delivering the documents to Mr. Kitching before his departure. We also were successful in persuading Barkey to permit you to apportion your drawings equally between the two contracts still uncompleted. This in substance will permit you to average your prices.

"It would now appear that you still owe some 350 to 400 tons under these old contracts and Barkey's willingness to proceed was contingent upon your execution of these balances due under the old contracts by shipping them by the first available steamer for Khorramshah." (Defendant's Exh. K).

(1–20) Letter dated August 11, 1950, to Barkey from Kitching contained the following:

"Iravani is supposed to come over for a talk as soon as he comes home and I will try to get things straightened out with him. At the moment he is talking some junk about averaging all the shipments at ¼ at 60 cents, ¼ at 70 cents and ½ at the four hundred ton price. He claims that this will help him to average and his loss will not be so great." (Plaintiff's Exh. 52).

(1–21) A letter dated August 11, 1950, from Iravani to Valensi explaining his need for a price averaging among the contracts, allowing him to deliver some of the wool called for by the higher priced contracts before requiring him to complete delivery on the first contracts, contains the following paragraph on page 5:

"The request that we now have is that you please request Mr. Barkey to open the (sic) immediately the letter of credit for the last contract of 400 tons, in it's (sic) full amount for which we shall be very grateful. Please assure him that we will only ship to the extent of the quantities we have on contract with him and not more and will only negotiate documents against his Ls/c where we have not already drawn on him directly. We hope that you will be able to persuade Mr. Barkey to accept all our shipments on the basis of

25% against the first contract of 350 tons
25% " " second two contracts of 300 and 100 tons
and 50% " the last contract of 400 tons

until we have duly completed all of them." (Parentheses supplied). (Plaintiff's Exh. 53).

(1–22) Letter dated August 12, 1950, from Kitching to Barkey, contains the following quotation:

"Iravani has written under date of 11 August, a rather interesting letter to Valensi and I believe that Valensi should let you read it. It is 4½ pages long and covers a lot of ground. I am too tough on him and shouldn't tell him it isn't honest to ship a 70 cents contract when there is still an outstanding contract at 60 cents." (Plaintiff's Exh. 54).

(1–23) Letter dated August 28, 1950, from Valensi to Iravani contained, inter

alia, a list of concessions made by Barkey to alleviate Iravani's financial difficulties. One of these concessions is spoken of thusly:

"* * * we have permitted you to invoice material under the several contracts at 60 cents and 70 cents so that you can average your prices, etc., etc." (Plaintiff's Exh. 55).

(1–24) Letter, dated August 31, 1950, from Valensi to Iravani (marked Plaintiff's Exh. 57) contained a reference to a letter from Barkey dated August 30, 1950, which letter was enclosed with Valensi's letter in the envelope sent to Iravani; Barkey's letter included the following excerpts:

"The time limit for the completion of the first two contracts has expired. The expiration on the 400 ton purchase is the end of October. We shall be looking forward anxiously to advices of shipments and in accordance with the concurrence given to Iravani's request, shipments are to be applied one third to the first contract, one third to the second contract, and one third to the third contract * * *".

"Of course, in respect to the first two contracts, the time limit has expired and we shall for the purpose of facilitating the completion of the sales just mentioned accept shipments beyond the time limit on the first two purchases." (Plaintiff's Exh. 58).

(1–25) Letter dated August 18, 1950, from Valensi to Barkey and countersigned by Barkey, contained the following sentence with reference to colored wools shipped to Barkey by Iravani and held by Barkey for Iravani's account:

"This will confirm my verbal acceptance on their behalf of your offer of 42 cents per pound, clean basis, for these wools, ex warehouse New York, in bond, for September delivery." (Plaintiff's Exh. 74).

(1–26) Radiogram apparently sent August 23, 1950, and received August 24, 1950, from Iravani to Valensi contained the following excerpt:

"Does Barkey Agree Negotiate Balance Documents Lemsterkerk Designer Lindekerk Against Credit Number 82037 At Sixty Cents Being Average Seventy Cents White Forty Two Cents Colored * * *". (Plaintiff's Exh. 73).

(1–27) Radiogram dated August 25, 1950, from Valensi to Iravani contained the following excerpt:

"* * * Barkey Agrees Negotiation Balance Documents Lemsterkerk, Designer, Lindekerk, Under Credit 82037 If After Presentation Draft Documents Encounter Difficulty Have Bank Melli Cable Firstboston For Instructions * * *". (Plaintiff's Exh. 73).

(1–28) Letter dated August 29, 1950, from Valensi to Iravani contained the following paragraph:

"Old Credit: This will confirm cabled advise to you that Barkey agrees to permit you to negotiate the balance of the documents covering shipments per S.S. Lemsterkerk, Designer, and Lindenkerk under credit No. 82037 in the quantities and at prices of 70 cents for white and and (sic) 42 cents for colored wools so as to make an average price of 60 cents per pound, C. & F., New York, clean basis * * *". (Plaintiff's Exh. 73). (Parenthesis supplied.)

The contents of the above quote was confirmed by testimony of Barkey (S.M. p. 768).

(1–29) Invoice dated December 5, 1950, and rendered, according to Iravani, after receipt of the letter of August 29, 1950 (supra fact #1–28) listed as shipped on the S.S. Lemsterkerk-Westerdam 828 bales. The bales were mixed; that is there were bales of white wool, bales of colored wool, and bales of cream wool. (S.M. pp. 49–50). The price listed for the wool was 60 cents per net

lb. clean basis, with no description of colors of wool. (Plaintiff's Exh. 75).

(1-30) Account #2 dated October 29, 1950, from Barkey to Iravani, covering shipments on the S.S. Lemsterkerk-Westerdam credited Iravani with 42 cents per net lb. 'clean basis for the colored wool, 60 cents per net lb. clean basis for the #2 white wool, and 60 cents per net lb. clean basis for white wool. The amount of white wool for which Barkey credited Iravani at the rate of 60 cents per lb. in this shipment was 132,479 net lbs. in the grease. (Plaintiff's Exh. 76).

(1-31) Invoice dated July 6, 1950, rendered by Iravani for 130 bales of white wool shipped by Iravani on the Lemsterkerk-Westerdam weighing 43,637 lbs. net in the grease. (Plaintiff's Exh. 96).

This shipment is included in the 132,479 lbs. referred to in fact #1-30, but should be deducted from that amount because it forms a part of the second cause of action.

(1-32) 132,479 net lbs. of white wool in the shipment
 — 43,637 net lbs. of white wool in the second cause
 of action
 ————————
 88,842 net lbs. of white wool in the grease remaining
 in the first cause of action.

The yield, estimated in the invoice (plaintiff's Exh. 96) to be 50% turned out to be 49.7%. (Plaintiff's Exh. 76).'

Thus

$$
\begin{array}{r}
88842 \\
.497 \\
\hline
621894 \\
799578 \\
355368 \\
\hline
44154.474
\end{array}
$$

or 44,154.5 net clean lbs. at 10 cents per net clean lb. over the price credited; this would equal $4,415.45 for that part of the wool involved in the first cause of action that was shipped on the S.S. Lemsterkerk-Westerdam.

(1-33) Invoice dated December 5, 1950, rendered by Iravani for 184 bales of wool at 60 cents per net lb. clean basis shipped on the S.S. Steel Designer. No description of colors of wool. (Plaintiff's Exh. 77).

(1-34) Account #3D, dated October 31, 1950, rendered by Barkey to Iravani, covering shipment on the S.S. Steel Designer, credits Iravani with 42 cents per net lb. clean basis for colored wool, 60 cents per net lb. clean basis for white wool, and 60 cents per net lb. clean basis for #2 white wool. The white wool, amounted to 16,340 lbs. net in the grease, produced a yield of 50.7% or 8284.4 net clean lbs. (Plaintiff's Exh. 78).

(1-35) An additional 10 cents per net clean lb. over the price credited would equal $828.44 for that part of the wool involved in the first cause of action that was shipped on the S.S. Steel Designer.

(1-36) Invoice dated December 5, 1950, rendered by Iravani for 202 bales of wool at 60 cents per net lb. clean basis shipped on the S.S. Lindekerk-Averdyk. No description of colors of wool. (Plaintiff's Exh. 80).

(1-37) Account #10, dated January 3, 1951, from Barkey to Iravani, covering shipment on the S.S. Lindekerk-Averdyk, credited Iravani with 60 cents per net lb. clean basis for 61 bales of white wool on the contract of December 8, 1949. This wool, amounting to 30,381 lbs. net in the grease produced a yield of 50.9% or 15,463.9 net clean lbs. (Plaintiff's Exh. 81).

(1-38) An additional 10 cents per net clean lb. over the price credited would equal $1546.39 for that part of the wool involved in the first cause of action that was shipped on the S.S. Lindekerk-Averdyk.

(1-39) Invoice dated December 5, 1950 rendered by Iravani to Barkey, for 89 bales of wool at 60 cents per net lb. clean basis shipped on the S.S. Laagkerk-Westerdam. No description of colors of wool. (Plaintiff's Exh. 82).

(1–40) Account #6, dated November 8, 1950, from Barkey to Iravani, covering shipment on the S.S. Laagkerk-Westerdam, credited Iravani with 60 cents per net lb. clean basis for 7 bales of white wool on the contract of December 8, 1950. This wool, amounting to 3170 lbs. net in the grease, produced a yield of 50.21% or 1591.7 net clean lbs. (Plaintiff's Exh. 83).

(1–41) An additional 10 cents per net lb. clean basis over the price credited would equal $159.17 for that part of the wool involved in the first cause of action that was shipped on the S.S. Laagkerk-Westerdam. It is well to note at this point, however, that the correspondence contained in plaintiff's Exh. 73 makes no reference to wool shipment on the S.S. Laagkerk-Westerdam.

(1–42) Draft drawn by Iravani against Barkey account with Bank Melli in Teheran was for amounts based on the 60¢ flat rate regardless of color as per the abovementioned invoices rendered by Iravani on the four shipments including the S.S. Laagkerk-Westerdam. (Plaintiff's Exh. 79). The draft was paid.

### Conclusory Remarks

The defendant asserts in his brief that there was a fatal variance between the allegation in the pleading that the parties verbally agreed to change the purchase price from 60 cents to 70 cents for the wool sent on the four ships referred to above, and the proof of an averaging agreement.

■ This court believes that the proof supports the pleading as to the wool shipped on 3 of the 4 ships, and further that what the defendant feels is a fatal variance is merely an enlargement of evidence based on the pleading. The averaging agreement is not a variance, it is evidence of the claim; and the plaintiff need not plead evidence. It might also be noted that, at least in this Circuit, a variance is seldom fatal unless the complaining party can show both genuine surprise and prejudice.

The defendant's other objections based on this alleged variance are believed to be without merit on the basis of the ruling on the main objection.

■ The defendant correctly points out that the correspondence included in plaintiff's Exh. 73 (see facts #1–26 through 1–28) makes no mention of the shipment on the S.S. Laagkerk-Westerdam, although it is mentioned in the draft (see fact #1–42). Accordingly, this court finds that, as to that shipment, the plaintiff has failed to sustain his burden of proof. While it is difficult to state at what exact point the evidence falls short of sustaining the burden of proof in this case, we believe that it has fallen short as to that shipment.

■ The other defenses raised by the defendant (e. g., lack of consideration and Statute of Frauds) are nullified by actual shipment and receipt of the goods in question and the communications contained in Plaintiff's Exh. 73 when looked at in the light of the whole series of transactions.

Four years after performance of a contract by one party and receipt of the benefits by the other party is a poor time to raise the issue of lack of consideration in an attempt to rescind that agreement. It might even be argued that the communications contained in plaintiff's Exh. 73 constitute a rescission of the contract containing the 60¢ price and the making of a new contract containing all of the same provisions except for a 70¢ price. [See also Moore v. Scott Stamp & Coin Co., Inc., 2 Cir., 178 F.2d 3, and New York Personal Property Law, Book 40, McKinney's Consol.Law, c. 41, § 33(2)].

■ Whatever occurred, the plaintiff did not "hold up" the defendant for the extra 10 cents on the shipment involved in this cause of action; the goods had already been shipped at the time the price was changed. Therefore, such a change in price would not be against public policy as it might be in the case of a "hold-up".

The communications included in Plaintiff's Exh. 73 referred to a rate of 70 cents per lb. applicable against letter of credit #82037 (issued to cover the First

Written Contract), rather than #83287 (issued to cover the Second Written Contract), against which the plaintiff would have had a right to invoice the shipments, since the restrictive clause had been deleted. The only logical reason for this permission was to raise the price to 70 cents per lb. on those indicated shipments and yet to apply the tonnage in them against the First Written Contract.

To indicate its rationale in deciding this cause of action, the court wishes to point out that many of the quotations it has taken from documentary evidence were included for background purposes and that these, together with other documentary evidence, are believed to indicate:

1. that Iravani would have been bankrupted if he had been held to his agreements;

2. that both Iravani and Barkey "sold short" in the sense that they sold goods they had under contract rather than in their possession;

3. that Barkey's position was such that the corporation was better off financially agreeing to pay Iravani more than the original contract price to avoid forcing him out of business, securing a hollow judgment, and being compelled to pay an even higher price on the then current market for wool with which to meet his own contractual obligations. (See testimony on contract prices between Barkey and Bigelow Sanford Carpet Co. [S.M. pp. 613–626]).

4. that, therefore, Barkey did agree to pay 70 cents per net clean lb. for certain white wool shipped pursuant to what amounts to an amendment of the First Written Contract on the steamers Lemsterkerk-Westerdam, Steel Designer and Lindekerk-Averdyk, as indicated above, but in fact only credited or paid Iravani at the rate of 60 cents per net clean lb. for this wool. The change in price represented only one of a number of transactions agreed to at that time.

In view of the above facts and conclusions, as well as the conclusions which this court draws from the fact that Barkey continued to meet the requests of Iravani, (as illustrated above) even though he was not compelled to do so, it is the opinion of this court that the plaintiff has sustained his burden of proof on that part of the first cause of action which concerns the shipments made on the Steamships Lemsterkerk-Westerdam, Steel Designer and Lindekerk-Averdyk, and should have judgment in the amount of 10 cents per lb. for the number of net clean pounds computed above as per facts ##1–32, 1–35 and 1–38, or $6,790.28 unless that amount was included in subsequent agreement of settlement which possibility will be determined in the court's analysis and decision of the settlement causes of action.

Second Cause Of Action

Turning now to the second cause of action, we note that it is composed of two parts or series of shipments; one under an alleged half-and-half arrangement, and the other under a straight delivery in accordance with the Second Written Contract.

These shipments may be broken down further as follows:

(A) Shipments allegedly made pursuant to the Second Written Contract and not claimed to be covered by the alleged half-and-half agreement were those on board the steamships:

1. Steel Apprentice, sailing July 2nd, and arriving September 7, 1950;

2. Steel Designer, sailing June 4, and arriving July 20, 1950;

3. Lemsterkerk-Westerdam, sailing May 21, and arriving July 7, 1950;

4. Lindekerk-Arkeldyk, sailing August 3, and arriving October 6, 1950.

(B) Shipments allegedly made pursuant to a half-and-half agreement were those on board the steamships:

1. Steel Designer, sailing September 20, and arriving November 2, 1950;

2. Steel Artisan, sailing August 24, and arriving October 4, 1950;

3. Lissekerk-Alblassadyk, sailing August 19, and arriving October 21, 1950;

4. Steel Apprentice, sailing November 23, 1950, and arriving January 4, 1951.

The sailing dates are taken from the plaintiff's main brief which differs slightly from the list of steamers (Plaintiff's Exh. 256) introduced for the convenience of the court. The voyages being thus identified, the exact dates are immaterial.

In this cause of action, the plaintiff seeks an additional 10¢ per net clean lb. for white Iranian wool which he alleges was shipped pursuant to the Second Written Contract at 70¢ per lb., and which the defendant asserts was applicable to and paid for in accordance with the First Written Contract at the price paid of 60¢ per lb.

Accordingly, the main fact for the determination of the court is which contract the parties intended these wool shipments to fulfill.

Resuming our earlier method of listing some of the pertinent documentary evidence and conclusions drawn therefrom, we note the following:

(2–1) Radiogram dated April 7, 1950, to Barkey from Kitching began as follows:

"Iravani Interested New Business May June Hundred Tons Washed Two Hundred Greasy White Seventy Five Clean Fifty Black Thirty Eight Fifty Medium Grey Fifty Five Fifty Mixed Forty Five Wire Acceptance Or Counteroffer Stop". (Plaintiff's Exh. 19).

(2–2) Radiogram dated April 8, 1950, from Barkey to Kitching contained the following language:

"100 Tons Washed 200 Tons Greasy White If Can Depend May June Shipment Absolutely Authorize Close Seventy Cents Clean". (Plaintiff's Exh. 20).

(2–3) Radiogram dated April 13, 1950, from Iravani to Valensi opened as follows:

"Yours Nineth Confirming Twohundred Tons Greasy Onehundred Tons Washed Seventy Cents". (Plaintiff's Exh. 23).

(2–4) Second Written Contract, as described in the introductory portion of this opinion. (Plaintiff's Exh. 25).

(2–5) Letter of Credit #83287 dated April 24, 1950, issued for wool purchased through the Second Written Contract with a price of 70¢ per net clean lb. indicated. (Plaintiff's Exh. 61).

(2–6) Letter dated April 10, 1950, from Valensi to Iravani, in discussing possible new business (which ultimately became the Second Written Contract), advised as to a proper profit for Barkey as follows:

"However they certainly are entitled to net a few cents per lb. and that would mean a gross of close to 5¢ per lb." (Plaintiff's Exh. 21).

See also contract prices between Barkey and Bigelow-Sanford Carpet Co. (S.M. pp. 613–626).

(2–7) Letter dated August 30, 1950, from Barkey to Valensi asking that Valensi communicate certain information to Iravani. Valensi forwarded this letter to Iravani together with a letter of his own (Plaintiff's Exh. 57). Barkey's letter contained the following quote:

"You were very kind to let us read several of Mr. Iravani's letters, the contents of which were very carefully noted. From the reading of such letters, we got the impression that Mr. Iravani feels we have benefited in a very large way because of the perpendicular price advance in Wools. This is not the case, however. We are not speculators and our profits in sales that we made to mills against our purchases were only very nominal as they always are when trading in raw materials." (Plaintiff's Exh. 58).

(See also contract prices between Barkey and Bigelow-Sanford Carpet Co., S.M. pp. 613–626).

(2–8) Summary sheet prepared by employee of Bigelow-Sanford Co. indicated a contract with Barkey for Iranian wool. The contract was dated March 14, 1950, was for white Iranian wool shipped aboard the "S.S. Steel Artisan" and the "S.S. Steel Apprentice", and was to be paid for at the rate of 75 cents per net clean lb. (Plaintiff's Exh. 257). Trans-

actions leading to the above contract for 75 cents per net clean lb. of wool purchased from Iravani indicate the reason why Barkey may have been willing to let Iravani ship at 70 cents rather than requiring him to ship at 60 cents. The radiograms leading to this situation are as follows:

(a) Radiogram dated March 7, 1950, from Barkey to Kitching:

"Bigelow Willing Buy Half Quantity Iravani Purchase Seventy Five Cents Clean Shipment March April From Khorramshar Telegraph If Safe Assume Commitment Can We Depend Shipment At Least Such Quantity." (Plaintiff's Exh. 15).

(b) Cable dated March 9, 1950, from Kitching to Barkey:

"Yours Seventh Would only Sell Amount Actually Declared Although Iravani Should Ship At Least Half Of Total Quantity." (Plaintiff's Exh. 16).

(c) Cable dated March 10, 1950, from Barkey to Kitching began as follows:

"Sold Bigelow Fifty Tons Wool Iravani Stop". (Plaintiff's Exh. 17).

Another possible motivating factor in allowing shipment at the higher price was the fact that Barkey knew Iravani had turned down even higher prices offered by others because he wished to complete his obligations to Barkey. (Plaintiff's Exh. 40).

(2–9) Cable dated June 2, 1950, from Kitching to Barkey contained following phrase:

"Iravani Shipping on Designer Instead Leopoldskerk". (Plaintiff's Exh. 65).

(2–10) Cable dated June 12, 1950, from Iravani to Valensi contained the following excerpt:

"To Recover Our Losses Requesting Sell Threehundred Tons At Present Market Price". (Plaintiff's Exh. 66).

(2–11) Cable dated June 12, 1950, from Valensi to Iravani began as follows:

"Unclear Why Iranian Banks State Second Boston Credit Useless When Valid Condition Complete First Contract Which Understand Accomplishing Designer." (Plaintiff's Exh. 67).

(2–12) Letter dated June 15, 1950, from Valensi to Iravani, contained, inter alia, reasons why Barkey at that time would not delete the limiting clause in 2nd letter of credit; and reasons why Valensi cannot undertake to sell more wool while Barkey commitments were still outstanding. (Plaintiff's Exh. 68).

(2–13) Radiogram dated June 15, 1950, from Iravani to Valensi, contained the following:

* * * "But As Losses Unsupportable Arrange Barkey Accept Half All Future Shipments Against Contracts And Half To Sell Our Account Assure Fulfill All Contracts by Fifteenth July" * * * (Plaintiff's Exh. 103).

(2–14) Letter dated June 16, 1950, from Kitching to Barkey contained the following sentences:

"Evidently Iravani wants to make future shipments on a basis of half against contracts and half for own account and these latter to be sold at the going market. His story is that he will, in spite of half for own account, be able to finish the contracts by 15 July." (Plaintiff's Exh. 45).

(2–15) Radiogram dated June 19, 1950, from Barkey to Kitching, and referring to shipments of wool which form a portion of the subject matter of this cause of action, contains the following request:

"Attend Immediately Airmailing Documents Lemsterkerk Designer". (Plaintiff Exh. 46).

(2–16) Radiogram dated June 21, 1950, from Kitching to Barkey, contains the following excerpt:

"Iravani Advises Will Ship Half At Sixty Half Seventy And Will Complete Contracts Within Thirty Days Stop". (Plaintiff's Exh. 47).

(2–17) Letter dated July 1, 1950, from Kitching to Barkey contains the following reference to the shipment referred to in #2–15:

"The expected weight lists together with commercial invoice on the 133 bale lot Steel Designer are not going in this mail." (Plaintiff's Exh. 50).

(2–18) Invoice dated July 6, 1950, for 133 bales of greasy white wool invoiced at 70 cents per net clean lb. shipped on the S.S. Steel Designed. (Plaintiff's Exh. 94).

(2–19) Account #3, dated November 20, 1950, issued by Barkey to Iravani covering 133 bales of white wool shipped on the S.S. Steel Designer, and credited to Iravani at 60 cents per net clean lb. (Plaintiff's Exh. 95). The 133 bales amounted to 62,036 net lbs. in the grease which produced a yield of 46.27% or 28,-704.1 net scoured lbs. which were credited to Iravani at the rate of 10 cents per net clean lb. lower than the invoiced amount. If Iravani's contention is correct that this white wool should have been paid for at the rate of 70 cents per net clean lb., then he should receive $2,-870.41 in recompense for the underpayment.

(2–20) Radiogram dated July 6, 1950, from Barkey to Kitching, includes the following:

"Also Anxiously Awaiting Report Whereabouts B/L Thousandthree Bales Ex Lemsterkerk". (Plaintiff's Exh. 97).

(2–21) Radiogram dated July 12, 1950, from Kitching to Barkey includes the following excerpt:

"Yours Sixth Am Following Shipments * * * Lemsterkerk * * * Iravani Delivering Documents approximately Twentyseven Tons Lemsterkerk Requesting Seventeen Grand Will You Accept." (Plaintiff's Exh. 98).

(2–22) Radiogram dated July 14, 1950, from Barkey to Kitching contained the following excerpts:

"Yours Twelfth * * * Twentyseven Tons Lemsterkerk Answering Monday". (Plaintiff's Exh. 99).

(2–23) Letter dated July 7, 1950, from Valensi to Iravani contains the following excerpts:

"You seem to lose track of the fact that Barkey Importing Company contracted with you for the delivery of these wools back in December of 1949, which is some seven months ago. They as yet, have not received delivery of the wools for which they contracted, with the exception of some 75 tons of off-grade wools received on the SS Steel Artisan. They themselves, resold these wools and have already incurred heavy losses because of their default with the buyers here."

"If you require new credits to assist you in obtaining advances from the banks in Teheran, it is a very simple thing for you to obtain. All you have to do is complete the existing contracts and you have solemnly promised time and time again that these would be completed by June 30th, and now, not later than July 15th, which is only one week away." (Plaintiff's Exh. 72).

(2–24) Letter dated July 19, 1950, from Valensi to Iravani contained the following excerpts:

"We acknowledge with thanks, receipt of your three letters of July 14th and copies of weight lists and invoices on part of the wools shipped per the SS. Lemsterkerk and the SS. Designer. At the same time, we wish to confirm our cablegram of July 18th per enclosed copy."

*"400 Tons*

"We have continued to attempt to secure for you, a new letter of credit to cover the last sale of 400 tons. I now feel that Barkey can be persuaded to open up a credit before all of these contracts are completed, provided that a very substantial portion of the contracts are completed. I calculate that if as indicated, you

effect shipment of 150 tons on the Laagkerk and another 150 tons on the Steel Apprentice, that Barkey will open up the new credit even though some 100 to 150 tons are still due him under the old contracts. This is, however, a very delicate matter. Regardless of the reasons why you desire this new credit, you are certainly not so naive as not to realize that you could very easily utilize immediately the new credit for the wools which were bought under the old contracts and thus be realizing an average of 80¢ per lb., on wools which were transacted at a time when the market levels were at 60¢ and 70¢ per lb. It is for these reasons that no new credit would be opened until the bulk of the old wools were delivered and the documents covering these wools were surrendered. This is even more imperative since your cablegram of the 5th of July, disturbed greatly the faith which the buyers had been reposing in you. And, as we have indicated in our letter to you, faith is the essential part of any business transaction."

*"27 Tons:*

"We understand that it has been your desire to surrender documents covering 27 tons, directly to Mr. Kitching, against payment here of $17,000. Up until yesterday, when we received your invoices covering these 27 tons, we had no idea what this represented. Now that we received the copy of the invoices we were able to explain to Barkey how these $17,000 that you requested were arrived at. It was lack of information which prompted Barkey to counteroffer $15,000, since they did not know anything of the types and colors of these 27 tons. In the event this counteroffer has not already been accepted, we believe that Barkey, with new information on hand, will gladly and promptly advance the original $17,000 requested." (Defendant's Exh. G).

(2–25) Radiogram dated July 20, 1950, from Barkey to Kitching contained the following:

"Thousandthree Bales Lemsterkerk Discharged Examined Together With Randyfound Approximately One-third Shipment Contains Darkcolors". (Plaintiff's Exh. 71).

(2–26) Invoice dated July 25, 1950, rendered by Iravani for 154 bales of white wool @ 70¢ per net clean lb. shipped on the S.S. Steel Apprentice. (Plaintiff's Exh. 84).

(2–27) Radiogram stamped as received August 1, 1950 from Kitching to Barkey contains the following:

"Documents In Hand In Order Thirtytwo Tons White Apprentice Seventy Cents Deliver Ten Grand Each" etc. (Plaintiff's Exh. 85).

(2–28) Radiogram dated August 1, 1950, from Barkey to Kitching contained the following:

"Have Done Needful Thirtytwo Tons White Apprentice Airmail B/L". (Plaintiff's Exh. 86).

(2–29) Invoice dated August 8, 1950, rendered by Iravani for 300 bales of wool (out of a 346 bale shipment) shipped on the S.S. Steel Apprentice of which 34 bales are invoiced at 70 cents per net clean lb. and 266 bales are invoiced at 60 cents per net clean lb. (Plaintiff's Exh. 87).

(2–30) Invoice dated August 8, 1950, was rendered by Iravani for 51 bales white and 38 bales cream greasy wool shipped on the S.S. Steel Apprentice, with the white invoiced at 70 cents per net clean lb. and the cream at 60 cents per net clean lb. (Plaintiff's Exh. 88).

(2–31) Account #4 dated October 16, 1950, rendered by Barkey to Iravani covering wool received on the Steel Apprentice covered the following bales:

 51 bales white
 154 bales white
 34 bales white

Total 239 bales of Iranian white wool amounting to 119,670 net lbs. in the grease which produced a yield of 47.9%

or 57,321.9 net scoured lbs. which were paid for at the rate of 60 cents per net clean lb. The account also credits Iravani with 60 cents per net clean lb. for 304 bales (38 plus 266) of No. 2 white wool. (Plaintiff's Exh. 89).

If Iravani's contention is correct, that the white wool should have been paid for at the rate of 70 cents per net clean lb., then he should receive $5,732.19 in recompense for the underpayment.

(2–32) Radiogram dated August 3, 1950, from Valensi to Iravani and quoted in fact #(1–18) in that portion of this opinion dealing with the first cause of action. (Defendant's Exh. K₁).

(2–33) Letter dated August 4, 1950, from Valensi to Iravani, and quoted in fact #(1–19) in that portion of this opinion dealing with the first cause of action. (Defendant's Exh. K).

(2–34) Radiogram stamped as received August 9, 1950, from Kitching to Barkey contained the following:

"Have Documents Covering Twentytwo Tons White Seventy Cents And Seventysix Tons Cream Sixty Cents All Steel Apprentice Ninety Percent Value Fiftyfour Thousand Deliver Thirtyfive Grand Murad And Confirm." (Plaintiff's Exh. 90).

(2–35) Radiogram dated August 9, 1950, from Barkey to Kitching contained the following:

"Yours Eighth Thirtyfive Grand Murad Have Done Needful Airmail Documents Immediately Stop *Have Not Yet Received Documents Thirty-two Tons Apprentice."*

"What Are Iravani's Intentions Regarding Three Hundred Tons Balances Due Old Contracts". (Plaintiff's Exh. 91).

(2–36) Letter dated August 11, 1950, from Kitching to Barkey contained the excerpt included as #(1–20) in the opinion of this court on the first cause of action, and also the following paragraph:

"Enclosed herewith are two bills lading covering the 35 grand you have just paid Murad. These are going in today's pouch and additional copies will go by international mail on Saturday and these you should have by Wednesday. These are bills of lading numbered 56 and 57 Steel Apprentice. No. 56 covers 300 bales, 34 bales of White and 266 bales of Cream. No. 57 covers 51 bales White and 38 bales Cream. Actually on this bill of Lading 94 bales were shipped but some are coloured, these he did not draw against." (Plaintiff's Exh. 52, also 92).

(2–37) Letter dated August 11, 1950, from Iravani to Valensi contained the following excerpts:

"In our recent discussions with Mr. Kitching concerning our contracts of wool with Barkey, it has been most depressing to us to be told by him such things as, for instance, that it is dishonest on our part to invoice shipments at 70¢ while still having outstanding contracts at 60¢. Or, 'When do you want to complete the first contract? Where is your wool? Why haven't you, etc. In this manner you will spoil your reputation' and general talk of this nature, always running us down.

"My reply has been, 'All you say is quite true. Nevertheless, I feel that we are quite honest in our dealings with you * * *'.

"I, therefore, requested him, for the sake of humanity, not to put us into serious difficulties by forcing us to complete the whole of our 60¢ contract first. This can only be achieved in the present state of affairs, by gradual shipments in combination with the second and the last contract of 400 tons.

* * * "It would be cruel and inconsiderate if you persisted in your aforesaid demands. It would seem that you want your goods no matter if we are obliterated by delivering them to you in the manner you demand * * *.

"Despite all the foregoing difficulties and losses, we have borne them and will continue to bear them with the hope that we will be repaid

for them in the future. But, if Mr. Barkey is not more lenient with us in the present difficult circumstances with the will to help us, as we are only working for him here, we would lose all hope of deriving any benefit from him in the future in recompense for the losses we have so far undergone.

"When signing the last contract, we proposed to Mr. Kitching as a help to us, that our shipments be taken as 25% against the 1st. contract, 25% against the second two contracts and 50% against the last contract of 400 tons, to enable us to get a better average price on the whole. Mr. Kitching fully realized our position and cabled our aforesaid suggestion to Mr. Barkey.

* * * "Now we see from your telegram of the 3rd that Mr. Barkey is insisting that we first ship our first two contracts at 60¢ and 70¢ respectively and then come to the 85¢ contract. From the explanations we have already given to you in this letter, you will appreciate that this is an impossibility and if we were to do a thing like this at this stage it would simply mean going headlong into bankruptcy. As stated we must combine all our shipments against all our contracts in the percentages proposed by us to get a reasonable average price.

"We hope that you will be able to persuade Mr. Barkey to accept all our shipments on the basis of

25% against the first contract of 350 tons
25% against the second two contracts of 300 and 100 tons
and 50% against the last contract of 400 tons until we have duly completed all of them."

(Plaintiff's Exh. 53).

(2–38) Letter dated August 12, 1950, from Kitching to Barkey, contained the following excerpts:

"Enclosed herewith are three bills lading, Nos. 55, 56 and 57 of the Steel Apprentice.

"Iravani has written under date of 11 August, a rather interesting letter to Valensi and I believe that Valensi should let you read it. It is 4½ pages long and covers a lot of ground. I am too tough on him and shouldn't tell him it isn't honest to ship a 70¢ contract when there is still an outstanding contract at 60¢. I have told Iravani all along to take the contracts in order and finish them in the same order they were booked." (Plaintiff's Exh. 54).

(2–39) Radiogram dated August 18, 1950, from Kitching to Barkey, contained in part the following:

"Documents In Hand Twentyseven Tons White Lindekerk Seventy Cents * * *" (Plaintiff's Exh. 101).

(2–40) Invoice dated August 15, 1950, rendered by Iravani covered 101 bales of white wool estimated at 60,767 net lbs. in the grease, invoiced at 70 cents per net clean lb. and shipped aboard the S.S. Lindekerk-Arkeldyk. (Plaintiff's Exh. 102).

(2–41) Account #9 dated December 18, 1950, rendered by Barkey to Iravani covering 110 bales white and 25 bales cream wool shipped on the S.S. Lindekerk-Arkeldyk. The white wool weighed 61,003 net lbs. in the grease, produced an average yield of 43.015% and resulted in 26,240.4 net clean lbs. for which Barkey credited Iravani at 60 cents per net clean lb. (Plaintiff's Exh. 100). If Iravani's contention is correct, that this wool should have been paid for at the rate of 70 cents per net clean lb., then he should receive $2,624.04 as a recompense for the underpayment.

(2–42) Account #9A dated December 30, 1950, rendered by Barkey to Iravani informed him that one bale previously counted as colored wool turned out to be white wool. This bale, shipped aboard the S.S. Lindekerk-Arkeldyk, was given a pro-rata value (per account #9) of $143.-13. Thus, if Iravani was underpaid on that account, he was similarly underpaid

on this one. As Barkey credits him at 60 cents rather than the 70 cents that Iravani claims, if the latter is correct, the added value of the bale would be one-sixth of $143.13, or $23.86 (Plaintiff's Exh. 100A).

(2–43) Radiogram stamped as received August 24, 1950, from Iravani to Valensi included the following quote:

"Shipped Lissekerk Fifty Tons White Quantity Artisan Still Unknown".

This radiogram also contained the excerpt quoted in fact #(1–26) of the opinion of this court in the first cause of action and which the court believes is pertinent here also. (Plaintiff's Exh. 73).

(2–44) Radiogram dated August 25, 1950, from Valensi to Iravani contained the quotation used in our opinion on the first cause of action, fact #(1–27), and pertinent here also. (Plaintiff's Exh. 73).

(2–45) Letter dated August 29, 1950, from Valensi to Iravani containing the quotation used in our opinion in the first cause of action, fact #(1–28) and pertinent here. (Plaintiff's Exh. 73).

(2–46) Invoice dated July 6, 1950, rendered by Iravani for 45 bales of Greasy Meshed wool shipped aboard the SS Lemsterkerk. The estimated net weight in the grease was 15,602 lbs.; the estimated yield was 52% and the invoice price was 60 cents per net clean lb. (Defendant's Exh. E). In pencil at the top of this invoice, Barkey has noted that he paid $17,000 for the 45 bales therein together with the 130 bale lot. [See fact #2–49] (infra).

(2–47) Invoice dated December 5, 1950, referred to in fact #(1–29) in our opinion on the first cause of action and pertinent here. (Plaintiff's Exh. 75).

(2–48) Account #2 dated October 29, 1950, which is referred to in our opinion as fact #(1–30) in the first cause of action and pertinent here. (Plaintiff's Exh. 76).

(2–49) Invoice dated July 6, 1950, referred to in our opinion as fact #(1–31) in the first cause of action and pertinent here also (Plaintiff's Exh. 96). It is

well to note here that this shipment (invoiced at 70 cents per net clean lb.) is specifically deducted from the whole shipment involved in the first cause of action on the ground that it forms a portion of the second cause of action. It amounts to 43,637 net lbs. of white wool in the grease with a yield of 49.7% as per plaintiff's Exh. 76 and fact #(1–32) in the first cause of action. In pencil, at the top of the invoice (Plaintiff's Exhibit 96) Barkey has noted that he paid $17,000 for the 130 bales of wool invoiced thereon together with a 45 bale lot (see fact #2–46 supra).

(2–50) Thus, multiplying the net lbs. of greasy wool (43,637) by the resultant percentage yield of clean wool (49.7%), we arrive at the figure of 21,687.589 or 21,687.6 net clean lbs. which remain as forming a portion of the wool on which an additional 10 cents per net clean lb. is claimed. If Iravani's contention is correct that he should have been paid for this wool at the rate of 70 cents per net clean lb., then he should receive $2,168.76 in recompense for the underpayment.

(2–51) The letter dated August 28, 1950, from Valensi to Iravani was in answer to Iravani's letter of August 11, 1950, to Valensi. In this letter Valensi, in pointing out how Barkey had already helped Iravani, included the following phrases:

\* \* \* "we have permitted you to invoice material under the several contracts at 60¢ and 70¢ so that you can average your prices, etc., etc."

And with reference to Iravani's request for a new credit to be opened under the Fourth Written Contract, Valensi wrote:

"It would be most naive for you to believe that a buyer here would open up in your favor, the letter of credit for 400 tons of wool, permitting you to bill him at 85¢ per pound when you still owe him wools at 60¢ and 70¢ per pound." (Plaintiff's Exh. 55).

(2–52) Letter dated September 8, 1950, from Iravani to Valensi, contained the following excerpts:

"First of all we should like to state that we will complete all our contracts by the end of November 1950, provided Mr. Barkey could see his way to cooperate with us by agreeing to our undermentioned suggestions without alteration. Mr. Barkey writes that we owe him in all about 650 tons or more of wool. In the present situation it will of course be necessary for him to arrange matters in such a way so that he gets his 650 tons of wool quickly and at the same time protects us against heavy losses.

\* \* \* "The present position of our un-negotiated shipments, stocks and purchases at to-day's high prices are as follows:

| | | |
| ---------------------------- | --------- | ----- |
| Shipped per S.S. "Lissekerk" | 25,980 | kilos |
| " " S.S. "Lindekerk" | 12,000 | " |
| " " "Steel Artisan" | [1] 50,100 | " |
| | [1] 88,080 | kilos |
| Ready stocks | 150 | tons |
| Purchases for prompt delivery | 110 | tons |

"If we say that we will ship all these wools towards our contracts, it woul (sic) be untrue, since we would suffer an unbearable loss. Consequently, the only feasible course that we should like to suggest under the present circumstances is:

"That we ship half the quantity of these wools and half of any purchase that we may make hereafter against our outstanding contracts, provided that Mr. Barkey will immediately amends (sic) his letter of credit in our favour for the full value of the last contract of 400 tons. And, the other half to be sold by you or him for us to any mill at the best and highest prices available on a commission basis for your selves (sic). The sale of our half of the wool would be subject to our final cable confirmation regarding the price.

"In concluding this letter, we should again like to express the hope that Mr. Barkey will agree to our suggestions herein. Please do not send us ultimatums. For example, when Mr. Kitching telephoned to New York, he came and gave us a final ultimatum that all the contracts must be shipped by the end of October ⅓ against the first contract, ⅓ against the second and ⅓ against the last." (Plaintiff's Exh. 59).

(2–53) Radiogram dated September 14, 1950, from Iravani to Valensi ended as follows:

\* \* \* "Shipping This Month 250 Tons Half Against Contract Half For Sale At Present Prices In This Manner Hope Complete All Contracts End November". (Plaintiff's Exh. 112).

(2–54) Letter dated September 20, 1950, from Valensi to Iravani contained the following excerpts:

"With reference to the letter of credit Barkey's position on this subject has been stated to you many times. Now according to your last indications you will not be able to ship more than 300 tons by the end of October, and even that quantity seems to be in doubt. There seems to be little point then in issuing at this time a credit for greater quantities than those which you yourself indicate. A credit for $200,000 was originally issued to you in accordance with your agreement and mani-

1. [In the beginning of the quoted portion of this letter, the figures "50,100" and "88,080" appear to be crossed out in pen- cil and the figure "37,500" written in. The parenthetical words are supplied.]

festly for the purpose of enabling you to obtain local financing. Now that you indicate that you desire a change Barkey is willing to go along with you, but desires to stick within the realm of the actual and within the realm of his agreement. We feel that a letter of credit for 300 tons, as proposed to cover 90% of the value of the merchandise based on one-third to be delivered under the first contract, one-third of the quantity to be delivered under the second contract, and one-third of the quantity to be delivered under the third contract, would in this instance provide you with the necessary credits in your immediate requirements.

"*Additional Business.* Your proposal that on all future deliveries one-half be applied against your contracts and one-half be sold by Barkey for your account on a strict commission basis is not practicable for many reasons."

Valensi then went on to give the reasons and also added:

"We have indicated to you in earlier correspondence that the most vital thing at this time is to complete the first two contracts, on which a balance of some 300 tons is due."

"*S.S. Lissekerk* From you cable advices we note that you stated that you had shipped some 50 tons on the S.S. Lissekerk, while in your letter you indicate shipments of only some 26 tons. Will you please explain the difference? * * * Will you also do the same in the S.S. Lindekerk." (Plaintiff's Exh. 64).

(2–55) Radiogram dated September 21, 1950, from Iravani to Valensi answering his remarks re negotiation of letter of credit #82037 for full $114,257 contained the following excerpts:

"Imperative Pay Murad Murgently 25000 Stop Invoices Listed Bank Melli At Sixty Cents Less Freights Total 145325 Dollars Of Which 114257 Payable According Credit * * *.

"Regarding Completion Contracts And Future Shipments Only Possible Way Proposals Our Letter Eight Delay Credit Fourhundred Tons Only Worsening Matters If Agreeable Open This Credit Urgently Stipulating Therein Valid Provided 200000 Cancelled Meanwhile Sell Half Shipments Eighty Tons Lissekerk Lindekerk Artisan And Sixty Tons Designer At Present Prices Will Draw Thirty Days Sight Other Half Will Draw Against Contract". (Plaintiff's Exh. 114).

(2–56) Radiogram, dated September 25, 1950, from Valensi to Iravani discussing the $114,257 amount referred to earlier, ended as follows:

"Impossible Accept You Proposal Eighty Tons Lissekerk (sic) Lindekerk Artisan Because. Barkey Already Declared Steamer Names Fully To His Customers Stop Willing Accept Sixty Tons Designer Half Sell Your Account Prices Prevailing Upon Arrival Steamer Half Accept Under Contracts And All Future Shipments Likewise Provided Arrive At Prompt Satisfactory Solution Twentyfive Grand And Negociation (sic) 114257". (parentheses supplied.) (Plaintiff's Exh. 115).

(2–57) Invoice dated December 3, 1950, rendered by Iravani, for 1099 bales of wool (colors not indicated) shipped on the S.S. Steel Apprentice included the following:

| Bales | Est. Wt. (net clean lbs.) | @ |
|---|---|---|
| 204 | 39,572 | $ .85 |
| 205 | 39,572 | 1.30 |
| 112 | 24,093.5 | .75 |
| 111 | 24,093.5 | 1.20 |
| 74 | 17,819 | .65 |
| 24 | 4,576.5 | .65 |
| 215 | 54,891.5 | .60 |
| 24 | 5,909 | .85 |
| 25 | 5,909 | 1.30 |
| 33 | 9,347 | .75 |
| 33 | 9,347 | 1.20 |
| 10 | 2,851 | .65 |
| 7 | 2,128 | .65 |
| 22 | 5,760 | .60 |

(Plaintiff's Exh. 129).

**740**

(2–58) Invoice, dated December 3, 1950, rendered by Iravani, for 57 bales of wool (colors not designated), shipped on board the SS Steel Designer included: 8 bales, net clean weight estimated at 1798 lbs. @ 75 cents; 7 bales, net clean weight estimated at 1798 lbs. @ $1.20; and 42 bales net clean weight estimated at 9,888 lbs. @ 60 cents. (Plaintiff's Exh. 130).

(2–59) Invoice dated December 3, 1950, rendered by Iravani for 167 bales of wool (colors not designated), of which 112 bales were shipped on the S.S. Lissekerk and 55 bales were shipped on the S.S. Lindekerk as follows:

| Bales | Estimated net clean lbs. | @ |
|---|---|---|
| 52 | 13,446.5 | $ .70 |
| 52 | 13,446.5 | 1.30 |
| 17 | 4,256 | .75 |
| 17 | 4,256 | 1.20 |
| 29 | [2] 6,315.5 | [2] .60 |

(Plaintiff's Exh. 131).

(2–60) Invoice dated December 3, 1950, rendered by Iravani for 147 bales of wool (colors not designated) shipped on the S.S. Steel Artisan, as follows:

| Bales | Estimated net clean lbs. | @ |
|---|---|---|
| 1 | 258 | $ .70 |
| 22 | 6,334 | .75 |
| 21 | 6,334 | 1.20 |
| 103 | 28,873 | .60 |

(Plaintiff's Exh. 132).

(2–61) Invoice dated December 3, 1950, rendered by Iravani for 215 bales of wool (colors not designated) shipped on the S.S. Steel Designer, as follows:

| Bales | Estimated net clean lbs. | @ |
|---|---|---|
| 35 | 9,747 | $ .70 |
| 35 | 9,747 | 1.30 |
| 26 | 6,783 | .75 |
| 25 | 6,783 | 1.20 |
| 54 | 15,399 | .60 |
| 20 | 5,875 | .70 |
| 20 | 5,875 | 1.30 |

(Plaintiff's Exh. 133).

(2–62) Draft dated December 20, 1950, issued by Iravani to cover invoices which are plaintiff's Exhibits 129 through 133 after deducting freight and other charges. The face amount of the draft is $316,010.88. (Plaintiff's Exh. 135). The plaintiff testified that the draft was paid after Mr. Iravani came to this country and the defendant conceded that $200,000 was paid March 14, 1951, and $116.028.88 on March 23, 1951 (S. M. 101). [The discrepancy of $18.00 is not explained.]

(2–63) Corrected Account #11 dated June 15, 1951, rendered by Barkey to Iravani covering 1099 bales of wool shipped on the S.S. Steel Apprentice credited Iravani as follows:

| Bales | Color | Net clean lbs. | @ | Per Contract Dated |
|---|---|---|---|---|
| 111 | white | 23,599 | $ .60 | 12–8–49 |
| 158 | white | 21040 | .60 | 12–8–49 |
| | | 10144 | .70 | 4–17–50 |
| 170 | white | 43377 | .70 | 4–17–50 |
| 70 | cream | 16347 | .75 | 6–30–50 |
| 35 | [3] cream | 9181 | .75 | 6–30–50 |
| 56 } | cream | 38532 | .75 | 6–30–50 |
| 98 } | | | | |
| 130 } | colored | 42789 | .73 | not indicated |
| 28 } | | | | |
| 152 | colored | 39959 | .73 | " " |
| 90 | colored | 24845 | .73 | " " |
| 1 | (short) | | | |

2. Note: These figures were not in the exhibit, but have been computed on a basis

3. See Note 3 on page 741.

(2–64) It is as to the first and third, and a portion of the second items that Iravani seeks an additional 10 cents per net scoured pound. The first item of 111 bales which produced 23,599 net clean lbs., the second item of 158 bales which produced 31,184 net clean lbs. and the third item of 170 bales which produced 43,377 net clean lbs. totals 98,160 net clean lbs. of white wool. If the plaintiff's contentions are correct, he was entitled to have the lower-priced one-half of this poundage (or 49,080) credited to him at 70 cents per net clean lb. According to defendant's Exh. UU, p. 2, the poundage of clean wool covered by these shipments and credited to Iravani at the lower rate of 60 cents per net clean lb. was 44,639 lbs.; at 10 cents per lb. extra this would total $4,463.90.

(2–65) Account #8, dated December 30, 1950, rendered by Barkey to Iravani, covering 272 bales of wool [see invoice summaries in facts ##2–58 and 2–61 supra] shipped aboard SS Steel Designer credited Iravani as follows:

| Bales | Color | Net Clean lbs. | @ | Per Contract Dated |
|---|---|---|---|---|
| 40 | | | | |
| 1 | white | 10,849 | $.60 | 12–8–49 |
| 52 | " | 13,007 | .60 | " " " |
| 76 | | | | |
| 1 | cream | 19,632 | .75 | 6–30–50 |
| 4 | S.A.G. white | [4] 896 | .60 | 12–8–49 |
| 4 | S.A.G. cream | [4] 927 | .75 | 6–30–50 |
| 178 | Total accredited for | | | |
| 94 | Colored remaining in warehouse | | | |
| 272 | Total bales in shipment | | | |

(2–66) Account #5 dated November 30, 1950, rendered by Barkey to Iravani covering 112 bales shipped on the SS Lissekerk-Alblasserdyk credited Iravani as follows:

| Bales | Color | Net Clean lbs. | @ | Per Contract Dated |
|---|---|---|---|---|
| 80 | white | 20,767 | $.60 | 12–8–49 |
| 16 | cream | 4,303 | .75 | 6–30–50 |
| 16 | colored | (in storage for Iravani's account). | | |

(Plaintiff's Exh. 138).

(2–67) Iravani seeks 10 cents per lb. for 17,592½ net clean lbs. of white wool shipped on the S.S. Lissekerk-Alblasserdyk. This weight is made up of portions of the 20,767 net clean lbs. computed as follows:

of a 50% yield of the net greasy pounds, with that result itself then being divided into the total invoice price for the 29 bales in order to arrive at the price per bale.

3. [This shipment allegedly turned out to be fawncolored, and a 10 cent per lb. allowance was given to the buyer by Bar-

Of the total figure of 20,767 lbs., 14,418 lbs. were excluded from the half and half arrangement in order, combined with other shipments (see Fourth Cause of Action), to add up to the 80 tons referred to in the Valensi cable of Septem-

key thereby reducing the credit to Iravani to 65¢ per lb.] (Plaintiff's Exh. 136).

4. A repeat of the test for yield was indicated in these bales with a possible future adjustment as to net clean lbs. (Plaintiff's Exh. 137).

ber 25, 1950, fact #2–56. Thus, as to this full 14,418 lbs. and as to the ½ of the balance of 6,349 lbs. (or 3,174½ lbs.), totalling 17,592½ lbs., the plaintiff seeks an additional 10 cents per lb. If his contentions are correct, Iravani is entitled to $1,759.25 for underpayment on the wool involved in this shipment.

(2–68) Account #7, dated December 30, 1950, rendered by Barkey to Iravani covering 147 bales of wool shipped aboard the S.S. Steel Artisan credited Iravani as follows:

| Bales | Color | Net Clean Lbs. | @ | Per Contract Dated |
|-------|-------|----------------|-----|--------------------|
| 43 | cream | 11,552 | $.75 | 6–30–50 |
| 1 | white | 236 | .60 | 12–8–49 |
| 103 | colored (in storage) | | | |

Plaintiff's Exh. 139).

(2–69) Letter dated November 23, 1950, from Iravani to Valensi includes the following excerpts:

"We are writing to acknowledge with thanks the receipt of your letters dated October 13th, and 8th, 10th, 13th and 16th. November, together with the enclosed accounts rendered by Mr. Barkey. We have just glanced over these accounts and have not had the time yet to go through them thoroughly. Moreover, you had not sent us the complete accounts up to date to enable us to know our exact position. We should like to know what is actually due to us now, in accordance with Mr. Barkey's calculations.

"We have however noted that Mr. Barkey has calculated all our previous shipments at the price of 60¢ although we had drawn on him for them at 70¢ which he paid. We presume that he has placed the difference between the above two prices to the debit of our account with him. You will not doubt appreciate, that under such abnormal circumstances it was quite impossible for us to invoice and to draw on Mr. Barkey at 60¢ for these shipments, the documents of which we handed over to Mr. Kitching here. When Mr. Kitching was here, I discussed this matter with him and he communicated it to Mr. Barkey. It was then agreed that I should draw on them at 70¢. For example, all the drafts drawn by me against the shipments per the 'Steel Apprentice' and the 'Steel Designer', with the exception of the 481 bales on the 'Steel Artisan', were at the price of 70¢ as agreed. We therefore cannot understand why Mr. Barkey has now calculated them at 60¢. This will cause a lot of inconvenience and a mix up, since each shipment has been invoiced and paid for at the agreed price that we had drawn.

"You will recollect that some time previously we sent you the Bank Melli account showing a loss to us on the first two shipments that we had made at 60¢, despite the fact that these wools had been bought when prices here were comparatively cheap. Prices now are over three times that purchase value. Surely, Mr. Barkey should consider our position and not reduce the price to 60¢ for those shipments against which he has already paid us 70¢ * * *.

"Another reason that prompted us to buy wool at current high prices was because we heard in the radio news that the price of wool would still go up and we considered it advisable, therefore, to buy up whatever wool we could lay our hands on at present prices, before they went up further. This fact in itself, places us in considerable risk and danger, if Mr. Barkey does not extend to us his closest cooperation with regard to prices. His insist-

ance that we should complete our contracts at 60¢ and 70¢, while we are paying twice that amount here, would simply mean not only our going out of business, but running headlong into bankruptcy. * * *" "It is quite obvious, that no one now could possibly buy wool at for instance $1.30 per lb. and deliver it at 60¢ or 70¢. It would be good for all concerned if Mr. Barkey would arrange a compromise or an agreement with the mills with which he himself has committments, to cancel the first two contracts with them, owing to circumstances, as already explained, entirely beyond our control * * *.

"We are therefore shipping a total quantity of 300 tons on the 'Steel Apprentice'. We are negotiating the documents for the 125 tons on this steamer through the bank, on the basis of our agreement, half against the last contract and half at present prices for our own account.

"Regarding our shipments per the 'Lissekerk', 'Lindekerk', 'Steel Designer' and 'Steel Artisan', we have handed the relative documents and our drafts on Mr. Barkey to the bank here, half at 70¢ for the white and 75¢ for the cream, and the other half at $1.30 for the white and $1.20 for the cream and 60¢ for the coloured, based on our mutual agreement that all our previous shipments be calculated half at contract prices and half for our account at current prices. Kindly see to it that none of our aforesaid drafts are dishonoured, since it will be very bad for us here if they are." (Plaintiff's Exh. 134).

(2–70) Letter dated November 10, 1950, from Valensi to Iravani enclosing Barkey's accounts numbered 2, 3A, 3D and 4, contained the following:

"We have attempted to control these accounts for accuracy as best as we could. However, it is not possible for us to control each account in its entirety since we lack the necessary documentation here. In par-

ticular we have no way of checking the amounts of freight disbursed for your account since we do not have copies of the bills of lading. In like manner it is not possible for us to check the disbursements made for your account, such as for handling, weighing warehousing, insurance, etc., although we feel that the charges appear reasonable in accordance with our past experience.

"You will also note that the wools received are being charged off to each contract in its chronological order, in other words the wools are being applied first to our contract of December 8, 1949, and when that is exhausted the wools are being applied to the contracts of April 17 and 21, etc. This is done as a matter of expediency and to permit some sort of control on the balances actually due under each contract. The first contract has been calculated according to the modifications agreed upon during my visit to Teheran on the basis of 300 tons of white greasy wools and 40 tons of cream wools. The other contracts stand as written. As a result of your very large shipments of second light wools compared to white wools you will notice that you are already running well into the final contract of June 30 on these wools. You will also notice that in accordance with the principles established above these wools are being credited to you at the contract price of 75¢ per pound". (Defendant's Exh. R).

(2–71) Letter dated January 5, 1951, from Valensi to Iravani, included the following:

"We should also mention that it is our impression that contrary to your understanding Barkey will not accept one-half of these wools under contract and sell the other one-half for your account at current market prices. It is our impression that Barkey will attempt to seek full satisfaction on all contracts with whatever wools you ship, including the

last contract for 400 tons, before he will consider accepting any wools as a consignment for sale for your account at current market prices. This feeling of ours is further strengthened by the fact that Barkey appeared to be very much concerned with the wools ex s.s. Steel Apprentice and the wools to be shipped at the time by the s.s. Steel Artisan on the basis that he was committed under contracts of his own on the basis of his contract with you for 400 tons." (Defendant's Exh. AA).

(2–72) Accountants' statement setting forth the schedule by which Barkey credited the shipments received from Iravani to the various contracts and to excess. This statement, marked defendant's Exh. QQ, is incorporated as if fully set forth herein. It should be noted, however, that this is the method Barkey used, and not necessarily the one he should have used; therefore its effect is limited.

According to this schedule, Barkey applied white wool received against the first contract until it was completed by shipment received on the S.S. Steel Apprentice which arrived January 4, 1951 (see Barkey accounting #11). The cream wool as per the first contract is considered by Barkey to have been completed by shipment received on the S.S. Lemsterkerk-Westerdam on July 17, 1950. (See Barkey accounting #2).

Part of the wool received on the S.S. Steel Apprentice as per above also began Barkey's crediting the wool toward the Second Written Contract which Barkey regarded as completed by shipment received on the S.S. Steel Voyager on July 20, 1951. (See Barkey's Accountings #11–22A).

### Conclusory Remarks

The shipments on the S.S. Steel Apprentice on its voyage commencing July 2, 1950, and ending on September 7, 1950, contained the wool referred to in Iravani's invoices listed herein in facts ##2–26, 2–29 and 2–30, and in Barkey's account #4 (see fact #2–31).

The question of whether this wool should have been paid for at the accounting rate of 60 cents or the invoiced rate of 70 cents per net scoured lb. is resolved in favor of the plaintiff in the opinion of the court, by the communications listed in facts ##2–27, 2–28, 2–34 and 2–35, between Barkey and Kitching referring to shipment of the white wool at 70 cents.

The shipment on the S.S. Steel Designer on its voyage commencing June 4, 1950 and ending July 20, 1950 involves a similar question of the price upon which the parties ultimately agreed; 70 cents as invoiced (see fact #2–18) or 60 cents as per accounting #3 (see fact #2–19).

This shipment, the documents of title to which several of the communications between Barkey and Kitching refer, is not as clearly confirmed at 70 cents as were the shipments on the Apprentice. Absent proof to the contrary, we assume that shipment was made at the old contract price of 60 cents. Accordingly, since this court is of the opinion that the plaintiff has failed to sustain the burden of proof as to the additional 10 cents per net clean lb. of the wool involved in this shipment, we must rule against him on the question of this shipment.

The shipment on the S.S. Lemsterkerk-Westerdam on its voyage commencing May 21, 1950 and ending on July 7, 1950, contained the wool referred to in Iravani's invoice listed herein in fact #2–49 and Barkey's Account #2 listed herein in fact #2–48.

Barkey's request to Kitching for the information as to the location of this shipment [fact #2–15], Kitching's answer informing him of Iravani's request for $17,000 [fact #2–21], Barkey's reply to the request [fact #2–22], his notations of payment of the $17,000 on the two invoices, one for 60 cents and the other for 70 cents per net clean lb. [see facts ##2–39 and 2–46] together with Valensi's letter [see fact #2–45] all point to the fact that Barkey agreed to Iravani's request. At the invoiced prices, Iravani would have a right to ask for the $17,000 since the agreed amount payable against the

documents at invoice prices may be computed as follows:

$13,745.65 (90%@70¢)
3,894.25 (80%@60¢)
————————
$17,639.90

Whereas, if both lots were computed at the 60 cent price as credited by Barkey, the amount to which Iravani would have been entitled would be computed as follows:

$11,781.99 (90%@60¢)
3,894.25 (80%@60¢)
————————
$15,676.24

The figure of $11,781.99 was arrived at as follows: the invoice net greasy poundage with a yield of 50% would produce a figure of $13,091.10 if paid for at the rate of 60 cents per net clean lb.; 90% of this amount produces the above figure used in the computation.

It thus becomes clear that Barkey would not have agreed to pay the $17,000 if he were computing the price of both invoiced amounts at 60 cents per net clean lb., but would agree to do so if he computed the 130 bale lot at 70 cents per net clean lb.

It is therefore the opinion of the court that, as to this shipment, the plaintiff has sustained his burden of proof and would be entitled to the additional 10 cents as demanded.

The shipment on the S.S. Lindekerk-Arkeldyk on its voyage commencing August 3, 1950, and ending on October 6, 1950, contained the wool referred to in Iravani's invoice listed herein in fact #2–40 and in Barkey's accounts listed herein in facts # #2–41 and 2–42.

The weight of the shipment amounted to about 27 tons of greasy wool; and in view of Kitching's cable listed in fact #2–21, it is the opinion of this court that the plaintiff has sustained his burden of proof as to the additional 10 cents per net clean lb. for the wool involved in this shipment.

In conclusion, as to the shipments in this cause of action which were not claimed to be covered by the half-and-half arrangement, the plaintiff has sustained his burden of proof as to three of the four shipments, and according to the computations indicated in facts # #2–31, 2–50, 2–41 and 2–42. Adding these figures we conclude that Barkey underpaid Iravani in the amount of $10,548.85 on these claims.

The second half of the second cause of action concerns itself in part with the existence of a half-and-half arrangement. Although the higher half of the prices claimed under this arrangement are not a part of this cause of action, we will note in passing that it is apparent that, at least in the beginning, Iravani believed Barkey would permit the half-and-half arrangement, and also that Barkey knew he believed it (see facts # #2–13, 2–14, 2–16, 2–37, 2–51, 2–52, 2–53, 2–54, 2–55, 2–56 and 2–71, and all of the invoices referred to in the portion of this opinion dealing with the second half of this cause of action.)

Turning now to the claims in this cause of action involving four shipments pursuant to the alleged half-and-half agreement, three of them may be taken together since the proof offered is as to the three of them rather than as to each individual shipment.

The shipments on the Steel Designer's voyage commencing September 20, 1950, and ending November 2, 1950, the Steel Artisan's voyage commencing August 24, 1950, and ending October 4, 1950, and the Lissekerk-Alblassadyk's voyage commencing August 19, 1950, and ending October 21, 1950, are the subject matter of the action.

The plaintiff's invoices covering these shipments are listed in facts ##2–58, 2–59, 2–60, and 2–61, and the defendant's accounts are listed in facts ##2–65, 2–66 and 2–68.

The shipment on the S.S. Steel Designer was in two lots with two invoices [see facts # #2–58 and 2–61], neither of which listed the colors of the wool

shipped. These two lots are combined in Barkey's account #8 [see fact #2–65] covering 215 bales. In that account, Barkey lists the wools as being part colored, part cream and part white.

The white (24,752 net clean lbs.) is credited to Iravani at the rate of 60 cents per net clean lb., despite the fact that all the bales were invoiced generally at prices of 60 cents, 70 cents, 75 cents, $1.20 and $1.30. Half of the above poundage (or 12,376 lbs.) is claimed by Iravani to have been invoiced at 70 cents per net clean lb. (see infra).

The shipment on the S.S. Steel Artisan is covered by the invoice listed in fact #2–60, and Barkey's account #7 (see fact #2–68).

This 147 bale lot, contained, according to Barkey's account, only 1 bale of white wool; Iravani invoiced a 1 bale item at 70 cents and Barkey credited it at 60 cents per net clean lb. Its yield is given as 236 lbs., half of which it is claimed should have been credited at the rate of 70 cents.

The shipment on the S.S. Lissekerk-Alblassedyk contained 112 bales (see fact #2–59) which, invoiced together with a 55 bale shipment on the S.S. Lindekerk-Arkeldyk, carried invoice prices of 60 cents, 70 cents, 75 cents, $1.20 and $1.30 per net clean lb. This wool is covered by Barkey's Account #5 (see fact #2–66), which lists 80 of the 112 bales as white. This white wool (with a yield of 20,767 net clean lbs.) is credited to Iravani at the rate of 60 cents per net clean lb. Iravani claims that 17,592½ lbs. of it (see computation in fact #2–67) should have been credited at the rate of 70 cents per net clean lb.

The three aforementioned shipments are referred to in a letter from Iravani to Valensi (see fact #2–69) in which Iravani stated that he considered the white wool to have been invoiced half at the 70 cent rate and half at the $1.30 rate. It is the 70 cent half, credited to him by Barkey at the rate of 60 cents which forms the crux of the dispute in this portion of the second cause of action.

Although Iravani's letter refers to the 70 cent price as being based on mutual agreement, and although the draft covering both these shipments and the shipment on the S.S. Steel Apprentice was eventually paid (see fact #2–62), this court finds that the plaintiff has failed to sustain his burden of proof as to that portion of the second cause of action covering these three shipments. This conclusion is based on the facts that his letter is obviously self-serving, and that the draft was not paid until March of 1951, after the settlement agreement had been reached.

The fourth shipment with which this portion of the second cause of action is concerned, is the shipment on the S.S. Steel Apprentice.

This shipment of 1099 bales (see fact #2–57) was invoiced at various prices (i. e., 60 cents, 65 cents, 75 cents, 85 cents, $1.20 and $1.30). Barkey's corrected Account #11 (see facts # #2–63 and 2–64) lists the amount of white wool as yielding 98,160 net clean lbs. and credits 44,639 lbs. of this amount at the rate of 60 cents per net clean lb. Iravani claims that half of the 98,160 (49,080) lbs. should have been credited at 70 cents per net clean lb. and seeks the additional amount for the poundage credited at 60 cents. There is nothing to support plaintiff's claim to the additional amount for the shipment except the payment of the draft (see fact #2–62) and this is insufficient for the reason mentioned previously.

Barkey's crediting at the rate of 60¢ the amounts claimed at 70¢ is proper as closing out Iravani's existing obligations, and was made known to Iravani, if he had had any doubts on that score, by the letter from Valensi quoted in fact #2–70.

Accordingly, this court finds for the defendant on this portion of the second cause of action.

In conclusion as to the entire second cause of action, and in the light of all of the facts listed above, we find for the plaintiff in the amount of $10,548.85 unless it is found that the claims here

involved were disposed of in the alleged final settlement agreement.

### Third Cause of Action

The third cause of action concerns itself with an alleged consignment by Iravani to Barkey of 142 bales of wool which Iravani claims was shipped to Barkey to be sold by him (Barkey) at the then market price and for Iravani's account.

That these bales were shipped by Iravani and sold by Barkey is not denied. The dispute centers around an alleged modification by Barkey, authorized by Valensi, which Barkey claims changed the terms of the original agreement to provide for the market price to be paid Iravani on these bales only if and when he completed his outstanding contracts.

The documentary evidence concerning this shipment is as follows:

(3–1) Radiogram, dated June 15, 1950, from Iravani to Valensi contained the following excerpt:

"Shipped Further 142 Bales Which Owing Heavy Loss First Contract Requesting To Sell Immediately At Present Market Price." (Plaintiff's Exh. 103).

(3–2) Radiogram, stamped as received in Iran on June 20, 1950, from Valensi to Iravani, contained in part the following:

"94 and 142 Bales Consignments Further Sales Your Account Writing Fully." (Plaintiff's Exh. 104).

(3–3) Radiogram, stamped as received June 30, 1950, from Iravani, to Valensi contained, inter alia, these words:

"142 Bales Barkey Accepted To Sell At Present Prices Please Authorize Draw Against Documents."

(Plaintiff's Exh. 105).

(3–4) Radiogram, dated July 6, 1950, from Valensi to Iravani contains the following excerpt:

"142 Bales Barkey Willing Advance Ninethousand Dollars Against Full Set Documents Although Unable Sell At Present." (Plaintiff's Exh. 106).

(3–5) Provisional invoice dated July 6, 1950, rendered by Iravani for 142 bales of wool (colors not designated) shipped on the S.S. Steel Designer, states that the shipment is for the account of Iravani on consignment to Barkey. It estimates the yield at 50% of the 33,702 net greasy lbs. and the price at 90 cents per net clean lb., or $15,165.90 less freight. (Plaintiff's Exh. 107).

(3–6) Barkey Account #3B, dated October 30, 1950, rendered to Iravani for:

| No. of Bales | Color | Net. lbs. in grease | % Yield | At | Total |
|---|---|---|---|---|---|
| 131 | white | 30,448 | 54.5 | $ .85 | $14,104.90 |
| 7 | #2 white | 1,802 | 51.9 | .75 | 701.25 |
| 4 | colored | 945 | 51.9 | .42 | 205.80 |
| 142 | | | | | $15,011.95 |

(Plaintiff's Exh. 108).

(3–7) Letter, dated July 7, 1950, from Valensi to Iravani, was illustrative of the unfriendly relationship then existing between the parties to this action. After enumerating several of the unpleasant details, Valensi then went on to include the following:

"*142 Bales:*

"In view of the foregoing, it is not possible for Barkey to sell these 142 bales for your account as you desire. Nor, would it be possible for him to advance you up to $12,000 on these 142 bales, since from the information we have here plus the information supplied in your cablegram, this

würde represent an advance far in excess of any price which could be currently realized for these wools. However, to accommodate you, Barkey was willing to advance $9,000 which we calculate represents an advance of about 90% on a price basis of 70 cents per lb. C. & F. clean, and which is the same price as our current contracts.

"We might point out that you have never given us the total weights of these 142 bales, and we had to inquire with the Steamship Company, who told us that their manifest showed these 142 bales to gross 34,-171 lbs. It was on that basis we made our calculations." (Plaintiff's Exh. 72).

(3–8) Radiogram, dated July 12, 1950, from Kitching to Barkey, contained the following excerpt:

"Documents Hundredfortytwo Bales In Hand Deliver Nine Grand Murad". (Plaintiff's Exh. 98).

(3–9) Radiogram, dated July 14, 1950, from Barkey to Kitching, commenced as follows:

"Yours Twelfth Nine Grand Murad Doing Needful." (Plaintiff's Exh. 99).

(3–10) Contract (confirmation of purchase) dated August 2, 1950, between Barkey and Alexander Smith & Sons Carpet Co. This contract was for the purchase from Barkey of 131 bales of white wool and 7 bales of #2 white wool weighing approximately 30,000 net clean lbs. at the price of 91 cents per net clean lb. regardless of color. This wool was referred to as having been shipped on the S.S. Steel Designer. (Plaintiff's Exh. 140).

(3–11) Letter, dated September 20, 1950, from Valensi to Iravani contained the following excerpt:

"142 *Bales*. We note your remarks on this subject, and apparently you did not fully understand our advices to you. These 142 bales were delivered by Barkey under his commitments to his customers here.

These 142 bales are not unsold. Barkey simply agreed that when the contracts were completed he would consider these 142 bales as a special consignment, and since he delivered them immediately from the pier to his customers all he could possibly pay you would be the going price on the day of the arrival of the steamer." (Plaintiff's Exh. 64).

(3–12) Testimony of Mr. Julius Lavis of Barkey's office given during the trial on October 29, 1954:

"By Mr. Kunen:

"Q. Did you at any time approve the shipment of 142 bales by Mr. Iravani as a shipment outside of your contracts, and as a special arrangement with Mr. Iravani to give him the price of this merchandise? A. We treated it as a special lot.

"By The Court:

"Q. What do you mean by that, Mr. Lavis? Do you mean that you did agree to accept it on consignment? A. I agreed to take it in as a special lot, not on consignment, but we did not charge him a commission on it. We simply took it in the manner that was explained before, that we were to give him market price as per the market on arrival and provided he completed the contracts.

"By Mr. Kunen:

"Q. You were to give him market value at the arrival of the steamer, and you just added 'provided he completed his contracts'? A. Correct.

"Q. Now I am reading from Question 3028:

" 'Q. Mr. Lavis, at Question 295 of the last examination, I asked you a question with regard to Exhibit 73, which was a provisional invoice for 142 bales of wool "which lot—" '

"Mr. Kunen: Mr. Kresel, will you concede that is Exhibit 107 here?

"Mr. Kresel: Whatever you say I will take.

"Q. (continuing) 'That Mr. Iravani billed at 90 cents, and in Exhibit 72 you figured a price of 85 cents for 135 bales and 75 cents for 7 bales of second white. Do you recall that question? A. Yes.

" 'Q. And you gave him credit, I believe, at those prices, 85 cents for the white and 75 cents for the second white. A. That is right.

" 'Q. Where did you get those prices from? A. Those prices were gotten as being the fair market value on the arrival of the merchandise. We agreed to consider this shipment as a special lot, at the request of Mr. Iravani.

" 'Q. Was that done through Mr. Valensi? A. Through Mr. Valensi, yes. It was arranged through Mr. Valensi, that we were going to give him—we were going to purchase these wools at fair market value at that time.

" 'Q. At the time of the arrival of the steamer? A. Yes.

" 'Q. And the 85 cents for white and 75 cents for second white represents your giving him the fair market value of this merchandise at the time of the arrival of this steamer? A. That is right.'

"Now, you gave those answers, did you not?" (S.M. pp. 953–955)

"By Mr. Kunen:

"Q. Now, Mr. Lavis, this steamer covering this merchandise, the Steel Designer, arrived here on July 20, 1950, did it not? A. If that is what the record shows. I don't remember that.

"Mr. Kresel: Are you talking about the 142 bales?

"Mr. Kunen: I am still talking about the 142 bales. Well, do you concede that, Mr. Kresel, or do I have to have the witness—

"Mr. Kresel: No, you don't have to do anything that is not necessary. Is that the invoice that you have there? A. Yes, the Steel Designer came in on July 20, 1950. It is conceded, your Honor, 142 bales come in on the Steel Designer July 20, 1950.

"Q. And isn't it a fact that very shortly thereafter, and on August 2, 1950, this contract to sell this wool which is covered by this Exhibit 110, was made by you with Alexander Smith, to cover the identical wool at 91 cents a pound for the white and 91 cents a pound for the cream?

"Mr. Kresel: That has been conceded, your Honor, by Mr. Barkey, that we sold that wool to Alexander Smith. Now it is necessary to go into it again? And if you want it, we sold it immediately.

"The Court: I don't want to interrupt his examination. He may have some purpose for it.

"Q. Isn't it a fact that this sale represented the market at 91 cents? A. At the time of the sale, yes.

"Q. And is it your testimony today that the reason you did not give Mr. Iravani 91 cents on this sale was that the market was lower than 91 cents on July 20? Is that your explanation? A. I don't know what the market was on July 20.

"Q. Isn't it a fact, Mr. Lavis, that in this Exhibit 8, your account covering this steamer, that what you were really doing was giving Mr. Iravani credit for the price under the fourth contract? A. Not at all. Probably they coincide with the price on the fourth contract, but that was not the intent.

"Q. But they do coincide with the price on the contract? A. They do, because they happen to be 85 and 75." (S.M. pp. 957–958).

(3–13) Letter, dated September 26, 1950, from Valensi to Iravani contained the following paragraph:

*"142 Bales*

"We have written you many times and at great length on this subject, and all we can do is repeat ourselves once again in the hope that we can make it clear to you the actual position of these 142 bales. These 142 bales were delivered by Barkey immediately upon the arrival of the steamer under the contracts which

he holds with his customers on the wools purchased from you. These 142 bales were not the subject of a separate sale, and no longer exist in fact. As a matter of generosity Barkey indicated his willingness to you to consider these 142 bales as a separate consignment, and upon completion of your contracts with him to permit you to obtain for these 142 bales the price existing for the wool at the time of the arrival of the steamer. We hope this matter is now understood thoroughly." (Defendant's Exh. S).

(3–14) Letter, dated November 10, 1950 from Valensi to Iravani, contained the following paragraph:

"*142 Bale Consignment.* Barkey Importing Co. also desired to render us an accounting on the 142 bale consignment at prices approximately 85¢ for white wool and 75¢ for cream wools and 42¢ for colored wools. We refused on your behalf to accept the accounting. We contended that since Barkey had held that these wools would be considered a consignment only upon completion of the contracts that we desired that the wools continue to be treated in that manner. Actually it would be our opinion that you would be far better off on this point to have this consignment of 142 bales delivered as wool under contract since any wool that you would have to replace it today can be sold at $1.10 and $1.20, which is appreciably more than the existing market price of 85¢ at the time of the arrival of this consignment in New York. We trust you will concur in our action on your behalf." (Defendant's Exh. R).

(3–15) Letter dated March 14, 1951 from Valensi to Iravani as follows:

"Herewith please, find our commission statement covering 142 bales of carpet wool shipped to Barkey Importing Company Inc. per s.s. Steel Designer, arrival July 1950, together with account sale #3 B of Barkey Importing Company.

"If you will recall we had written you at an earlier date advising you that we had refused to accept this accounting back in October on the basis that it was to be rendered only after completion of deliveries by you under our contracts with Barkey Importing Company. We now are given to understand that you have arrived at a final settlement with Barkey Importing Company, in which is included this accounting. We, therefore, render it to you as is." (Defendant's Exh. T).

(3–16) A chart prepared by the defendant's own accountants indicates that Barkey received 25 tons of greasy white wool in excess of the requirement of the four primary contracts. (Defendant's Exh. QQ).

(3–17) If the plaintiff's contention is correct, and he is entitled to recover the then market value on the 142 bales, the best evidence of the proper amount for the 138 white and second white bales is the contract between Barkey and Alexander Smith and Sons, Inc. or 91¢ per net clean lb. (Plaintiff's Exh. 140).

Excluding the colored wool, we would figure that the plaintiff was underpaid in the amounts of 6¢ for 16,594 lbs. and 16¢ for 935 lbs. Computing these amounts, the result would be that the defendant undercredited the plaintiff in the amount of $1,145.24 for the 138 bales of white and second white wool.

### Conclusory Remarks

Barkey contends that Iravani was not entitled to the market value unless and until he had completed all of his contractual obligations. The defendant further contends that any claim the plaintiff may have had with respect to these bales was wiped out by the subsequent settlement agreement.

Strangely, Iravani's version is aided by the testimony of Mr. Lavis [see fact #(3–12)] and Barkey's version is aided by letters written by Mr. Valensi [see facts #(3–11)–(3–13) and (3–14)]. It is the opinion of the court, however, that the written communications sent at the time by the plaintiff's agent are of great-

er value in determining this matter than is Mr. Lavis' testimony some time later, after the entire case reached its more complex stage.

Accordingly, we conclude that whatever Iravani's original understanding may have been with respect to these 138 bales, the ultimate agreement between Valensi and Barkey (and Valensi, as agent, could bind his principal) was that the 142 bales would be credited at the then market price only after completion of the contracts.

Furthermore the letter quoted in fact #(3–15) points to the disposition of the claim by settlement.

Inasmuch as the defendant's own computations indicate that they received 25 tons of greasy white wool more than were required under the terms of the first four contracts (see fact #3–16), and inasmuch as the entire 142 bales, according to the defendant's own account weighed considerably less than 25 tons (see fact #3–6), it is apparent that the plaintiff was entitled to have the shipment treated separately as agreed, and credited to him at the then fair market price.

Accordingly, this court finds that, unless the entire matter was disposed of by settlement (which contingency will be covered in the discussion of the settlement agreement), the plaintiff is entitled to judgment for $1,145.24 on this cause of action (see fact #3–17).

### Fourth Cause of Action

The fourth cause of action concerns itself with the half and half agreement referred to in our analysis of the second cause of action. That such an arrangement existed is admitted in Barkey's answer to paragraph 13 of the plaintiff's complaint as well as certain of the testimony on trial and other evidence, much of which will be listed (note particularly the testimony of Barkey at S.M. pp. 737–738).

The main questions are to what extent the agreement existed, what shipment or shipments it covered, how long it existed, and whether it was disposed of by settlement.

Returning to our method of itemizing the evidence, we proceed with the following facts;

(4–1) Plaintiff's amended complaint contained the following paragraphs:

"Twelfth: That in or about September and October, of 1950, plaintiff and defendant verbally mutually agreed that one-half of the white and cream Iranian carpet wool thereafter received by the defendant from plaintiff, with the exception of 80 tons thereof, was to be sold by defendant for the plaintiff's account at the market price prevailing at the time of the arrival of the steamers upon which the said goods were shipped and to be shipped.

"Thirteenth: That plaintiff, in pursuance of said agreement and in reliance thereon, shipped to the defendant, and the defendant received from the plaintiff, the following wool, which defendant so undertook and agreed to sell for plaintiff's account as aforesaid:

| | Name of Steamer | Arrival Date New-York | Quantity |
|---|---|---|---|
| Item 1. | Lissekerk-Alblasserdyk | 10/21/50 | 3174 ½ lbs. scoured white 2151 ½ lbs. scoured cream |
| Item 2. | Steel Artisan | 10/4/50 | 118 lbs. scoured white 5776 lbs. scoured cream |
| Item 3. | Steel Designer | 11/2/50 | 12376 lbs. scoured white 10279 ½ lbs. scoured cream |
| Item 4. | Steel Apprentice | 1/4/51 | 49080 lbs. scoured white 32030 lbs. scoured cream |

"Fourteenth: That all of said wool was sold by the defendant, but that defendant failed and refused to make payment therefor to plaintiff at the market prices prevailing at the time of the arrival of said steamers, as it was required to do under said agreement, but only paid plaintiff a part thereof as hereinafter set forth.

"Fifteenth: That at the time of the arrival of the wool referred to in paragraph Thirteenth hereof, the market prices of the aforesaid wool exceeded the amount which the defendant credited and paid to the plaintiff therefor as follows:

| | Column 1<br>Steamer Arrival Market Price per Scoured lb. | Column 2<br>Amount per Scoured lb. paid by Defendant to Plaintiff | Balance due computed at Difference between Columns 1 and 2 | |
|---|---|---|---|---|
| Item 1 | $1.30 | $.60 | $2,222.15 | (3174 ½ lbs. scoured white at $.70 per lb.) |
| | 1.20 | .75 | 968.18 | (2151 ½ lbs. scoured cream at $.45 per lb.) |
| Item 2 | 1.259 | .60 | 77.76 | (118 lbs. scoured white at $.659 per lb.) |
| | 1.159 | .75 | 2,362.38 | (5776 lbs. scoured cream at $.409 per lb.) |
| Item 3 | 1.30 | .60 | 8,663.20 | (12376 lbs. scoured white at $.70 per lb.) |
| | 1.20 | .75 | 4,625.78 | (10279 ½ lbs. scoured cream at $.45 per lb.) |
| Item 4 | 1.75 | .70 | 51,534.00 | (49,080 lbs. scoured white at $1.05 per lb.) |
| | 1.55 | .65 | 8,262.90 | (9181 lbs. scoured cream at $.90 per lb.) |
| | 1.55 | .75 | 18,279.20 | (22849 lbs. scoured cream at $.80 per lb.) |
| | | Total | $96,995.55" | |

(4-2) Defendant's answer contained the following paragraphs:

"10. The defendant denies the allegations contained in paragraph 'Twelfth' of the amended complaint, except that the defendant admits that it agreed to sell one-half of certain shipments of Iranian carpet wool belonging to the plaintiff which then were past due under the aforesaid written contracts of December 9, 1949 (as modified as alleged in paragraph 'Third' of the amended complaint) and of April 17, 1950, and under a certain other written contract entered into in New York City between the plaintiff and the defendant on or about April 21, 1950, under which the plaintiff agreed to sell to the defendant 100 tons of wool, each ton of 2240 lbs. net, at 60¢ (United States currency) net per lb., clean basis, to be shipped to the Port of New York not later than June 30, 1950, partial shipments permitted, for plaintiff's account at marketprices prevailing at the time of arrival, and the other half to be allocated to the said contracts and to be paid for by defendant at the contract price thereof; and defendant begs leave to refer to

the said written contract of April 21, 1950, for all and singular the terms and provisions thereof.

"11. The defendant denies the allegations contained in paragraph 'Thirteenth' of the amended complaint, except that it admits that the plaintiff sold and delivered to the defendant the quantities, but not all of the kinds, of wool referred to therein.

"12. The defendant denies the allegations contained in paragraph 'Fourteenth' of the amended complaint, except that it admits that the said wool was sold by the defendant and that the defendant made payment to the plaintiff and the plaintiff received from the defendant the full price therefor, although not the market prices prevailing at the time of the arrival of the said steamers.

"13. The defendant denies the allegations contained in paragraph 'Fifteenth' of the amended complaint, except that, as to column 1, it admits that the market price was $1.30 as stated in item 3 thereof, and except that as to column 2, it admits the items thereof, with the exception of the two items of 70¢ and 65¢ referred to therein under item 4, which the defendant denies; and except that the defendant admits only so much of the column entitled 'Balance due computed at difference between Columns 1 and 2' as refers to the quantities of wool and the description thereof, except, however, that the defendant denies that the 9,181 lbs. appearing under item 4 consisted of scoured cream wool."

(4–3) That portion of the radiogram (Plaintiff's Exh. 103) heretofore quoted in fact #2–13 is incorporated herein at this point.

(4–4) That portion of the letter (Plaintiff's Exh. #59) heretofore quoted in fact #2–52 is incorporated herein at this point.

(4–5) That portion of the radiogram (Plaintiff's Exh. 112) quoted heretofore in fact #2–53 is incorporated herein at this point.

(4–6) That paragraph entitled "Additional Business" in the letter (Plaintiff's Exh. 64) heretofore quoted in fact #2–54 is incorporated herein at this point.

(4–7) That portion of the radiogram (Plaintiff's Exh. 114) heretofore quoted in fact #2–55 is incorporated herein at this point.

(4–8) That portion of the radiogram (Plaintiff's Exh. 115) heretofore quoted in fact #2–56 is incorporated herein at this point. In addition, that radiogram also contained three propositions proposed by Barkey, the third of which was as follows:

"Willing Pay Immediately Twentyfive Grand But Negociation (sic) 114257 To Be Postponed Until Barkeys Return From Europe Stop Willing Open New Credit 400 Tons As You Suggest Immediately After Negotiation Documents Representing 114257". (Parenthesis supplied).

(4–9) Radiogram dated September 28, 1950, from Iravani to Valensi contained the following qualified acceptance of Barkey's offer:

"Third Proposition Practicable Subject You Can Arrange Credit Four Hundred Otherwise Telegraph Credit Urgently Tomorrow Stipulating Subject Negotiation 114257". (Plaintiff's Exh. 116).

(4–10) Radiogram dated September 29, 1950, from Valensi to Iravani contained the following excerpt:

"Cabling Your Proposition Barkey Europe Will Reply Monday". (Plaintiff's Exh. 117).

(4–11) Radiogram and letter both dated September 29, 1950, from Barkey Company to Jack Barkey.

The radiogram contained in part the following:

"Iravani Cabled Randy Should Pay Murad Twentyfive Grand Will Delay

Negociation (sic) 114000 Until Your Return But Insists Open Credit Fourhundred Tons Now Instead Of After Your Return As We Proposed Subject Of Course Cancellation Credit 200,000 Stop We Intend Complying Iravanis Request Monday Stop Will Make Sure He Will Not Negociate (sic) Unused Documents Against New Credit By Stipulating Bladings Dates Must Show Earliest September First Latest October Thirtyfirst Stop Desire Your Concurrence". (Parenthesis supplied).

The letter began with the following paragraph:

"We have just cabled you regarding Iravanis reply to Randy. The sum and substance is that he accepted our proposition with the exception that he wants the 400 ton credit to be opened now instead of after your return as we had proposed. We believe we should comply with his request making sure that the new credit will be used for new shipments only as outlined in our cable. Since no action can be taken before Monday we thought advisable to ask for your concurrence in the meantime."

(Plaintiff's Exh. 118).

(4-12) Radiogram stamped as received October 2, 1950, from Jack Barkey to the Barkey Company began as follows:

"Yours Twentyninth Agreeable Pay Murad Twentyfive Grand New Credit To Be Opened Only After Melli Bank Confirms Cancellation Last Credit." (Plaintiff's Exh. 119).

(4-13) Radiogram dated October 2, 1950, from Valensi to Iravani contained the following excerpt:

"Barkey Remitting Today Fifteengrand Murad Accordance Your Telephone Conversation Me Stop Also Prepared Remit Additional Tengrand Upon Receipt Your Proper Instructions Stop Barkey Willing Open New Credit 90% Provided You Cancel Credit 200000 First Stop For Own Reasons Embarrassing Barkey Open Conditional Credit As You Suggest Stop I Personally Assure You Barkey Prepared Open New Credit Promptly Upon Receipt Cancellation Notice". (Plaintiff's Exh. 120).

(4-14) Letter dated October 3, 1950, from Valensi to Iravani, contains the following paragraphs:

"Your proposals, as contained in your cablegram of September 28, have been accepted by Barkey in principle. About the only item on which I could not come to an immediate decision with Barkey was the subject of the letter of credit covering the 400 tons. Barkey is willing and prepared to open a new credit in your favor to represent 90% of the value of the 400 ton contract. However, for reasons of their own they do not wish to send you a revocable or conditional letter of credit, such as you suggest when you request that the new credit be valid only upon your surrender for cancellation of the letter of credit for $200,000."
* * *

"Barkey is willing to remit the $25,000.00 which you requested and to which they agreed by cable. However, since you indicated to me in telephone conversation that you desired only $15,000.00 to be paid to Murad I instructed Barkey to pay out $15,000.00 now and to await your new instructions on the balance of $10,000.00. I did this in the event there had been a change in your plans on this subject." (Plaintiff's Exh. 121).

(4-15) Radiogram dated October 5, 1950, from Iravani to Valensi reads as follows:

"Cancellation 200000 Impossible Because Fixed Rate Stop Credit Four Hundred Tons Urgently Needed Delaying Further Will Only Cause Harm Both Interests Stop Counting On Barkeys Immediate Action Leaving Tomorrow For Kermanshah To Receive Wool Contracted Stop Hun-

dred Tons Shipping First Direct Steamer." (Plaintiff's Exh. 122).

(4–16) Radiogram dated October 5, 1950, from Barkey Company to Jack Barkey contained the following:

"Iravani Cabled Cancellation 200000 Impossible Stop We Suggest Amend Existing Credit Increasing Amount To 322000 Permitting Ninety Percent Drawing Bladings Date Earliest September First Telegraph Concurrence". (Plaintiff's Exh. 123).

(4–17) Letter of Credit #85076 dated August 18, 1950, for the use of Iravani in an amount not to exceed $200,000 for 56% of the invoice cost of 200 metric tons of greasy white Iranian carpet wool based on 50% yield at 85 cents per net pound clean basis; and 200 metric tons of greasy cream Iranian carpet wool based on 50% yield at 75 cents per net pound clean basis.

This letter of credit required ocean bills of lading dated on or before October 31, 1950. (Plaintiff's Exh. 128).

(4–18) Notice of amendment dated October 6, 1950, to letter of credit #85076 changed that letter of credit to read:

"100 metric tons greasy white Iranian carpet wool. 342,400 lbs. greasy cream Iranian carpet wool".

The draft to be presented by Iravani was to cover 90% C. & F. invoice cost. The amendment further provided that bills of lading submitted pursuant to it must be dated not earlier than September 1, 1950, and not later than October 31, 1950. (Plaintiff's Exh. 128A).

(4–19) Letter of credit #33054, dated October 6, 1950, for the use of Iravani in the amount of $117,600, to cover invoice costs of 100 metric greasy tons of white Iranian carpet wool based on 50% yield at 85 cents per net pound clean basis; and 98,520 pounds of greasy cream Iranian carpet wool based on 50% yield at 75 cents per net pound clean basis, all C. & F. New York.

The invoices were required to show a 10% deduction and be accompanied by ocean bills of lading dated not earlier than September 1, 1950, and not later than October 31, 1950. (Plaintiff's Exh. 127).

(4–20) Letter dated October 9, 1950, from Valensi to Iravani, contained the following excerpts:

"We are pleased to inform you that Barkey finally consented to make available to you through letters of credit drawings up to 90% of the value of the 400 tons of wool currently under contract with you. We assume that you have received advice of these credits through your own banks in Teheran. We believe that you will find the manner in which the credits have been made available to be reasonably clear.

"We would call your attention simply to the fact that these letters of credit are available for documents whose bills of lading are dated the earliest September 1. This provision was inserted in the letters of credit in accordance with our exchange of cablegrams, and which was made clear that documents representing earlier shipments would not be negotiated under these letters of credit.

"It is also understood that you will continue to hold the documents representing the $114,000 odd, which you presented for payment under letter of credit #82037 until Mr. Jacques Barkey returns from Europe, which will be towards the latter part of the month." (Plaintiff's Exh. 126).

(4–21) Summary of invoice (Plaintiff's Exh. 129), dated December 3, 1950, for 1099 bales shipped aboard the SS Steel Apprentice, heretofore made by this court in fact #2–57, is incorporated herein at this point.

(4–22) Summary of invoice (Plaintiff's Exh. 130) dated December 3, 1950, for 57 bales shipped aboard the SS Steel Designer, heretofore made by this court in fact #2–58, is incorporated herein at this point.

(4–23) Summary of invoice (Plaintiff's Exh. 131) dated December 3, 1950,

for 167 bales shipped aboard the SS Lissekerk and the SS Lindekerk, heretofore made by this court in fact #2–59, is incorporated herein at this point.

(4–24) Summary of invoice (Plaintiff's Exh. 132) dated December 3, 1950, for 147 bales shipped aboard the SS Steel Artisan, heretofore made by this court in fact #2–60, is incorporated herein at this point.

(4–25) Summary of invoice (Plaintiff's Exh. 133) dated December 3, 1950, for 215 bales shipped aboard the SS Steel Designer, heretofore made by this court in fact #2–61, is incorporated herein at this point.

(4–26) Summary of draft (Plaintiff's Exh. 135) dated December 20, 1950, heretofore made by this court in fact #2–62, is incorporated herein at this point together with the additional factual matter contained in that paragraph.

(4–27) Summary of corrected Account #11 (Plaintiff's Exh. 136) covering 1099 bales shipped aboard the SS Steel Apprentice, heretofore made by this court in fact #2–63, is incorporated herein at this point.

(4–28) Summary of account #8 (Plaintiff's Exh. 137) covering 272 bales shipped aboard the SS Steel Designer (see invoice summaries in facts ##2–58 and 2–61), heretofore made by this court in fact #2–65, is incorporated herein at this point.

(4–29) Summary of account #5 (Plaintiff's Exh. 138) covering 112 bales shipped aboard the SS Lissekerk-Alblasserdyk, heretofore made by this court in fact #2–66, is incorporated herein at this point.

(4–30) Summary of account #7 (Plaintiff's Exh. 139) covering 147 bales aboard the SS Steel Artisan, heretofore made by this court in fact #2–68, is incorporated herein at this point.

(4–31) The last three paragraphs of the excerpts quoted from the letter of the 2nd of November 1950, (Plaintiff's Exh. 134) contained in fact #2–69, heretofore made by this court, are incorporated herein at this point.

(4–32) Letter dated November 24, 1950, from Valensi to Iravani, contained the following paragraphs:

"*Murad* It is our understanding that Barkey is attending to the payment of $30,000 today to Murad. Since yesterday was our Thanksgiving holiday it was not possible to attend to these matters earlier. This payment is made frankly in view of the very high balances and equity which you now have here in New York with Barkey and in spite of his statements to us made earlier that he would not make any further remittances. This payment, is of course on account of the 175 tons to be shipped per S.S. Steel Apprentice or first available steamer. Since you have indicated that you desire to handle these 175 tons on a cash rather than a letter of credit basis we believe that upon advice of shipment and deposit of the corresponding shipping documents Barkey will advance on a cash basis up to 90% of the value.

"Consignments. We believe that Barkey has made it quite clear in his cablegram that he will not consider any additional business, including consignment business, with us until he has cleaned the slate concerning all the old accounts and has arrived at a satisfactory settlement of all undelivered merchandise and uncompleted contracts. When this is accomplished, we believe that new business will be possible and on a consignment basis. However, from all indications that we have they would not be willing to advance more than some 60% of the value of the merchandise at present market prices. It is also our impression that future business will have to be confined for the time being to a consignment basis. This is due in great part to the uncertainty of the buyers and mills concerning current market conditions and their feeling that prices are extended beyond normalcy. We make these remarks so you can

give the subject some thought prior to your arrival here.

"It is not possible for us to give you any more concrete idea than that which we have already given you in previous letters concerning what is Barkey's idea of what is fair and what is generous. The settlement will be strictly a matter of personal negotiation. However, it is our continued feeling that some compromise which would permit you to divest yourself of the unfinished portions of these contracts against an indemnification to Barkey and to start business afresh should be better for you than attempting to execute these contracts in their entirety. Certainly your losses should be less in that manner, and you should have the opportunity to benefit in full of the current market with whatever wools you have on hand.

"In addition, we cannot lose sight of the fact that you are relatively in a very vulnerable position regarding Barkey should you not complete these contracts or should you not arrive at a satisfactory settlement with them since they are holding on hand very considerable equities of yours. All of the foregoing reasons have been instrumental in our urging you to fly here as early as possible for your benefit and for your protection." (Plaintiff's Exh. 157).

(4–33) Contract, dated January 12, 1951, between Barkey and Bigelow Sanford Carpet Co., for 52 tons of washed white wool with an estimated yield of 80% to be paid for at the rate of $1.75 per net clean pound. (Plaintiff's Exh. 177).

(4–34) The list of ships which carried the wool involved in these transactions together with Barkey's account number and the departure and arrival dates of these ships as indicated in plaintiff's Exh. 256 is incorporated as if fully set forth herein.

(4–35) Letter dated June 4, 1954, from Bigelow Sanford to Barkey concluded with the following sentence:

"Also, the usual differential in price between Iranian white and Iranian cream wools is 25%–30%."

The letter was signed by a J. P. Bentz, as Assistant Wool Purchasing Agent. (Defendant's Exh. CC).

(4–36) Donald Higley, identified as wool buyer for the Bigelow Sanford Carpet Company (S. M. p. 596), testified that the J. P. Bentz referred to in the previous enumerated fact was his (Higley's) Assistant (S. M. p. 628). He testified in his redirect examination as follows: (S. M. pp. 629–630).

"Redirect Examination By Mr. Kunen:

"Q. Mr. Higley, you have listed here a price of white. Now what is the difference in prices with respect to cream, which is second white? A. You mean percentagewise?

"Q. No, pricewise. For instance, October 10, 1950 you have an awassi white, $1.21. If awassi white is $1.21 what would an awassi white or cream be? A. I would say the proper relationship there would be about $1.10—$1.21 you said? A. $1.21. A. About $1.05.

"Q. A difference of 16 cents? A. Roughly that.

"Q. Can you tell us the differential on these other items, between white and cream; or if you say that 16 cents is the difference between white and cream of those dates, I will accept that. I want to find out what the difference is because we have cream wool involved here.

"Mr. Kresel: He has a letter on that very subject.

"Mr. Kunen: I am asking the witness.

"Mr. Kresel: He has not had a chance to read it. A. It is set up at 25 to 30 percent.

"Q. Do you agree with that? A. Let us take the present market, and the relationship more or less holds; at the present time white wool is worth 92 cents, speaking of delivered prices. Now second white or the

foreign, as we have to use it, which is comparable to your cream is worth at the present time about 75 or 76 cents. You get 16 cents from 92. It is about 18—

"Q. Eighteen percent difference? A. Yes, or 20 percent."

(4–37) Letter dated May 26, 1954, from Alexander Smith, Inc. to Barkey concluded with the following sentence:

"Your so-called creamy type Iranian wools approximate a Fawn color, therefore, I would value same at approximately 30% less than the whites."

This letter was signed by Joseph A. Tully as Director, Fiber Purchasing. (Defendant's Exh. NN).

(4–38) Joseph A. Tully, the signer of the letter previously referred to, testified from the witness stand as follows:

"Q. My question was, what is the differential between a white wool and a second white wool? A. Well, if it is a good second white wool I would say about ten per cent.

"Q. And a second white wool is generally what is known as creamy, is that right? A. Not necessarily, no.

"Q. What is the distinction between a second white and a cream? A. Well, a second white is just an off white. They have so many descriptions of yellow, some say pale yellow, deep yellow, and so on, and so if you have a creamy yellow, a creamy yellow may of course, be approaching a brown, a deep cream color.

"Q. Well, you made contracts for the purchase of wool with the Barkey Company? A. We have.

"Q. And on those contracts you had a variation between white and cream? A. That is right.

"Q. Now, for instance, here on June 6, 1950, you made a contract to purchase 90 tons of white and ten per cent of second white. You paid 80 cents for the white and 70 cents for the second white, or the cream, is

that correct? A. You mean if that is the contract there?

"2. Well, you look at that contract 1196. A. You mean that is Barkey's 1196. I have to get my corresponding number. You would not have my number on there, would you? What date was that?

"Q. June 6, 1950. A. June 6. Maybe that will help me. Sixth—contract 63?

"Q. 1196. A. That is not my number.

"The Court: What is the date of it, and what does it call for?

"Mr. Kunen: It is 100 tons of white wool dated June 6, 1950.

"The Witness: I don't seem to have that one.

"Q. Mr. Tully, I show you your testimony on the examination before trial where you produced the contract. Will you look at my statement there, and see if that helps you. A. Yes, I see it here. It is Barkey's number 1196, my number 4502, 100 tons of Middle East wool, 90 per cent white and 10 percent second white at 80 cents, clean basis for the white and 70 for the number 2.

"Q. And the number 2, you had a differential there— A. Of ten cents.

"Q. Ten cents? A. Ten cents against that 80-cent top, and that is about 12½ per cent.

"Q. And on the 16th day of March, 1951, Barkey's contract No. 5677, you made a contract for 100 tons of white and 30 tons cream, which, according to your price, was $1.90 for the white and $1.65 for the cream? A. That is correct.

"Q. Or light gray; and the differential there is about 13 per cent, is it not? A. It is 25 cents differential, which would be about the same differential, I guess.

"Q. About 13 per cent. A. About the same, I guess." (S. M. pp. 926–928).

(4–39) Market quotation summary sheet, Defendant's Exh. PP, composed by the defendant's accountants from the Bigelow Sanford and Alexander Smith written quotations with cream quotations figured at 25% less than white is incorporated at this point as if fully set forth herein.

(4–40) Barkey's schedule of its application of wools received to the four formal contracts (Defendant's Exh. QQ) is incorporated at this point as if fully set forth herein.

(4–41) The defendant's Exh. SS containing a comparison of amounts on accounts ##1–11 inclusive, on the bases indicated therein, is incorporated at this point as if fully set forth herein.

(4–42) Excerpt from letter dated October 1, 1954, written by Saul Gordon, Esq., one of defendant's counsel, to Iravani, in answer to a question as to the market prices of Iranian white wool on October 4, 1950, November 2, 1950 and January 4, 1951:

* * * "our best information is as follows: 'October 4, 1950, whites, $1.1575, cream $.87 November 2, whites, $1.24 and clean cream $.97 January 4, 1951, whites $1.56 clean cream $1.17.' " (S. M. p. 670).

(4–43) Testimony by Iravani on cross examination included the following excerpt as to the half-and-half agreement:

"Q. You said a little while ago that it stopped, terminated, ended with the arrival of the Apprentice? A. After my invoicing it was terminated.

"Q. After what? A. After invoicing, my invoices on the basis of half-and-half, it was terminated.

"Q. Now, I think I have it. What you mean is that after the 4th of January, 1951, when the Artisan [5] arrived, you do not claim that you had any other shipments under the arrangement of half-and-half. Is that your statement? A. Yes, sir." (S. M. p. 421).

(4–44) Contracts dated November 29, 1950, between Barkey and Bigelow Sanford Carpet Co., list Iranian white wool at $1.45 per net clean lb. (Purchase order #50654) and Iranian cream wool at $1.35 per net clean lb. (Purchase order #50655). (Plaintiff's Exh. 257).

(4–45) The summary of contracts made between Barkey and the Bigelow Sanford Carpet Co. showed a fairly steady rise in the price of wool during the winter of 1950–1951. (Plaintiff's Exh. 257).

(4–46) The plaintiff's computations under the half-and-half agreement indicate that as to 10,279½ lbs. of cream wool shipped aboard the Steel Designer, and as to 32,030 lbs. of cream wool shipped aboard the Steel Apprentice, the defendant overpaid him at the rate of 5 cents per lb. by paying 75 cents per lb. for clean wool for which Iravani only claims 70 cents per lb. (Defendant's Exh. U, and Plaintiff's Exhibits 136 and 137).

### Conclusory Remarks

Examining the contentions of the parties in the light of these facts we conclude that on September 28, 1950, the alleged half-and-half agreement came into existence between the parties to this action. (See facts ##4–8 and 4–9).

At that time Barkey became bound to accept on this new basis sixty tons shipped aboard the S.S. Steel Designer, and at the same time to grant the same treatment to future shipments if the parties were able to "arrive at prompt satisfactory solution twenty-five grand and negotiation 114257". This latter had reference to Iravani's radiogram (Plaintiff's Exh. 114) which showed his calculations on the amount owed him by Barkey. (See reference contained in fact #4–7).

Quoted excerpts from communications between the parties and their representatives (facts 4–9 through 4–20) establish that both the $25,000 payment to Murad and the negotiation of the $114,257 sum met with the requisite satisfactory solution by early October. The negotiation

5. It is apparent from the facts already established that Mr. Kresel meant the Steel Apprentice and that the plaintiff so understood the question.

of these documents was withheld at that time, and Barkey issued a new letter of credit for $117,600 and amended a prior letter of credit (see facts ##4–17 through 4–19).

In view of the above, Iravani claims that the shipments thus placed under this agreement were those whose invoices are referred to above in facts ##4–20 through 4–25, and for which Barkey's accounts are referred to in facts ##4–27 through 4–30.

This agreement specifically excepted from its coverage 80 tons already shipped aboard the Lissekerk, Lindekerk and Artisan.

 The main issue is the meaning of the words "future shipments". Iravani apparently regards this as applicable to goods already shipped, but whose arrival was to follow the date of the agreement, or goods whose shipping documents had not already been negotiated. Barkey contends that "future shipments" meant goods which had not been shipped. Since, in the opinion of this court, the apparent meaning of the phrase is that which Barkey claims was the meaning intended by the parties, the burden is on the plaintiff to prove otherwise, and this court, is of the opinion that the plaintiff has not sustained this burden.

Thus, although he claims the benefit of this agreement for the wool shipped on the Lissekerk-Alblasserdyk which sailed August 19, 1950, and for the wool shipped on the Steel Artisan, which sailed August 24, 1950 (see fact #4–34), this court does. not believe that he has proved this claim.

Iravani testified that the half-and-half agreement came to an end after the arrival of the shipment arriving on January 4, 1951. (see fact #4–42).

The only shipments which were shipped and arrived within the time limits set out were the wools shipped aboard the Steel Designer and the Steel Apprentice.

Assuming for the moment that the subsequent settlement of this claim were not in issue, we look to the amount due Iravani on these shipments under the agreement and the amount paid or credited by Barkey.

As to the shipment aboard the Steel Designer, Iravani's invoices (see facts ##4–22 and 4–25) indicate a total shipment of 272 bales of white, cream and colored wool. Barkey's account (see fact #4–28) indicates that 97 of these bales were white wool, and that the yield of these 97 bales was 24,752 net clean lbs.

Of this amount, 12,376 lbs. should have been applied against the contracts and an equal amount should have been credited at the market price for white wool.

Eighty-one of the bales in this shipment were cream wool (see fact #4–28). Their yield was 20,559 net clean lbs.

Of this amount, 10,279½ lbs. should have been applied against contracts, and an equal amount should have been credited at the then market price.

Barkey credited all of the white at 60 cents per net clean lb. and all of the cream at 75 cents per net clean lb.

This shipment arrived November 2, 1950 at which time the market price for white wool admittedly was $1.30 per net clean lb. (see fact #4–2). Thus, the plaintiff was underpaid 70 cents per net lb. for 12,376 lbs., or $8,663.20 for the white wool shipped aboard the Steel Designer.

Turning to the market price of cream wool on November 2, 1950, it is the opinion of this court that, preferable to averaging all of the voluminous and various opinions as to the difference between the value of white wool and cream wool, we will utilize the relative contract prices set out in the contracts in evidence closest to the date of November 2, 1950. Those contracts are the ones between Barkey and Bigelow Sanford referred to in fact #4–44 and they list the white wool at $1.45 per net clean lb. and the cream at $1.35 per net clean lb.

Although the rise in price on November 29, 1950 from that agreed to with respect to white wool on November 2, 1950 is notable, it is unlikely that the percentage difference between white and

cream wools varied to any great extent in that period.

Accordingly, since cream wool was 7% less than white wool on November 29, 1950, we will use that same percentage difference with respect to the market value of cream wool on November 2, 1950. Thus, as the market value for white wool was $1.30 per net clean lb. on November 2, 1950, the market value for cream wool on that date will be regarded as $1.21 per net clean lb.

Since Barkey paid for this wool at the rate of 75 cents per net clean lb. we find that Iravani was underpaid for this part of the cream wool by 46 cents per lb. or $4,728.57.

Turning now to the 1099 bale shipment which arrived aboard the Steel Apprentice on January 4, 1951, (see facts # #4–21, 4–27, and 4–34) we note that, of this amount 439 bales of white wool with a yield of 98,160 net clean lbs. were paid for by Barkey at the rate of:

 60 cents per net pound for 23,599
 60 cents per net pound for 21,040
 70 cents per net pound for 10,144
 70 cents per net pound for 43,377.

Of this amount, 49,080 lbs. should have been applied against the old contracts and an equal amount should have been credited at the then market price.

Defendant's Exh. QQ indicates that, at the time of the arrival of the Steel Apprentice on the voyage in issue, Iravani still owed what amounted in scoured pounds to 44,639 lbs. on his first contract (see fact #4–40). This we believe to be the fact. Thus the amount of wool credited at 60 cents by Barkey was correct.

However, in view of the half-and-half agreement only 4,441 net clean lbs. should have been credited at the rate of 70 cents per lb. and 49,080 lbs. should have been credited at the market price for white wool.

As to that market price, the plaintiff asserts and the defendant denies that the market price of the white wool at the time of its arrival was $1.75 (see facts # #4–1 and 4–2).

The contract between Barkey and Bigelow Sanford Carpet Co. dated January 12, 1951 (see fact #4–33) made just 8 days after the arrival of the shipment, provided for a price of $1.75 per net clean lb. and is the best evidence of the market price on that date.

The market quotation summary sheet offered by the defendant (see fact #4–39) and the summary of contracts by Barkey offered by the plaintiff (see fact #4–45) indicate that the market had been rising steadily and continued to do so after the date of this Barkey Bigelow contract of January 12, 1951.

On November 29, 1950, the contract price for white wool was $1.45, on January 12, 1951, it was $1.75, and on February 23, 1951, it was $1.90 per net clean lb. (see fact #4–45). Thus, since the price went up 45 cents in 86 days, a good average figure would be 2 cents a day. And since the shipment in question arrived 8 days before the January 12, 1951 contract, the market price of white wool for that day will be taken as 16 cents less, or $1.59 per net clean lb.

Since this wool was paid for at the rate of only 70 cents per lb. there was an underpayment of 89 cents per lb., or $43,681.20 for the white wool.

Turning next to the cream wool in the shipment, Barkey's account indicates that there were 259 bales of cream wool which yielded 64,060 net clean lbs., but that 9,181 lbs. of that amount turned out to be "fawn-colored" rather than cream and Barkey therefore had to lower its price, 10 cents per lb. for that wool (see fact #4–27).

Of the 64,060 lbs. the defendant credited Iravani at the rate of 75 cents per lb. for 54,879 lbs. and 65 cents (75 cents less ten cents for fawn color) for 9181 lbs.

Since Barkey treated the fawn colored wool as cream in applying it as well as the cream against the contract of June 30, 1950, and then reduced the credit by

10 cents per lb., the amount he allowed to his buyer, we will treat it similarly.

Thus, out of 64,060 lbs., 32,030 lbs. should have been credited against the contract, and an equal amount paid for at the market price as of the day of arrival.

Using the same method of reaching a percentage reduction of price for cream wool as we used in reaching the market value for the cream wool shipped aboard the Steel Designer, we note that the Barkey-Sanford contracts ##51027 and 51029, each dated January 12, 1951, fix the price of white wool at $1.75 and of cream at $1.55 or about 11½% less than the then market price for white wool.

Since we have determined that the then market price for white wool was $1.59 per net clean lb., we now set the market price for cream wool as of that date at 18 cents (11½%) less or $1.41 per lb.

Thus as to 32,030 lbs. of cream wool (including 27,439½ of true cream color wool and 4,590½ lbs. of fawn color wool at 10 cents less), the defendant underpaid the plaintiff in the amount of 66 cents per lb., for a total underpayment of $21,139.80.

Adding these underpayments, we find that the defendant failed to credit the plaintiff with the market price of goods to the extent that the underpayment equalled:

$ 8,663.20 for white wool on the Designer
4,728.57 for cream wool on the Designer
43,681.20 for white " " " Apprentice
21,139.80 for cream wool on the Apprentice

Total $78,212.77

We note, however, that Iravani's computations indicate an overpayment of 5 cents per lb. as to 42,309½ lbs. (see fact #4–46). This would equal $2,115.48 overpaid.

We note further that the defendant is entitled to a 2% commission on the total market price of the wool which should have been credited at the market price. Thus 2% of:

$ 16,088.80 for white wool shipped on the Designer
12,438.20 " cream " " " " "
78,037.20 " white " " " " Apprentice
44,703.25 " cream and fawn wool shipped on the Apprentice

Totals $151,267.45, the total market price of all the wool that should have been sold at market price, amounts to $3,025.35.

The $2,115.48 overpayment and the $3,025.35 commission deducted from the $78,212.77 leaves a balance of $73,071.94 to which the plaintiff is entitled in this cause of action unless this sum was covered in the subsequent settlement agreement.

### Fifth Cause of Action

The fifth cause of action concerns itself with Barkey's profit from the sale of a 292 bale shipment of wool which arrived in New York aboard the S.S. Steel Artisan in February of 1951 as part of the 395 ton lot which forms the basis for the sixth cause of action.

The plaintiff asserts that this lot was to be sold by the defendant for the plaintiff's account.

The defendant admits that it sold the wool, but denies that it was sold for the plaintiff's account, giving as its reasons for not doing so that the plaintiff did not ship the wool, have title to it, or even possess the shipping documents thereto.

The following facts indicate the documentary and more reliable verbal evi-

dence which serves to support the allegations of the parties:

(5-1) Contract dated November 19, 1950, between Iravani (as purchaser) and Dezfuli (as vendor) for 50 to 60 tons of wool of certain specified characteristics at a certain price per kilo F.O.B. Khorramshahr. The terms of payment were 300,000 rials, cash, and the balance against shipping documents. On the face of the instrument appears a receipt by Dezfuli for a check from Iravani for 300,000 rials. (Plaintiff's Exh. # #142 and 142A).

(5-2) Radiogram dated February 12, 1951, from Iravani, then in New York, to Teheran began as follows:

"Barkey Took Delivery 292 Bales Wool Sherkate Jonoob And Willing Pay Draft 64000 Dollars Drawn On Murad Please Meet Urgently Neissani And If Necessary Others Request Jonoob To Request Irving Bank To Deliver Documents To Barkey Against Payment His Draft". (Plaintiff's Exh. 143).

(5-3) Summary of events dealing with this shipment prepared in February, 1951, by Iravani in the office of Saul Gordon, Esq., in New York, the first five paragraphs of which, are as follows:

"1. Skerkat Jonoob sold to me according to a written contract 54 tons of wool spot in Khorramshahr f. o. b. Khorramshahr, payment a part advance and balance against bill of lading in Teheran showing the goods had been shipped from Khorramshahr to New York, with b/1 to order, as follows:

"2. Skerkat Jonoob shipped the wool from Khorramshahr to New York under the name of Karoon for Sh. Shinker, as shipper, and instead of delivering bills of lading to me, he delivered documents to Bijarchi, Teheran, and the latter Bijarchi drew against documents on Murad (D. S. Murad & Co.) 141 Broadway New York) for the sum of $64,000 odd.

"3. According to the letter shown me by D. S. Murad, New York, Mr. Bijarchi, Teheran, wrote a letter to Murad that this wool belongs to Skerkat Jonoob, and after sale of the wool to credit the account of Skerkat Jonoob for the sale proceeds.

"4. D. S. Murad told me yesterday that he has received a telegram from Skerkat Jonoob to act according to instructions of A. Sahim & Co. because A. Sahim sold the wool at 168¢ to Baroco or to Lees, Amsterdam, N. Y.

"5. For inspection of the goods I had sent my expert to Khorramshahr and all the bales had been marked under the mark of B.I.C. (Barkey Importing Co.)" (Plaintiff's Exh. 144).

(5-4) Telegram dated February 14, 1951, from Iravani to D. S. Murad reading as follows:

"According to contract in my possession dated 29th Aban signed by Dezfuli Manager of Sherkat Jonoob the 292 bales BIC wool ex steamer Artisan have been already sold to me and after shipment of this merchandise I advised Barkey Importing Co. Inc. that this wool is shipped against my contracts with him stop Messrs. Barkey have taken delivery of these 292 bales in accordance with their contract with me stop apparently Sherkat Jonoob instead of delivering documents to me drew draft through Bijarchi on you for some $64,000 and sent letter of Bijarchi dated Jan. 20, 1951 that the above mentioned wool belongs to Sherkat Jonoob stop if you pay the draft you will be blocked without being able to take possession of the merchandise stop copy of this telegram is being sent to Barkey Importing Co., Inc. for their information and guidance stop for your information you must understand that BIC is the mark of Barkey Importing Co. Inc.

M. Shafi Iravani Mottaghi." (Plaintiff's Exh. 145).

(5-5) Pro forma account #12 rendered by Barkey to Iravani in June or

July of 1951 (S.M. p. 128). The first five items of this account cover the shipment of 290 of the 292 bales of wool shipped on the SS Steel Artisan which forms the subject matter of this cause of action. (S.M. p. 128). The appropriate portion reads as follows:

| | | |
|---|---|---|
| 47 Bales White Wool 22120 lbs. net | | |
| Bigelow yield—53.20%—11768 net scoured lbs. @ $1.90 | $22359.20 |
| 111 Bales Cream Wool 43598 lbs. net | | |
| Bigelow yield 55.50% 24197 net scoured lbs. @ $1.60 | 38715.20 |
| 84 Bales Lt. Grey | | |
| 1 " Fawn 32792 lbs. net | | |
| Bigelow yield 52.30% 17150 net scoured lbs. @ $1.40 | 24010.00 |
| 47 Bales Colors 18335 lbs. net | | |
| Bigelow yield 46.50% 8526 net scoured lbs. @ $.90 | 7673.40 |

The account refers to a 5% commission for Barkey. (Plaintiff's Exh. 146).

(5–6) Barkey's final account #12, dated October 29, 1951 eliminates any credit for the 292 bales referred to in fact #(5–5) and refers to a 95% credit to Iravani on the balance. (S.M. p. 129 and Plaintiff's Exh. 147). Although the date of its receipt is set forth, it was first made available to Iravani at the examination before trial. (S.M. pp. 950–951).

(5–7) Document dated November 13, 1952, constituting a warranty of certain facts by one Abbas Bijarchi. It referred to an agreement between Abbas Bijarchi, by the Interseas Trading Co., and Barkey, that Barkey pay a certain sum for the delivery of certain documents. Material portions of the agreement read as follows:

"3. That, under date of December 31, 1950, the Isthmian Steamship Company duly issued, in triplicate, its certain bill of lading No. 67 covering 292 bales ex SS Steel Artisan, some of which bales of wool are marked BIC and the balance of which are marked AAK; that the said bills of lading were duly issued and delivered to Sherkat Shinker, who then were acting as the shippers of said bales of wool for and in behalf of Bijarchi; and that the said Sherkat Shinker heretofore duly endorsed in blank the said bills of lading No. 67, and duly delivered the same to Bijarchi.

"4. That Bijarchi duly purchased 172 of the said bales of wool from one Akbar Zerghery, of Teheran, Iran, in or about the month of November, 1950, and duly paid therefor, and that Bijarchi duly purchased 120 of the said bales of wool from one Mahmoud Simsarilar, of Teheran, Iran, on or about November 23, 1950, and duly paid therefor; that, ever since November, 1950, Bijarchi has been, and still is the sole owner of the said 292 bales of wool; that, ever since December 31, 1950, the date upon which said 292 bales of wool were placed aboard the S.S. Steel Artisan, Bijarchi has been, and still is, the sole owner of the said bills of lading issued in triplicate therefor. * * *

"7. That Mohamed Shafi Iravani, also known as M. Shafi Iravani Mottaghi (hereinafer called "Iravani"), in December 1950, entered into a written agreement with an agent of Bijarchi, to wit: one Sherkat Sahami Djenoub, of Teheran, Iran, wherein and whereby said Iravani agreed to buy the aforesaid 292 bales of wool at the price, and on the terms, provisions and conditions therein set forth; that said Iravani heretofore failed, neglected and refused to pay the said purchase price in full or otherwise to perform the terms, provisions and conditions of the said agreement; and that Bijarchi heretofore duly and lawfully terminated the said agreement.

"8. That the check made by the said Iravani, which is hereinafter referred to in subdivision (1) of paragraph (B) of this instrument, has never been paid.

"(A) In consideration of the payment by Barkey of the sum of $45,000 by its good check, the receipt of which is hereby acknowledged by Bijarchi, and of Barkey's promise to pay to Bijarchi, through the Interseas Trading Company, as hereinafter provided, the further sum of $6,000, Bijarchi does hereby sell, assign, transfer and deliver to Barkey:

"(1) All of the aforesaid bills of lading No. 67, issued in triplicate as aforesaid, covering the said 292 bales of wool;

"(2) All of the said 292 bales of wool;

"(3) Any and all other documents pertaining to said bills of lading and the said 292 bales of wool; and

"(4) Any and all claims of Bijarchi, of every kind, nature and description whatever, against Barkey and all other persons, firms, and corporations (including the officers, agents and employees of any thereof), relating to any and all acts of omission or commission arising out of or in connection with the said bills of lading, the said bales of wool, and/or any or all other documents or instruments relating to any of the foregoing.

"(B) In order further to induce Barkey to make the aforesaid payment of $45,000, and in order to induce Barkey to promise payment of the said further sum of $6,000, as hereinafter provided, Bijarchi hereby covenants and agrees, without further cost or expense to Barkey, promptly to deliver to Barkey, or cause to be delivered to Barkey, the following:

"(1) The certain original check No. 405356, dated January 4, 1951, in the amount of 100,000 Rials, drawn on the Bank of Melli of Teheran, in Iran, by the said Iravani to the order of Sherkat Sahami Djenoub for wool on account No. 27905, together with the original memorandum of the said Bank Melli of Teheran, in Iran, dated January 15, 1951, that states that said check is returned due to the following reason: 'Referred to Drawer'; and

"(2) The original contract entered into between the said Iravani and Sherkat Sahami Djenoub, and which is referred to in paragraph 7 thereof; and

"(3) The certain documents set forth and described in Schedule A hereto annexed, and hereby made a part hereof, duly acknowledged and/or redrawn, executed, verified and acknowledged, all in the manner or form that may hereafter be designated by counsel for Barkey, and which said documents, in their present form, have been initialled by Bijarchi and Barkey." (Plaintiff's Exh. 148, Defendant's Exh. A).

(5-8) A translation of a check and a bank memorandum, the originals of which are defendant's Exh. N-1 and N-2, reads as follows:

"Bank Melli Iran—Head Office
14 Dey 1329 January 4, 1951
The amount of:— One Hundred Thousand Rials
Pay to the order of: Sherkat Sahami Djenoob for wool
 Rials: 100,000/ —
check #405356 Account #27095

Bank Melli Iran
Check #405356 for account #27095 returned due to reasons mentioned below:
 Refer to drawer
Dated Jan. 15, 1951
The Branch: Head Office Cashier"

(Defendant's Exh. N).

(5-9) On direct examination, the plaintiff testified that, as of the date of the contract (see fact 5-1), the official rate of exchange was 32 rials to the U. S. dollar, and the commercial rate was

50 to 52 rials to the dollar. (S.M. pp. 109 and 110).

(5–10) The negotiations between Barkey and Iravani with respect to this shipment took place in New York shortly after the arrival of the S.S. Steel Artisan. A portion of the discussions were held in the office of Saul Gordon, Esq., attorney for Barkey, at which place Mr. Iravani was represented by a Mr. .Macy, a lawyer recommended by Mr. Gordon. (S.M. p. 113).

(5–11) Shortly after February 14, 1951, there was a conference at the office of the Barkey Importing Co. between the parties to this action and representatives of Murad, as to who had title to the goods. Murad asserted Desfouli's title; Barkey's attorney asserted title in Barkey through the contract to which we refer in fact #(5–1). (S.M. pp. 123–126).

(5–12) Iravani testified that although his home office proposed that he settle with Desfouli by paying him $50,000, Barkey advised him not to pay more than $45,000 or $46,000. (S.M. pp. 130–131).

(5–13) Stipulation entered into between counsel at the trial of this action is as follows:

"It is admitted by defendant that on April 22, 1952, plaintiff's attorneys wrote a letter to defendant's counsel, Saul Gordon, Esq., in which (a) the latter was informed that Mr. Iravani was about to make an adjustment with the seller of 292 bales of wool shipped on the S.S. Steel Artisan, settling said seller's claim for $40,000.

"(b) A demand was made on behalf of Mr. Iravani for the proceeds of the sale of the 292 bales. This demand was refused on various grounds stated in Mr. Gordon's reply dated May 7, 1952." (S.M. pp. 140–141).

(5–14) Iravani testified that all the wool referred to in Barkey's Pro forma account #12 (see fact #5–5) was shipped and received on a consignment basis (S. M. p. 185).

(5–15) Iravani's full contract price for Desfouli's wool exceeded 3,000,000 rials, and, as part of the payment in addition to the 300,000 rials paid at the time the contract was made, Iravani gave Desfouli two checks, one for 50,000 rials and the other for 100,000 rials. The 100,000 rials check is the one referred to in fact #(5–8) and was not paid by the bank. The total amount actually paid to Desfouli by Iravani was, therefore, 350,000 rials. (S.M. pp. 360–366).

(5–16) Iravani asked Barkey to take the 292 bales from the steamship company, although he knew he did not personally ship the goods, did not have the shipping documents, and that Barkey would have to give a bank guarantee for the merchandise. (S.M. pp. 366–369).

(5–17) Barkey testified that Iravani said that the 292 bales were to be applied against his contract with Barkey, and that he did not then have the bills of lading, but would have them in a few days. (S.M. p. 746).

(5–18) Iravani never was able to get the shipping documents to deliver to Barkey. (S.M. pp. 359 and 747).

(5–19) Barkey got the shipping documents from the Interseas Trading Company for an agreed price of $61,000 of which $59,000 had been paid at the time of this trial. (S.M. pp. 748–751). At the commercial rate referred to in fact #5–9, this would approach the original 3,000,000 rials price. (See fact #5–15).

(5–20) Barkey first testified that when the shipping documents were purchased from Interseas Trading Company he reversed the credit he had formerly given Iravani for the 292 bales. He later testified that he did not purchase the shipping documents until about one year after the reversal of credit. (S.M. pp. 752 and 781).

(5–21) Barkey testified that the 292 bales made up a part of the 150 tons required to fulfill his commitment to his buyers, and that the entire 150 tons was received by him. He denied that the 292 bales were shipped on consignment for

Iravani's account. (S.M. pp. 762–763 and 771–772).

(5–22) Lavis testified that despite the fact that Iravani failed to produce the shipping documents for the 292 bales during the period from February to June of 1951, the pro forma account referred to in fact (5–5) credited him with the shipment of the 292 bales and that credit remained on the books until the issuance of the final account referred to in fact #(5–6). (S.M. pp. 951–952).

(5–23) Barkey testified on cross-examination that he sold the wool involved herein and kept a 5% "commission" for the company. He denied, however, that the ordinary sense of the word "commission" was meant thereby. (S.M. pp. 781–785).

### Conclusory Remarks

From the above facts, it is clear that the plaintiff contracted to purchase the wool here involved from one Desfouli; the down payment of 300,000 rials was actually made, and another 50,000 rials was paid together with a check for 100,000 rials which was not honored by the bank. Since the total purchase price was in excess of 3,000,000 rials, it is apparent that Iravani actually paid only 11⅔% of it.

Desfouli never gave Iravani the shipping documents, but, in fact, himself shipped the goods (some of which were stamped with Barkey's code letters), sold them to another party, and delivered the shipping documents to one Bijarchi. Bijarchi then drew a large sum of money against these documents from D. S. Murad & Co. stating that the wool belonged to one Sherkat Jonoob. Subsequently, Murad was notified by Sherkat Jonoob to follow the instructions of one A. Sahim & Co. because the latter had sold the wool to certain other parties.

In the meanwhile, Iravani had arrived in New York, had told Barkey he did not have the shipping documents at that time, but assured him that he would get them. It is highly improbable that the Barkey Company would have filed a bank guarantee unless Iravani had indicated that he would get the shipping documents within a reasonable time and also had indicated that he had a clear right to them.

It is the further conclusion of this court that Iravani informed Barkey that there would have to be some negotiations with other parties and further payments before he could get possession of the documents. We believe, however, that Barkey was unaware of the dishonored 100,000 rial check passed by Iravani and was unaware of the serious nature of the title dispute when they took possession of the goods.

It is the opinion of this court that Barkey took possession of the goods on Iravani's claim of title, and at first did assert Iravani's title to the goods as against the Interseas Trading Company.

As such, and if the Barkey Company were acting as Iravani's agent, it ordinarily would have been estopped by basic agency principles from later denying its principal's title and negotiating with Interseas for the documents on its own account and to Iravani's detriment.

However, Iravani's actions were not without blemish in his dealings with Barkey on this matter. In persuading him (Barkey) to have his company take possession of the goods and to assert his (Iravani's) title to the goods whether directly or indirectly, Iravani neglected to inform Barkey of the dishonored 100,000 rial check.

Thus, while it is clear that the Barkey Company was aware of the dispute over title to the goods, and, if the court were to find that it was acting as Iravani's agent in the matter, otherwise would be estopped from asserting title in another, we conclude that Iravani's failure to inform Barkey of the dishonored check amounted to fraud on his part. It is highly improbable that a businessman could pass a bad check for an amount in the neighborhood of $2,000 and be unaware of it. Once having done so, he must have known that Desfouli well might have been justified in revoking the contract. That particular question is not

for this court to decide. It would be a question of Iranian law.

At any event, that situation, which must inevitably have led to a title dispute, should certainly have been revealed to Barkey in the course of Iravani's discussions with Barkey and Gordon.

It is not for this court to speculate on whether or not knowledge of the 100,000 rial check and the very dark cloud on the title would have changed Barkey's mind and prevented him from having his company deposit the bank guarantee with the shipping company and take possession of the goods. It is enough that we conclude that this information might have sufficed, and that Barkey should have been informed of it. Certainly, by taking possession of the goods while lacking legal title to them, Barkey was placed in a very awkward position.

Once it had taken possession of the goods, it had no real alternative but to assert title to the goods through Iravani and attempt to remove the cloud on that title.

For several months, Iravani continued to attempt to get possession of the documents and during all of that time Barkey credited him with the sum due him for that shipment. Iravani never did secure a clear title to the goods. Hence he could never give one to Barkey.

Eventually, late in 1952, Barkey found it necessary to negotiate directly for the purchase of the documents from Interseas. By then it seemed clear that Iravani never would get clear title to the goods, and by purchasing the documents from Interseas, Barkey renounced having title through Iravani.

 In view of all of the above, we conclude that, regardless of the question of agency, the failure of Iravani to reveal all of the pertinent facts to Barkey before Barkey took possession of the goods amounted to fraud on his part. We further conclude that this fraud in inducing Barkey to take possession of the goods without his (Iravani) being able to convey good title to them, and thereby placing Barkey in a position

where they eventually would have to buy the documents, was of such magnitude as to preclude Iravani's recovery on this cause of action. Iravani must look to Desfouli for his recovery of the 350,000 rial payments.

We, therefore, find for the defendant on this cause of action.

## Sixth Cause of Action

The sixth cause of action is founded on an allegation that a certain 395 tons of wool was shipped to Barkey on a consignment basis. This is denied by Barkey who asserts that these shipments were applied against contractual obligations as modified by a settlement agreement reached early in 1951.

Resuming our earlier method of analysis, we note the following facts:

(6–1) Cables between Iravani and Valensi and between Iravani and Barkey comprised plaintiff's Exhibits ##152 through 156. The pertinent excerpts are listed below.

1. Cable of 11/21/50, from Iravani to Valensi:

"* * * For Financial Aid Please Definitely Open 90 Percent New Credit 200 Tons Washed Sixtypercent White Fortypercent Cream Consignment Basis At Prevailing Prices."

2. Cable of 11/22/50, from Valensi to Iravani:

"Yours Twentyfirst Barkey Cabling You Directly".

3. Cable of 11/22/50, from Barkey to Iravani:

"Referring Yours Twentyfirst Valensi Have Discussed Thoroughly Your Requests For Thirty Grand Murad Also Financial Aid Proposed Consignment Two Hundred Tons 90% Credit Prevailing Prices Stop Will Comply Request Murad Stop Out Of Question Consider Financial Aid Requested For Proposed Consignment Until All Pending Accounts Including Unfinished Contracts Are Settled Stop Request You Fly Here Soonest Stop After Settle-

ment Will Consider Possibility Volume Business With You On Mutually Profitable And Practical Basis Stop We Promise Treat You Fairly Generously In Connection With Balance Wool Due After Shipment Hundred Seventyfive Tons Stop Please Reply."

(4) Cable of 11/23/50, from Iravani to Barkey:

"Many Thanks Yours Twentysecond 175 Tons In Course Shipment Kindly Deliver Murad Today Stop Flying Early December Stop My Sincere Desire Work With You In All Faithfulness Long Term Mutually Beneficial Business Relationship Meanwhile Expect Your Protection My Interests And Avoid Causing Me Losses Present Transactions."

(5) Cable of 11/24/50, from Barkey to Iravani:

"Yours Twentythird Delivered Murad Stop Looking Forward With Pleasure Your Arrival Early December Stop Bring All Missing Documents To Permit Complete Clearing Unsettled Transactions".

(6–2) That portion of plaintiff's Exhibit 157, a letter dated November 24, 1950, from Valensi to Iravani and heretofore quoted by the court in fact #(4–32) is incorporated as if fully set forth herein.

(6–3) Cable from Iravani to Valensi dated December 1, 1950, contained the following excerpt:

"Please Exert Persuade Barkey Open New Credit Three Hundred Thousand Before My Departure Which Will Greatly Serve Mutual Interests Because Khosrovshahi Bidding 145 Cents And If (we don't receive finance immediately)[6] Will Lose Large Undelivered Goods Purchased Here Kindly Avoid Delaying Like 400 Tons * * *".

(6–4) Cable from Valensi to Iravani, dated December 5, 1950, relayed the following message from Barkey:

"If You Want Financial Assistance For 200 Tons Willing Advance On Consignments Seventyfive Cents Pound Clean White". (Plaintiff's Exh. 159).

(6–5) Letter dated December 5, 1950, from Valensi to Iravani contained the following paragraphs:

"*Baluchi Wool.* We could not develop any keen interest for this wool at this time. In fact, it is difficult to develop much interest on the part of the buyers for wools that are not spot or afloat. We ourselves did not feel that we could give you a strong recommendation to consign these wools to this market, particularly if you have an active interest from Continental buyers. While Barkey indicated willingness to handle this consignment on the same basis as consignments of carpet wools, it was impossible for us to get any indication of the current value of this wool on this market since we had no prior experience with it and find it even more difficult to forecast what might be its price at the time of its arrival here.

"*Additional Finance.* We had a lengthy discussion once again with Barkey concerning your request for finances up to the extent of $300,000. We assumed that this request was part of the request which you had made earlier concerning 200 tons of wool which you had purchased and which you desired to consign here. As indicated to you in the cable Barkey is not willing to enter into any fresh commitments at current market prices, and even went so far as to indicate to you that he could not recommend that you yourself enter into fresh commitments at present prices. The best he would do was to advance a very modest amount of 75¢ per pound on any wools which you would care to consign. Any satisfactory basis for the financing of current business as well as future

---

**6.** Parenthetical matter was inserted in handwriting on Exhibit. (Plaintiff's Exh. 158A).

business can only be made when you arrive here and conclude a settlement with Barkey on all past business and establish a basis acceptable to them and yourself for future business. Attempting to do this before your departure is not only impossible, but is highly illogical since if this can be done your presence here would not be required." (Plaintiff's Exh. 160).

(6–6) Cable dated December 13, 1950, from Iravani to Valensi, contained the following excerpt:

"Apprentice Not Returned Sailed From Basrah For Newyork Shipping Balance Artisan Others Sold White December January 145 Colored Spot Hundred Cents Cannot Understand Why Barkey Not Selling For Us". (Plaintiff's Exh. 161).

(6–7) Cable dated January 4, 1951, from Iravani to Valensi contained the following excerpt:

"Shipped About 220 Tons Wool Artisan But Seventyfive Tons White Already Sold Through Local Brokers to Khorrovshahi And Haroco Stop Have Ready For Shipment About 250 Tons Most White Stop Mukammal Bidded Here Hundredsixty Cents Perhaps For Mohawk Please Insist Barkey To Sell Our Account At Best January Shipment Reply Urgently." (Plaintiff's Exh. 162).

(6–8) Cable from Barkey to Iravani, dated January 5, 1951, contained the following:

"Valensi Communicated Us Contents Yours Fourth Stop Telegraph Name Steamer Intend Ship 250 Tons Stop Assure You Will Do Utmost Your Behalf Immediately After 250 Tons Are Shipped Stop Meanwhile Telegraph Us Percentages White Cream Colors Of 250 Tons And 145 Tons Shipped Per Artisan Stop Looking Forward Your Arrival Shortly." (Plaintiff's Exh. 163).

(6–9) Letter dated January 5, 1951, from Valensi to Iravani contained the following paragraph:

"250 Tons January Shipment. We submitted your request to Barkey regarding the 250 tons which you desire them to sell for your account for January shipment. Barkey has advised us that they will cable you directly themselves to the effect that they will do the best they can for you as soon as the 250 tons are shipped. This statement appears to us slightly enigmatic, and frankly we do not know what to make of it. Certainly before Barkey would be able to undertake a sale for your account he would have to have some idea of the quantities and the grades of the wools of which you speak. We, therefore, feel that his statements are lacking in that he has not requested more precise information on the subject."

(Defendant's Exh. AA).

In addition to the above quoted paragraph we also incorporate herein the paragraph heretofore quoted in fact #2–71.

(6–10) Cable from Iravani to Barkey, dated January 9, 1951, referring to a total tonnage of 395 tons, contained the following:

"145 Artisan Together With 250 Consisting Eightytwo Tons White Washed Yielding About 80–0/0 118 Tons White Greasy And Slaughtered As Consignment 142 Bales Yielding About 60–0/0 Sixtythree Tons Light Cream Thirtyfive Tons Washed Light Grey Ninetyseven Tons Brown And Black Separately Sorted Must Be Shipped Hundred Tons. Algorab Sailing This Week Will Ship Remainder Direct Steamer Sailing 25th Requesting Deliver Urgently Middleast Care Balens I Tengrand Also Eightygrand To Murad Stop Delivering Lynch Blading Eightyfive Tons Please Telegraph Them Instruction Stop Kindly Arrange Also Open This Week Credit 200000 Dollars Top". (Plaintiff's Exh. 164).

(6–11) Cable from Barkey to Iravani, dated January 10, 1951, contained the following message:

"Yours Ninth Doing Needful Middleeast Stop Cabling Lynch Upon Receipt Reply Will Do Needful Murad Stop Arranging Credit 200000." (Plaintiff's Exh. 165).

(6–12) Cable from Barkey to Iravani, dated January 12, 1951, containing the following:

"Twohundred Thousand Credit Opened Do Utmost Expedite Shipment Twohundred Fifty Tons Stop Again Assure You Our Utmost Cooperation." (Plaintiff's Exh. 166).

(6–13) Letter of credit #33571, dated January 12, 1951, on the Irving Trust Company in the amount of $200,000 was opened by Barkey to be drawn against by Iravani. It required ocean bills of lading and weight lists evidencing shipment of 250 metric tons of carpet wool of the following natures: white washed, white greasy, cream and light grey. The invoices were to be made out C. & F. New York and payment was to be 90% invoice value. The bills of lading had to indicate that the goods were loaded not later than February 15, 1951, and the drafts were to be negotiated not later than March 15, 1951. Partial shipments were permitted. (Plaintiff's Exhibit 167).

(6–14) Radiogram dated January 13, 1951, from Valensi to Iravani, began as follows:

"Barkey States Sold 250 Tons Market However Prices Adnd (sic) Whether Sale For Your Account Left Hundetermined (sic) * * *". (Plaintiff's Exh. 168) (Parentheses supplied).

(6–15) Copy of cable dated March 20, 1951, from Irving Trust Company to Bank Melli in Iran reads as follows:

"Without Our Responsibility Barkey Importingco Requests Us Cable You Informing It Will Honor And Pay Your Drafts On Shafi Iravani For Eightyfive Percent Value Of Wool Shipments Steamers Steelworker Alamak Laurenskerk On Following Basis Onethird Quantity White And Cream Dollars Onepoint-twofive Per Pound Twothirds Dollars One Pointsixty and Colors Dollars One Stop The Goods Are Insured At Newyork By Barkey Stop Barkey Request Airmail Documents Soonest Stop Or Reference 33907." (Plaintiff's Exh. 169).

(6–16) Letter dated May 26, 1950, from Kitching to Barkey, indicated that Barkey was made aware of Iravani's precarious financial position at that time. Note particularly the paragraph entitled "Iravani and Cash" (Plaintiff's Exh. 37). See also the fourth paragraph of the letter dated August 12, 1950, from Kitching to Barkey (Plaintiff's Exh. 54).

(6–17) On October 27, 1954, Barkey testified on cross examination that "we never became commission agents for anybody." (S.M. p. 782). See also the paragraph entitled "Additional Business" on page 2 of the letter dated September 20, 1950, from Valensi to Iravani. (Plaintiff's Exh. 64), and see S.M. p. 771.

(6–18) Barkey's letter heads referred to its business as importers and commission merchants. (Plaintiff's Exhibits 76, 81, 83, 89, 95, 100, etc.).

(6–19) Drafts previously referred to in facts ##1–42 and 2–62 (Plaintiff's Exhibits ##79 and 135); the first draft was for $114,071.31, and the second, $316,010.88. Both were dated December 20, 1950, and both ultimately were paid.

(6–20) Barkey testified on direct examination that, at his first meeting with Iravani, he discussed the then recent presentation of the two drafts mentioned in the preceding fact and indicated that he did not intend to pay them because no such amount was due him (Iravani). (S.M. pp. 754–755). He then testified as follows as to a later conversation:

"A. I told Mr. Iravani that after having examined the records, that my bookkeeper gave me, there would be a very substantial overpayment if we were to pay those two drafts, and I told him that under the arrange-

ment of the half-and-half of September 25th, if continued, there would never be created a sufficiently large credit to be able to take care of those drafts, and I told him, 'I promised you that I was going to help you and going to treat you fairly, and this is what I am going to do for you: I said I would show you sales, all sales, that we have made to our various buyers, we obtained some very good prices; if you will set aside the arrangement of September 25th of the half-and-half from the beginning, I believe we will get you out of trouble by giving you billed values less five percent for us, and the incidental minor expenses that there are of trucking and things of that sort, thereby giving you actually 95 percent of what we would receive from our buyers.'

"I said, 'In this manner you will be getting yourself out of trouble, but this offer is made to you on this condition: the half-and-half arrangement as of the beginning is set aside, we need about 450 tons more of wool in order to complete our contracts, on the Steel Artisan come 145 tons'—

"Q. Did you tell him this? A. Yes. I said, 'We will count from the Steel Artisan, and we will take the 145 tons, and you have already told us that you have ready for shipment about 250 tons more of wool. If you will ship us 150 tons of white wool, why, I will pay you $1.10.'

"Q. A pound? A. A pound. And I said, 'That should put you in wonderful shape when this is completed'.

"Mr. Iravani demanded that we pay him $1.25 instead of $1.10. I told him I can't listen to any more demands, this was my final proposition, and he could take it or leave it.

He finally agreed and thanked me very profusely for my kindness.

"Q. When was this talk? You said it was about ten days after you—A. This talk happened very close to the end of February, around the 20th or 22nd of February, and I remember this date because promptly upon having reached this final agreement, the drafts were paid and the recorded date of the payment of the drafts is in the drafts." (S.M. pp. 756–758).

(6–21) Barkey's Pro forma account #12 referred to in fact #5–5 (supra). In addition to the first 5 items, the balance of the two page exhibit is incorporated as if fully set forth herein. After totalling the amount due to Iravani for the wool, certain charges were deducted therefrom, the first being a 5% commission on the total amount of wool covered by the account. The entire lot had been shipped aboard the S.S. Steel Artisan. (Plaintiff's Exh. 146).

(6–22) Barkey's account #12, dated October 29, 1951, and referred to in fact #5–6 (supra). In addition to this account, the other information in fact #5–6 is incorporated as if fully set forth herein. (Plaintiff's Exh. 147).

(6–23) Barkey's Pro forma accounts ##13, 14, 15 and 16 covering wool shipped on the Alamac/Leerdam, Laurenskerk/Aagtedyk, Steel Worker, and Steel Seafarer, and all providing for a deduction of 5% as Barkey's Commission, are incorporated as if fully set forth herein. (Plaintiff's Exhibits ##266 and 267).

(6–24) Barkey's final accounts ##13 through 19, dated October 29, 1951 are incorporated as if fully set forth herein. There is no mention in these accounts of a 5% commission, but instead the amounts credited to Iravani before deductions are set at 95% of the total value of the shipments. (Plaintiff's Exhibits ##183 through 187). These final accounts were not given to Iravani until an examination before trial. (S.M. p. 970).

(6–25) The following contracts (Purchase orders) dated January 12, 1951, between Barkey and Bigelow Sanford Carpet Co. are summarized as follows:

| Contract | Type | Amount | Price (clean basis) |
|---|---|---|---|
| W51027 | Washed White | 52 tons | $1.75 |
| W51028 | Greasy White Pulled | 75 tons | $1.72 |
| W51029 | Light Cream | 40 tons | $1.55 |
| W51030 | Washed Light Grey | 22 tons | $1.35 |
| W51031 | Brown and Black | 61 tons | $ .80 |

(Plaintiff's Exhibits 177, 181, 178, 179 and 182).

Thus the total tonnage amounts to 250 tons.

(6–26) Summary of Barkey Bigelow contracts prepared by Mr. Higley, Wool Buyer for Bigelow, contained, inter alia, the following information on contracts dated 11/29/50:

| Contract # | Type | Greasy Lbs. | Price Per Net Clean Lb. |
|---|---|---|---|
| 50654 | White | 231,000 | $1.45 |
| 50655 | Cream | 154,000 | $1.35 |

The amounts of wool specified in these contracts were reduced by subsequent agreements, so that as of October 12, 1951, the requirements were 34,102 lbs. of white wool and 49,434 lbs. of cream wool, both poundages greasy. The price per lb. remained unchanged, and the wool was supplied by 97 bales of white wool shipped aboard the Steel Designer arriving on June 5, 1951, 5 bales of white wool shipped aboard the Steel Artisan arriving on February 3, 1951, and 188 bales of cream wool shipped aboard the Steel Seafarer arriving on May 8, 1951. (Plaintiff's Exh. 257).

(6–27) Summary of Barkey-Bigelow contracts prepared by Mr. Higley (Plaintiff's Exh. 257) contained the following information concerning contracts listed in fact #6–25:

A. Contract #51027 was changed in that the amount of wool was reduced from 114,400 lbs. to 74,421 lbs. The 74,000 lbs. was comprised of 193 bales of wool shipped aboard the Artisan and 20 bales shipped aboard the Leerdam. There is further mention of a color adjustment of $842 received from Barkey.

B. Contract #51028 was changed in that the amount of wool was reduced from 165,000 lbs. to 64,321 lbs. The 64,000 lbs. was comprised of 46 bales shipped aboard the Seafarer, 51 bales aboard the Designer and 194 aboard the Exchester.

C. Contract #51029 was satisfied by 297 bales shipped aboard the Artisan. A color adjustment of $7,891.95 was received from Barkey.

D. Contract #51030 was satisfied by 25 bales shipped aboard the Leerdam, 51 bales, aboard the Artisan, and 165 aboard the Worker.

E. Contract #51031 was changed in that the amount of wool was increased from 134,200 lbs. to 184,200. The 178,874 lbs. actually received on this contract were all shipped aboard the Artisan. This change is also indicated by an attachment to the original contract.

(6–28) The prices on the four formal contracts (see remarks preceding the first cause of action) are much lower than those with which Barkey credited Iravani in his accounts ##12 through 16 (see facts 6–22 and 6–24).

(6–29) The list of steamers previously incorporated in fact 4–34 herein, indicates that the Steel Artisan completed the voyage covered by Barkey's Account #12 on February 4, 1951, the voyage of the Alamac Leerdam covered by Account #13, the Laurenskerk Aagtedyk covered by account #14, the Steel Worker covered by Account #15, and the Steel Seafarer covered by Account #16. The shipments listed as following the Artisan voyage mentioned above together with the shipments covered in Accounts 18 through 22B, were those arriving subsequent to the arrival of the Artisan on its above-mentioned voyage. (Plaintiff's Exh. 256).

(6–30) As an indication of the market price on wool as of December 18, 1951, the confirmation of sale by one Leo Hess to an Arthur Philip & Co., Inc. on that date lists the price of 409 bales of Iranian carpet wool at 84 cents per net clean lb. for white and 65 cents per net clean lb. for cream. The seller was to pay a 2% commission. (Iravani was the seller through Hess). (Plaintiff's Exh. 255).

(6–31) On cross-examination, Mr. Lavis testified that the change in wording on the final accounts, eliminating the phrase "5% commission" on the pro forma accounts, and replacing it with a calculation at 95% of the entire sum, was merely a correction of erroneous wording "because we cannot call it exactly commission. It was not really a commission." (S.M. pp. 971–972). It should be noted that while Mr. Iravani had received the pro forma accounts promptly, the final accounts were not revealed to him until after commencement of this action (see fact 6–24).

(6–32) Shortly after Iravani arrived in New York and met Barkey, the latter went to Florida (S.M. pp. 147–148); Iravani testified that, two or three days after Barkey returned from Florida, they discussed the consignment of wool to Barkey by Iravani. Iravani testified that in the course of this discussion, Barkey said that in accordance with Iravani's instructions to him about the 250 tons, he (Barkey) had sold that wool for $1.75 for white, $1.45 or $1.55 for cream, and a price that Iravani considered low for colored wool. (S.M. pp. 163–164).

(6–33) Iravani testified on direct examination that, with regard to the radiogram referred to in fact #6–14, he and Barkey discussed the 250 ton Steel Artisan shipment, and that Barkey said he would apply the 250 tons against the 250 ton contract obligation referred to in fact #6–25. (S.M. pp. 191–192).

Iravani further testified that he told Barkey he had about 400 tons of wool afloat or in stock, and requested him "to sell the balance because the 250 tons which he has sold before was not completed" * * * (S.M. p. 193). (Barkey had sold 130 of the 250 tons to Alexander Smith "at a price of $1.90 for white, and cream $1.60").

(6–34) Iravani testified on direct examination with respect to the radiogram quoted in fact #6–15 that, before it was sent, there was a discussion of the 400 tons referred to in fact #6–33; and also that, in the course of the discussion, Barkey said he sold 130 tons to Alexander Smith and told him the price. (S.M. pp. 165–166).

(6–35) Iravani testified with respect to the sending of the radiogram quoted in fact #6–15 as follows:

"A. Then he asked about 150 tons of wool to deliver against the old contracts as final settlement at $1.25 per pound, which I agreed upon, and after we agreed upon that he sent this cable to—he instructed Irving Trust to send this cable to Bank Melli." (S.M. p. 166).

"Q. You say with respect to this cable there were 400 tons? A. Yes. When I told him that I had 400 tons afloat and in stock in Khorramshahr and I have some shipping documents of some wool on ship, and I remember the names of the boats were Steel Worker and some other boat—

"Q. You see that cable makes it one-third of those shipments at $1.25? A. Yes. (S.M. pp. 166–167).

"Q. Suppose you tell us, was there any conversation as to what the one-third at $1.25 was to cover? A. This one-third was against the final settlement of 150 tons against older contracts at $1.25 per pound.

"Q. And you notice in that cable it says 'two-thirds at $1.60'? A. Yes, sir.

"Q. And there is a mention of the colored, $1. What was that supposed to be? Was there any discussion on that as to what that was to represent? A. The discussion was he has sold the wool to Alexander Smith and to Bigelow and others, and the average price was $1.60, and on that basis he wanted that I draw, and we agreed that he send this cable." (S.M. p. 167).

(6–36) On cross-examination, Iravani stated as one of the items on account #12 for which he was allegedly underpaid, the item of 59 bales at a price of 58 cents per lb. (S.M. p. 483). He stated that although the 58 cents (68 cents less 10 cents for color adjustment) may have been the amount Barkey actually received for the wool at the time (Plaintiff's Exh. 147), it was part of the 250 tons contracted for at $1.75 per lb. (S.M. pp. 486–487). He asserted that the wool delivered at 58 cents per lb. was wool other than the 250 ton shipment of wool which he was obliged to deliver at $1.75 per lb. He further claimed that although the 11,000 lbs. of wool sold for 58 cents was delivered to Barkey on the Artisan along with the other wool, it was shipped as part of a 395 ton consignment which Barkey took in order to fulfill some old contracts Barkey had with his customers.

Iravani asserted that Barkey used some of the 250 ton shipment to fill its own old contracts at 58 cents or 68 cents and later sold other wool to these customers at $1.75. (S.M. pp. 487–492).

(6–37) Barkey testified on direct examination as to his negotiations with Iravani in New York, shortly after returning from Florida, as follows:

"Q. All right. Did you tell Mr. Iravani on that occasion how much in tonnage you then owed to the mills? A. I believe I said about 450 tons.

"Q. You said that you figured you would get 145 tons off the Steel Artisan. A. The Steel Artisan; and he declared that he has for shipment 250 tons ready. I said I will need an additional 150 tons of white wool; if he will ship me this entire additional tonnage of 150 tons, that will clear my position with the mills, and I will also discharge him from any obligation on the number 4 contract.

"Q. That means the June 30th contract? A. The June 30th contract.

"Q. I want to clear up these figures that you have given us. If you have 145 tons off the Steel Artisan and you have 250 tons which you say he promised to ship soon, that is 395 tons. To make up 450 you did not need 150. A. Oh, yes. To make up 450—

"Q. Well, you did not need 150 to make up 450? A. Oh, yes. That was because we have had lengthy experience with the shipments, which never came up—

"Q. Did you say that to him? A. I certainly told that to him, and he knew it.

"Q. Tell us what you said. A. There wasn't a shipment of wool of his that did not contain 35 to 75 percent colored wools which we never used.

"Q. Did you point out to him how much you figured you would get of white and cream wool out of that 250? A. Well, if you take one-third from that you will get about 160 or 170 tons.

"Q. The 160 tons— A. And 145 was practically 300, and 150, which I asked him to ship, was to complete the quantity of wool we needed, and I also told him about

letting the contracts, I showed him sales we had made at $1.90 or $1.75 or $1.50, $1.45 and I said we still owe wools here which we sold early in April 1950 which we must deliver, and of course we will have to put those in the billed values to him, obviously, because I wasn't going to default with my buyers.

"The Court: And that accounts for that quantity of wool at 78 cents?

"The Witness: That's correct.

"The Court: Fifty-eight cents with credit.

"The Witness: That's correct. Those were contracts we had entered into in early 1950, and we were talking at that time in March 1952.

"Q. 1951. A. 1951; I beg your pardon.

"The Court: Which is the item on your account now that Mr. Iravani challenged.

"The Witness: That's correct. And we had Smith wool at 70 and 78 cents, and all this is recorded in the account which we gave to Mr. Iravani.

"The Court: Did you point that out to Mr. Iravani?

"The Witness: I showed him the contracts.

"The Court: Did he agree to it?

"The Witness: And he agreed to it and he sent me a beautiful rug in appreciation of what I did for him.

"By Mr. Kresel:

"Q. You mean after this settlement? A. After this settlement.

"Q. Did Mr. Iravani, after this settlement, make shipment of 150 tons? A. He did." (S.M. pp. 758–761).

(6–38) Both Iravani and Barkey apply the same reasoning to certain low-priced items in accounts ##14–15 that they apply in the previously enumerated facts regarding Account #12.

(6–39) That paragraph labelled "Additional Business" of the letter dated September 20, 1950, from Valensi to Iravani is incorporated as if fully set forth herein. (Plaintiff's Exh. 64).

(6–40) Barkey testified on direct examination with respect to the radiogram heretofore quoted in fact 6–14 as follows:

"Q. There is a cable has been put in evidence here, Mr. Barkey, dated sometime in January 1951, in which Valensi cabled to Iravani that he, Valensi, had been informed by Mr. Barkey that Barkey had sold 250 tons of wool, I think it said to Bigelow, but that the price and for whose account it was undetermined. I am giving the substance of the cable, and I think it is probably literally so. Now did you make a sale of 250 tons? A. Yes, we did.

"Q. To Bigelow? A. Yes, we did.

"Q. On or about that date? A. Yes, we did.

"Q. I think the cable is January 12, 1951. A. Yes, we did.

"Q. Did you sell that for Iravani's account? A. Oh, no. Oh, no.

"Q. You sold it for your account? A. For our account, certainly." (S. M. pp. 778–779).

(6–41) Barkey testified on cross-examination as to wool he sold to Alexander Smith as follows:

"Q. Did you have any discussion with Mr. Iravani with respect to the sale of wool that is referred to, the Alexander Smith wool that is referred to in that contract? A. Yes. I told him I had sold wool to Smith.

"Q. For whose account? A. For my account.

"Q. Wool that you were getting from him at what price? A. This was part of our final arrangement, at whatever price I sold to the mill we agreed to give him billed values, we would give the full billed value to him to the extent of 95 percent, and of course it was of interest to me and to Iravani to acquaint him with

this sale, because he was going to get the benefit of this sale.

"Q. And you gave him the benefit of this sale, did you? A. We did, yes.

"Q. The full price at which it is marked in that contract? A. That's correct.

"Q. Less 5 percent commission? A. That's right.

"Q. And that is 135 tons on top of the 250 tons of written sales that you made between January and March 1951? A. I don't know whether it is in excess. All I do know is at the time we made the arrangement with Mr. Iravani we needed 450 tons to complete our contracts. It might well be that those were out of the 450. I have no way of breaking down these things in the witness chair." (S.M. pp. 815–816).

(6–42) Barkey testified on cross-examination as to communications quoted in facts 6–7, and 6–8 as follows:

"A. * * * We were in such a state of confusion that I felt duty-bound to give encouragement to Mr. Iravani that we were going to do the best we could in his behalf after his arrival here. I assumed no responsibility of any kind to sell wool for his account at no time.

"Q. You wanted to give Mr. Iravani encouragement, is that right? A. Yes, I wanted to give Mr. Iravani encouragement.

"Q. You wanted to give him encouragement to ship the wool? A. Yes, if you like, I wanted to give him encouragement to ship the wools. We were in need of the wools.

"Q. And after he shipped the wools, after he told you that he wanted to have these sold for his account, you expected to make some deal with him; is that it? A. I expected nothing at that time, until the arrival of Mr. Iravani here. I just wanted the wool shipped in order to complete my contracts, and then we were hoping that some sort

of understanding would be reached upon Mr. Iravani's arrival here. The cable is clear.

"Q. You think it is clear? A. Very clear." (S.M. 817–818).

(6–43) The disputes between the parties to this action which are the subjects of the first, second, third, fourth, and sixth (395 ton portion) causes of action are found to have developed either before or shortly after Iravani's arrival in New York. Thus, in February or March of 1951, the existing situation required some solution or settlement.

(6–44) Various exhibits cited in the course of this opinion serve to indicate that one of the main purposes for Iravani's visit to the United States was to reach some kind of settlement with respect to his outstanding obligations, future business transactions, and amounts already in dispute for wool already shipped by him to Barkey.

(6–45) On direct examination, Lavis testified as follows:

"Q. Mr. Lavis, can you give us the amount of wool which Mr. Iravani, under his contracts with Barkey & Company, owed on the 1st of February, 1951? A. He owed 523 tons.

"Q. How was that made up? A. It is made up by 258 tons of white against the second contract, 200 tons of white against the fourth contract, and 65 tons of cream under the fourth contract.

"Q. On the 4th of February the Artisan came in, did it not? A. Yes.

"Q. And did that carry wool for Barkey & Company? A. Yes.

"Q. How much of white wool did you get out of the shipment on the Artisan? A. We got 95 tons between white and cream, and most of it was cream.

"Q. So that after you got that on the 4th of February, he owed you the difference of 428 tons? A. That is right.

"Q. Now I want you to give us the same information, if you will, as of the 1st of March, 1951. A. Well, he owed us 227 tons of white against the second contract and 200 tons of white against the 4th. The cream had already been fulfilled on the 4th.

"Q. Now then, will you turn to the situation as between the Barkey Company and the mills to which it had sold wool. Tell us, if you will, please, how much wool the Barkey Company owed to the mills, say at the beginning of March or the end of February 1951. * * *"

"Q. The end of February or beginning of March 1951, how much in Iranian wools did the Barkey Company owe to the mills to whom it had sold it? A. 489 tons.

"Q. Now, of those 489 tons, can you tell us whether there were any wools so sold that were not Iravani wools? A. Yes, 60 tons of them." (S.M. pp. 869–871).

(6–46) On direct examination with regard to settlement transactions Barkey testified, in addition to previously quoted matter, as follows:

"Q. I meant to ask you, and I will now, in your talk with Mr. Iravani, the result of which was this settlement, was there a time set when this billed-values arrangement was to take effect? A. As of the beginning. What do you mean, 'to take effect'? It took effect right at that time.

"Q. From what steamer? A. From the Steel Artisan, of course, the Steel Artisan.

"Q. In other words, you agreed with him that beginning with the Steel Artisan shipment— A. The Steel Artisan shipment would give billed values on the conditions I stipulated.

"Q. Yes, we know the conditions. In other words, the arrangement started with the shipment on the Steel Artisan? A. That's right.

"Q. So that it included the 140 tons which you got off there. A. It did.

"Q. When you made your calculation, as you have told us here, and explained it to Mr. Iravani, of how you arrived at 150 tons as your requirements to fill your commitments to your buyers, did you take into account this 292 bales that came on the Steel Artisan? A. Yes, I did.

"In other words, you figured that you were going to get that and get it from Iravani? A. Otherwise I would have needed 750 tons, pretty near—no, I beg your pardon. I don't know what the total of the 292 is, but it would be another 450 tons plus the weight of the 292.

"Q. Mr. Iravani claims or has testified here that on account of these 150 tons he shipped only 80 tons. A. Yes.

"Q. Is it the fact that he shipped only 80 tons or did he ship the entire 150 tons? A. So far as we were concerned, we received the entire 150 tons.

"Q. The claim is made that after this settlement was made, and I think the time was given as September 1951, Mr. Iravani offered you 40 tons additional,— A. Well, I was through with Mr. Iravani then.

"Q. Wait until I finish the question. A. All right.

"Q. (continuing)—claiming that that 40 tons plus the 80 tons that he had shipped made up the 120 tons, to which figure he says the 150-tons' arrangement had been reduced. Now was there an offer made to you of such 40 tons; yes or no? A. Yes, there was an offer made to me of those 40 tons.

"Q. Did you accept? A. No, I did not.

"Q. Why didn't you accept? A. Because I did not want to have anything to do with him any more.

"Q. You had received your wool and did not want to have anything more to do with him? A. Yes, sir."

* * *

"Q. When you made the settlement with Mr. Iravani, you said that you agreed to give him billed values; is that right? A. That's correct.

"Q. Does that mean that you were going to give him or credit him with the prices at which you had agreed to sell to your mills? A. That is exactly right.

"Q. And in those prices was included a profit for you? A. Not a penny, not a penny.

"Q. You mean he was to get it all? A. He was to get it all except the five percent.

"Q. But when you sold to your mills, you of course included a profit to yourself, didn't you? A. Oh, yes. We sold the wools according to market values.

"Q. And you are telling us now that you agreed to give him the benefit of that price? A. Exactly that.

"Q. I want to ask you why did you do that? Why should you give him the benefit of your profit? A. Well, I can't exclude from that the emotional side of it, because I was thoroughly sorry for the man.

"Q. All right, but never mind—"

* * * "A. And because we were most anxious to get additional wools to complete our engagements. It is as simple as that.

"Q. Now, if you had not been able to receive the wool from Iravani to fill your engagements with your customers, what would you have had to do? A. There are other things we could have done. We would have had to buy part of the wools in the open market to fill our engagements, or buy the contracts back from the mills.

"Q. And to buy those wools in the market, would you have had to pay the market price? A. Exactly.

"Q. Which was far above the price that you were going to get it from Iravani? A. In some cases it was higher, yes." (S.M. pp. 762–767).

(6–47) Mr. Lavis testified on direct examination as to the settlement agreement as follows:

"Q. Were you present at the conversations between Mr. Barkey and Mr. Iravani resulting in the settlement? A. I was present at some conversations. Of course I was busy part of the time.

"Q. I think we would like to have the dates. When was it that these conversations took place at some of which you were present? A. I would say early March.

"Q. 1951? A. 1951.

"Q. Will you state what you recall of the conversations that you heard between these two people concerning their business relations? A. I cannot give the actual conversations, that so-and-so said this and so-and-so said that, but I can tell the substance or the result of the conversation.

"Q. Very well, do that, please. * * *"

"The Witness: Mr. Barkey proposed to Mr. Iravani to settle all differences between us as follows: that the arrangement of half-and-half of September 25 was going to be canceled as if it never existed; we were to give him billed values the same as we give to our buyers, less five percent, on all the shipments that were coming in on the Steel Artisan February 4th and on; we were to release him from the obligation to complete the fourth contract, and he was to obligate himself in giving us the 150 tons of white wool at $1.10.

"Q. Were you present at any conversation in these relations where the price of the 150 tons was related? A. Yes.

"Q. Tell us the price Mr. Iravani wanted. A. Mr. Iravani wanted $1.25 a pound, clean, and we insisted on $1.10, and Mr. Iravani agreed.

"Q. He agreed? A. Yes. * * * "

"The Court: What did you say—I want it again—Barkey proposed to set aside the half-and-half arrangement under the September 25th cable?

"The Witness: Yes sir.

"The Court: What was he going to do from then on?

"The Witness: We were to give him billed values for all the wool that would be coming in from the Steel Artisan and on to the end, less five percent, and we were to relieve him from the obligation of the fourth contract, because some had already come in.

"The Court: What about the $1.10?

"The Witness: And the 150 tons at $1.10. * * * "

"Q. Were you present, Mr. Lavis, at any conversations in this connection where there was any talk between Mr. Iravani and Mr. Barkey as to how Mr. Barkey arrived at the request for 150 tons? A. Some of the conversations I was present at.

"Q. What do you recall on that subject? A. Well, I recall that it was explained to him that we needed about 450 tons to complete our engagements with our buyers, and that after receipt of the Steel Artisan wool, from which we had about 145 pounds and the 250 tons of wool that he proposed to ship from which we could only expect about 160 tons or 165 tons—

"Q. Of what? A. Of white and cream. That is without colors, because as he himself put it, there were colors, colored wool included in those 250 tons. So we figured we needed another 150 tons to complete this 427 tons that we owed." (S.M. pp. 887–890).

On redirect, he testified as follows:

"Q. Taking the three written contracts, the first three contracts, when was the first one completed?

"Mr. Kunen: We have been all—

"Mr. Kresel: Wait a minute.

"A. September 1950.

"Q. The first one? A. January 4, 1951.

"Q. When was the third one completed? A. September 1950.

"Q. Was the second one completed when the settlement of the 150 tons was made? A. No, sir.

"Q. According to your statement of what that settlement was, was Iravani relieved of that second contract? A. No.

"Mr. Kunen: I object to it. The witness has testified.

"Mr. Kresel: What is the matter now?

"The Court: You have covered it on cross, and it is a waste of time going over it on redirect.

"Mr. Kresel: It is the only question I will put on it.

"Q. Was he? A. No, he was not.

"Q. He was relieved of the fourth? A. Of the fourth, yes. * * * "

"The Court: With respect to the deliveries thereafter made under the second contract, that is, after the settlement of March 1951, what was he to get?

"The Witness: Billed value.

"Q. And did he get billed value? A. He did." (S.M. pp. 998–1000).

(6–48) On direct examination, Iravani testified with respect to consignments to Alexander Smith as follows:

"A. With regard to consignments? I think I did not say about this part, that he wanted one-third —he said that still he owes some wool to deliver to the mills against his own contract, and he wanted 150 tons, $1.25, which we agreed. Then he said it seems he did not deliver

the goods to Bigelow because at that time Bigelow had some financial problem; instead of delivering those goods to Bigelow he delivered to Alexander and Smith.

"Q. Was there any substitute arrangement made? A. Yes.

"Q. I think you told us about it. That is what you mean by the 120 tons for $150,000. A. Yes. (S.M. pp. 200–201).

(cf. Testimony on cross examination, S.M. pp. 518–524 and on redirect examination, S.M. pp. 579–585).

(6–49) On cross-examination Iravani testified that 120 tons of wool arriving on the Steel Artisan were to be treated as on consignment. He stated that this 120 tons, which was supposed to be 145 tons, formed a part of the 395 ton consignment alleged. (S.M. pp. 531–532).

(6–50) The defendant's accountant's entries on Exhibit RR are incorporated as if fully set forth herein.

(6–51) Contract (Confirmation of Wool Purchase) between Barkey and Alexander Smith & Sons Carpet Co. Contract #4677 dated March 16, 1951, was for 100 tons white "30 tons Cream and/or Light Grey" at prices of $1.90 for white and $1.65 for the other. (Plaintiff's Exh. 188).

(6–52) Draft #33872 dated May 11, 1951, in the amount of $208,830.55, drawn against an Irving Trust Co. letter of credit dated March 9, 1951, referred to hereinafter in fact # #7 & 8–30, infra. (Defendant's Exh. JJ).

(6–53) Barkey's accounts ##22A and 22B, both dated October 29, 1951, covering wool shipped on the Steel Voyager, are incorporated as if fully set forth herein. (Plaintiff's Exhibits 254 and 254A).

(6–54) The supplementary exhibit consisting of a schedule prepared by Mr. Higley pursuant to a request made at the trial (S.M. pp. 619–620) is incorporated as if fully set forth herein.

(6–55) Both Barkey and Higley testified that certain Barkey-Bigelow contracts were renegotiated in November of 1951 as covered herein in facts #6–26 and #6–27 (S.M. pp. 833–835). A $.0304 price increase paid according to the testimony of Higley represented interest and storage charges. (S.M. pp. 614–615).

(6–56) Translation of cable dated March 7, 1951, from Iravani in New York to his office in Teheran reads as follows:

"Bank did not accept 200,000 dollars Boston telegraphed today to Bankmelli that Barkey willing to pay 200,000 dollars immediately and balance after 10 days will take bills of lading after making full payment stop regarding 107 tons Dehnad 40 ton Iranbar invoice one third white and cream 125 cents and two-third at 1.60 cent black 100 cents draw 90% in invoice name black and white stop Barkey opening tomorrow credit for wool to buy instruct Rojhantaleb Eftekhari to arrange purchase don't worry regarding money stop receive immediate from Bankmelli one million and remit Kermanshah. According Barkey's instruction telegraphed Kermanshah to buy wool." (Plaintiff's Exh. 191A).

(6–57) Valensi's memorandum dated March 8, 1951, hereinafter incorporated in fact #7 & 8–2 of this opinion is incorporated as if fully set forth herein. (Plaintiff's Exh. 270). This memorandum indicates that a final settlement had occurred by this date. (Plaintiff's Exh. 270).

(6–58) Letter of Credit #33872, dated March 9, 1951, referred to in fact #7 & 8–8 (infra) is incorporated as if fully set forth herein. (Plaintiff's Exh. 189).

### Conclusory Remarks

Although Barkey has denied the existence of a consignment arrangement with Iravani, or with anyone else (fact #6–17), and although Valensi at first indicated in his letters that Barkey would not accept consignments, it seems probable to this court, by reason of both the cable of December 5, 1950 (fact #6–4) in its proper perspective, and the cables

of January 4th and 5th, 1951 (facts #6–7 and 6–8), as well as the material referred to in facts ##6–5, 6–18, 6–24 and elsewhere, that Barkey did agree to accept certain goods on consignment for Iravani.

While not at this point ruling as a matter of law that the consignment agreement was reached, however, we will assume that Iravani's contentions on this matter are correct, and that the parties did reach such an understanding. The cable quoted in fact #6–7 refers to 220 tons shipped aboard the Artisan, of which 75 tons were not for Barkey, leaving a balance of 145 tons. It also mentions 250 tons ready for shipment and requests that Barkey sell the wool for his (Iravani's) account at best January prices. These tonnages comprise the 395 ton basis for Iravani's claim.

The letter of December 5, 1950 (fact #6–5) indicates that Barkey was then willing to accept shipments at 75 cents per net clean pound of "any wools which you would care to consign". Prior communications indicated that Barkey would take 200 tons of white wool. Iravani's cable of January 4, 1951 (fact #6–7) is ambiguous in its wording as to whether all or only a portion of the wool referred to therein was shipped on consignment.

Barkey's answering cable (fact #6–8) still does not set forth clearly whether all or only a part of the wool was shipped on the consignment basis. But when, in answer to Barkey's request for details concerning the 250 tons (fact #6–8), Iravani replied by his cable of January 9, 1951 (fact #6–10), in which he joined the 145 and 250 ton lots in supplying the details of the shipment, he made it clear that he understood that both lots were to be included in the consignment arrangement. The breakdown in the telegram comprised 395 tons.

His requests for a letter of credit and payment of money to Murad and "Middleast" were complied with by Barkey as indicated by his next two communications (facts ##6–11 and 6–12), although this last cable referred to only the 250 ton lot. This is easily explained, however, by the fact that Barkey knew that the 145 tons was already underway.

Valensi's cable of January 13th (fact #6–14) indicates that he was probably unaware that Barkey's "enigmatic" agreement had been clarified by the necessary details as to tonnages and types of wool comprising the 250 ton shipment (facts ##6–9 and 6–10).

In conclusion as to these shipments and after consideration of all of the pertinent facts cited in the preceding pages on this cause of action, it is the opinion of this court that Iravani clearly and unambiguously requested that both the 145 and the 250 ton lots be sold for his account.

Turning now to the question of Barkey's acceptance of this offer, we note that Barkey in fact sold the wool. But, although Barkey immediately contracted to sell the 250 tons of wool (fact #6–25), the plaintiff has the burden of establishing either that Barkey did so for the plaintiff's account, or that Barkey agreed to do so for the plaintiff's account. Further, there remains the question of the 145 ton lot shipped aboard the Artisan.

As to this last, however, Iravani stated (see testimony referred to in fact #6–49) that this shipment was short 20 or 25 tons. Therefore, the wool consigned by Iravani was only 370 to 375 tons.

Assuming, without so ruling, that Barkey had thus agreed to accept 375 tons on consignment at "best January prices", we will subsequently look to the prices actually received by Iravani.

Iravani, subsequently, in settlement with Barkey of various disputes (facts ##6–43 and 6–44), agreed to ship the defendant 150 additional tons of wool so that Barkey could complete its contracts with Bigelow (facts # #6–42, 6–45, 6–46 and 6–47; see also 10th cause of action). There is a dispute about whether the price of this wool was to be $1.10 or $1.25 per net clean lb., but the court is of the opinion that the $1.10 price is correct. This opinion is based upon consideration of both the oral and the slim documentary evidence in this case pertinent to this item, and since that documentary

evidence does not limit itself to the plaintiff's version of the agreement, the matter must ultimately be decided by resort to an examination of the testimony. of the parties. Such examination compels the court to the conclusion mentioned above.

Turning then to Dr. Klein's chart (fact #6–50) covering wool received by Barkey on and after February 4, 1951 (the date of the arrival of the Artisan), we note that the total wool shipped in this period was about 619 tons. Of this amount, Barkey applied about 148 tons toward the aforementioned 150 ton settlement. This left a balance of about 471 tons. Deducting the 375 ton alleged consignment from this amount, we find that we are left with 96 tons which are clearly not a part of any consignment agreement.

"Best January prices" may be determined by the prices which Bigelow paid to Barkey (fact #6–25). Thus we have white at $1.72 to $1.75 (which, following Barkey's lead we will take at $1.75 per net clean lb.), Light Cream at $1.55, Light Grey at $1.35 and colors at $.80. Although actual delivery of quantities did not adhere to the January contract terms, and adjustments were made for color differentials (fact #6–27), these contracts remain the best evidence of January prices.

In his arithmetical brief, the plaintiff lists eleven lots of wool as lots on which he was underpaid. The defendant, in its brief, admits that items numbered 1, 2, 3 and 8, included in Barkey's accounts 12, 14, 15 and 16 (see facts ##6–22 and 6–24) were not credited by Barkey at the "best January prices". Item #1 (a 59 bale cream lot weighing 17,968 lbs. in the grease), item #2 (a 16 bale cream lot, weighing 6,609 lbs. in the grease), item #3 (two lots comprising 184 bales of cream wool weighing 55,059 lbs. in the grease), and item #8 (three lots comprising 148 bales of white wool, weighing 33,017 lbs. in the grease) total 112,653 lbs. in the grease, or about 51 metric tons. The defendant admits that this much of the shipments was applied to old contracts, and this court is of the opinion that the defendant had the right to apply at least that amount in that manner, since we can see no basis for finding that the consignment arrangement at "best January prices" could have exceeded the 375 ton mark referred to earlier.

Therefore, the next step is to determine whether the other items in plaintiff's arithmetical brief were credited to Iravani at less than "best January prices".

Item 4 deals with cream wool credited at $1.35. The plaintiff asserts that the price should have been $1.55, the price for *light* cream wool. Based on the Barkey-Alexander Smith Contract (fact #6–51), in which a price is set for "cream and/or light grey", this court concludes that cream wool has the same value as light grey wool rather than light cream wool. Accordingly, there was no underpayment on this item.

The defendant's defense to item 5 (a 146 bale lot of cream wool, 10,550 scoured lbs. of which were credited at $.80) an item amounting to about 7 metric tons of greasy wool, would require that this court go beyond the record. This the court will not do, nor is it necessary that we do so inasmuch as we have found that 96 tons were not covered by the "best January prices" arrangement. Adding the wool involved in this item to the 51 tons arrived at earlier, we now have a total of 58 tons not paid for at the "best January prices".

Items 6 and 9, being possibly subject to the same restrictions as item 5 and amounting to about 7 metric tons of *scoured* wool could have amounted to no more than 14 tons of *greasy* wool. Therefore, giving Iravani the benefit of any possible doubt, this would raise the previous amount of 58 tons not paid for at "best January prices" to 72 tons.

Items 7 and 10, sales of cream wool at $1.35 are disposed of by the same reasoning used with respect to item 4.

Item 11 concerns wool credited by the defendant at $1.10 (pursuant to the settlement agreement which will be discussed further on). for which Iravani

claims $1.75 per net scoured lb. Since this court finds that the weight of the credible evidence favors the argument that shipment of 150 tons rather than 120 tons of white wool was a part of the settlement agreement, this item is held to be without merit. The settlement agreement in general is discussed in the opinion of this court on the 10th cause of action.

■ Based on all of the evidence adduced in the trial of this portion of the case, this court is of the opinion that Iravani received "best January prices" where he was entitled to them, and billed prices less 5% where they were proper.

The renegotiation of the Barkey-Bigelow contracts gave him no additional rights, especially since the prices per lb. remained the same with the addition of interest and storage charges, and Iravani received his just share of the amounts paid to Barkey.

Accordingly, this court finds for the defendant on the sixth cause of action.

Seventh and Eighth Causes of Action

The plaintiff has asserted that in February of 1951, the parties to this action entered into a joint venture agreement whereby the plaintiff was to purchase wool and have it delivered to the defendant and the defendant was to sell the wool. Profits and losses were to be shared equally.

The defendant has denied the existence of any such agreement.

The seventh cause of action is brought to recover Iravani's alleged share of Barkey's profits on the sale of wool which Barkey received from Iravani; the eighth cause is brought to recover damages for Barkey's alleged wrongful refusal to accept wools which Iravani claims to have purchased under the joint venture agreement.

Since the main question presented in both of these causes of action is the question of the existence of any joint venture agreement, we will discuss them both together.

Turning first to the facts in the case, we note the following:

(7 & 8-1) On cross examination, Barkey testified as follows:

"Q. You testified that you had no discussion of any kind with Mr. Iravani with regard to entering into a joint venture with him? A. None whatever.

"Q. You know Mr. Valensi very well, don't you? A. Oh, yes, very well.

"Q. And you have testified in the examination before trial that Mr. Valensi is, to use your language, sterling quality merchandise. That is your language, isn't it? A. I think very highly of him, yes.

"Q. And you are very friendly with him? A. Yes, I am friendly with Mr. Valensi.

"Q. You have been friendly with him for a great many years? A. For a great many years, correct.

"Q. Did you have any discussion with Mr. Valensi about entering into a joint venture with Mr. Iravani? A. None whatsoever.

"Q. Do you recall having a discussion with Mr. Valensi on March 8, 1951, in which you, in reply to Mr. Valensi's question concerning the modus operandi in which Mr. Barkey and Mr. Iravani could conduct their business, Mr. Barkey indicated that it probably would assume the form of a profit-sharing venture? A. I remember—

"Q. Did you have any such discussion with Mr. Valensi on March 8, 1951? A. I remember very, very well that discussion of March 1951.

"Q. Did you in that conversation tell Mr. Valensi that you were contemplating entering into a profit-sharing venture with Mr. Iravani? A. I did not.

"Q. You did not? A. I did not.

"Q. Did you make a statement to Mr. Valensi which I have just read to you? A. I did not." (S.M. pp. 790–791).

(7 & 8-2) Memorandum dated March 8, 1951, by Valensi kept by him in the

regular course of business reads as follows:

"Memorandum re: Future Business in Wool between Barkey and Iravani

"This morning Jack Barkey called me by phone and subsequently I interviewed him in the presence of Mr. Iravani at his office concerning future business between Barkey and Iravani.

"1. It was stated by Mr. Barkey that he and Mr. Iravani had arrived at a final settlement concerning their old business and that although Mr. Barkey had felt that the settlement was not very favorable to himself, under the circumstances it was the best that could be expected.

"2. He stated that it was his desire to undertake additional business in the future with Mr. Iravani, but that in any future business dealings with Mr. Iravani he desired that all communications between himself and Mr. Iravani be made directly so that there could be no room for misunderstanding between them; and by so doing it would lighten the burden of his office overhead.

"3. He stated that in any future business between himself and Mr. Iravani he would be very much concerned with the rate of my commission, and he desired to have it placed at a rate which he would consider satisfactory.

"4. In reply to my inquiry concerning the modus operandi in which Mr. Barkey and Mr. Iravani would conduct their business Mr. Barkey indicated that it would probably assume the form of a profit sharing venture." (Plaintiff's Exh. 270 in evidence, formerly Defendant's Exh. DD for identification).

(7 & 8–3) Randolph Valensi, called by the plaintiff as a part of his rebuttal case, when asked about his memorandum (Plaintiff's Exh. 270, quoted in part in fact #7 & 8–2, identified it as a record made and kept in the regular course of his business. On cross-examination, he gave the following testimony:

"Q. Mr. Valensi, in your fourth paragraph of this memorandum—you have not a copy before you, have you? A. No.

"Q. I will use Mr. Kunen's (handing to witness). Did you note there under number 4 the exact language that Mr. Barkey stated to you, the answer to your inquiry? A. The exact language? No, sir.

"Q. You do not undertake to reproduce the exact language? That is right, isn't it? A. No, sir.

"Q. The answer to the question is no, you do not. A. Correct." (S. M. pp. 1027–1028).

(7 & 8–4) Jacob Barkey, on redirect examination as to Valensi's memoranda, marked plaintiff's Exh. 270 in evidence, then defendant's Exhibit DD for identification, testified as follows:

"Q. I show you defendant's Exhibit DD for identification, and I particularly direct your attention to the paragraph on the second page thereof marked 4, and ask you whether you ever saw that document before. A. I never saw this document before.

"Q. And you were asked by Mr. Kunen, and he read in evidence while he put his question, whether you ever spoke to Mr. Valensi about a modus operandi in which you and Mr. Iravani would conduct your business, and you indicated it would probably assume the form of a profit-sharing venture, and I recall that you said that you never said anything of that sort to Mr. Valensi. A. I didn't say anything of that sort to Mr. Valensi.

"Q. You also said, however, in this connection, that you do very well remember having a talk with Mr. Valensi. A. I do.

"Q. At this time. A. I do.

"Q. You were never asked by Mr. Kunen as to what that talk related to? A. No.

"Q. I am now asking you to tell us what it was. A. I will be very glad to tell you what it was. This was not very long after we arrived at a final agreement and understanding with Mr. Iravani. * * *

"Q. Please give us your recollection of the conversation you had with Mr. Valensi. A. I recall that Mr. Valensi, when he came to my office, I acquainted him at that time with the final agreement we had arrived at with Mr. Iravani after the lengthy conversations, and I don't think I need to repeat that—

"Q. No. A. —as provided in my testimony of this morning. Then Mr. Iravani said how about future business—

"Mr. Kunen: Who said?

"The Witness: Oh, Mr. Valensi, I meant. A. (continuing) I said 'Well, Randy I don't see any real reason why we should worry about doing business with Mr. Iravani in the future; wait until the time comes. We can devise some means of doing business with him but let's wait and see how this whole thing is finished and then we will talk about it. I recall specifically pointing out to him that one thing that will have to be done in the way of change, that the tie-up of materials which we handle, we just can't bear the commissions that he had arranged with Mr. Iravani to pay, there will have to be some modification of that and perhaps other changes, and we will see about it in the future, and that was all.

"Q. Was there anything said in that conversation about a profit-sharing arrangement? A. There was nothing said in that conversation about any profit-sharing arrangement. We might well have used the term 'we are going to do some business on a mutual profitable basis of some kind', but there was no specific details entered into." (S.M. pp. 848–850).

(7 & 8–5) Translation of radiogram dated March 7, 1951, from Iravani in New York to his office in Iran reads in part as follows:

" * * * Barkey Opening Tomorrow Credit For Wool To Buy Instruct Rojhantaleb Eftekhari To Arrange Purchase Don't Worry Regarding Money Stop Receive Immediate From Bankmelli One Million And Remit Kermanshah. According Barkey's Instruction Telegraphed Kermanshah To Buy Wool." (Plaintiff's Exh. 191–A).

(7 & 8–6) Translation of a portion of a radiogram dated March 7, 1951, from Iravani to one Yasharel in Kermanshah:

" * * * Wool Buy Quantity Available If You Can Buy Very Gently Requires Large Quantity You Should Make Best Efforts To Keep Market Quiet And Avoid Rising In Prices Paid 8,000 Dollars Azadvar Instructed Teheran To Remit You One Million Next Week." (Plaintiff's Exh. 192–A).

(7 & 8–7) Contract #4677 dated March 16, 1951, between Barkey and Alexander Smith for 130 tons, contains notations on its face which indicate that the amount was reduced to 100 tons of white wool and that it was to be supplied from Iravani shipments. The price listed was $1.90 C.I.F. New York. (Plaintiff's Exh. 188).

(7 & 8–8) Letter of credit #33872 dated March 9, 1951, by Irving Trust Co. for $300,000 payable against on board steamer Bills of Lading evidencing shipment of 200 tons of wool not later than April 30, 1951, and negotiated not later than May 30, 1951. There is no mention of who is to pay the freight. (Plaintiff's Exh. 189). On cross-examination, Iravani testified that he did not draw against the letter of credit in connection with the joint venture (S.M. p. 389). He testified earlier that he could not use this letter of credit because it required on board ocean bills of lading, and that, after his request, Barkey issued a $100,000 letter

of credit payable against inland bills of lading. (S.M. pp. 214–215).

(7 & 8–9) Letter of credit #88459 dated March 26, 1951, by the First National Bank of Boston for $100,000 payable against inland bills of lading issued by Pers Express, Teheran, evidencing shipment of 70 tons of wool not later than May 31, 1951, and drafts negotiated not later than June 30, 1951. There is no mention of who is to pay the freight (Plaintiff's Exh. 190).

(7 & 8–10) Letters of credit dated earlier than plaintiff's Exh. 190, namely plaintiff's Exhibits ## 60, 61, 62, 127, 128, 128A, and 167, provide for shipment C. & F. New York.

(7 & 8–11) Radiogram dated January 12, 1951, from Barkey to Iravani reads in part as follows:

"Two Hundred Thousand Credit Opened Do Utmost Expedite Shipment Two Hundred Fifty Tons Stop Again Assure You Our Utmost Cooperation Stop" (Plaintiff's Exh. 166).

(7 & 8–12) Letter dated January 11, 1951, from Valensi to Iravani contained the following paragraph:

"Barkey has also consented to issue a credit for $200,000 to help you finance the shipment of these last 250 tons. We do not know at this writing whether Barkey will issue a new credit or whether he will attempt to amend and extend the credit which just expired at the Irving Trust Co. We have attempted to persuade him to issue a new credit since we believe that this would serve your purpose better, and we hope he will follow our urgings." (Defendant's Exh. BB).

The letter of credit to which this letter and the preceding listed cable referred was admitted in evidence as Plaintiff's Exhibit 167. It required ocean bills of lading dated not later than February 15, 1951, and negotiated not later than March 15, 1951.

(7 & 8–13) Translation of a portion of a letter dated April 4, 1951, from one

Eftekhari writing from the office of one Albisher in Kuwait, on the Persian Gulf, to Iravani in New York. In this letter, Eftekhari discusses the quality of wool he is buying in that area and states:

"In any event I instructed to buy wool, although I did not have money with myself. * * * I said to them that afterwards, the letter of credit will be opened for the balance. * * *

"It is necessary to remind you that my face is yours, and if I did not receive the money duly, I will lose my reputation. Of course the price of wool is not stable. If another buyer arrives in the market, the price will advance immediately 10 rupees. For this reason, after my arrival I worked cautiously. Although I came for purchase of wool, I did not let the people trace it. Notwithstanding the fact that the price was 70/75 rupees per 30 lbs., I said that I am not interested. I reduced the price five rupees, and arranged to buy at that price. In the present situation, I can ship 100 tons within 20 days, all white without any cream. Now it is quite necessary that you instruct Murad to remit this preliminary advance. Of course with the said one million rials, I can buy one million rupees, without making any further payment, but for the first party it would be impossible to work without money. I hope that by Saturday 20/30 tons will be ready, but Albisher is badly concerned about money.

"The Present Price Of Kuwait 100% White Wool Is Seventy Rupees Per 30 Lbs. Colored 35 Rupees Per 30 Lbs." (Plaintiff's Exh. 194).

(7 & 8–14) Radiogram dated April 27, 1951, from Barkey to Albisher, Kuwait (Persian Gulf) reads as follows:

"According Information Shaffi Iravani Now In America You Purchased For His Account White Sheepswool 60% Yield All White At Seventy Rupees Per Thirty Pounds Stop Telegraph Total Quantity Purchased And

Now Available Stop Will Open L/C Your Favor Stop Telegraph Reply Soonest To Jabarkey New York. Barkey Importing Co." (Plaintiff's Exh. 195).

(7 & 8–15) Invoice dated April 1, 1951, rendered to Barkey by Iravani, covering 569 bales of wool shipped aboard the SS Steel Worker as follows:

"B.I.C. White and Cream Washed Wool

44 bales—gross weight: 20499.4 lbs. (1/3)
 nett " 20235.0 " "
based on 72% yield clean basis
@ $1.25 per lb. C & F New York.............. $ 18211.50

89 bales—gross weight: 40999.2 lbs. (2/3)
 nett " 40465.0 lbs. "
based on 72% yield clean basis
@ $1.60 per lb. C & F New York .............. 46615.68

White and Cream Greasy Wool

87 bales—gross weight: 31748.6 lbs. (1/3)
 nett " 31226.0 lbs. "
based on 50% yield clean basis
@ $1.25 per lb. C & F New York ................ 19516.25

174 bales—gross weight: 63497.7 lbs. (2/3)
 nett " 62453.0 lbs. "
based on 50% yield clean basis
@ $1.60 per lb. C & F New York ................ 49962.40

Coloured Washed Wool

69 bales—gross weight 27653 lbs.
 nett " 27239 lbs.
based on 72% yield clean basis
@ $1.00 per lb. C & F New York ................ 19612.08

Coloured Greasy Wool

106 bales—gross weight 34077 lbs.
 nett " 33441 lbs.
based on 50% yield clean basis
@ $1.00 per lb. C & F New York ................ 16720.50

Less ocean freight as per Bs/L Nos. 19, 20 & 24 $170638.41
issued by the Khorramshahr agents of the
Isthmian Steamship Co. payable at destination 6722.82

 $163915.59"

(Plaintiff's Exh. 175).

(7 & 8–16) Invoice dated April 5, 1951, rendered to Barkey by Iravani, covering 52 bales of wool shipped per "Pers Express S.A." makes no reference to color or condition of the wool covered by Pers Express' through bill of lading #2519, dated March 31, 1951, but refers to an "average price" of $1428.57 per metric ton for a total of $16,771.41. The entire descriptive portion of the invoice reads as follows:

"52 bales Iranian Carpet Wool.
Total Gross Weight: 26,176 lbs.
 Nett " 25,864 lbs. (11.74 tons)
@ $1428.57 per ton of 2204 lbs. (Metric Ton)
F.O.B. Khorramshahr." (Plaintiff's Exh. 215).

(7 & 8–17) Invoice dated May 18, 1951, rendered to Barkey by Iravani, covering 265 bales of wool shipped per "Messrs. Pers Express S.A." makes no reference to color or condition of the wool covered by Pers Express' through bill of lading #2664, but refers to an "average price F.O.B. Khorramshahr" of $1428.57 per metric ton for a total of $40,471.38. The entire descriptive portion of the invoice reads as follows:

"265 bales Iranian Carpet Wool
Total gross weight: 64,047 lbs.
" nett " 62,439 " (28.33 metric tons)
@ $1428.57 per metric ton of 2204 lbs.,
average price, FOB Khorramshahr." (Plaintiff's Exh. 214).

(7 & 8–18) Invoice dated May 23, 1951, rendered to Barkey by Iravani, covering 79 bales of wool shipped per "Messrs. Pers Express S.A." makes no reference to color or condition of the wool covered by Pers. Express' through bill of lading #2665, but refers to an "average price, f.o.b. Khorramshahr" of $1428.57 per metric ton for a total of $18,042.83. The entire descriptive portion of the invoice reads as follows:

"79 bales Iranian Carpet Wool
Total gross weight: 28,321 lbs.
" net " 27,847 " (12.63 metric tons)
@ $1428.57 per metric ton of 2204 lbs.,
average price, f. o. b. Khorramshahr." (Plaintiff's Exh. 212).

(7 & 8–19) Invoice dated May 25, 1951, rendered to Barkey by Iravani, covering 81 bales of wool shipped per "Pers Express S.A." makes no reference to color or condition of the wool covered by Pers Express' through bill of lading #2672, but refers to an "average price F.O.B. Khorramshahr" of $1428.57 per metric ton for a total of $18,342.83. The entire descriptive portion of the invoice reads as follows:

"81 bales Iranian Carpet Wool.
Total gross weight: 28,796 lbs.
" nett " 28,310 " (12.84 metric tons)
@ $1428.57 per metric ton of 2204 lbs.
average price F.O.B. Khorramshahr." (Plaintiff's Exh. 213).

(7 & 8–20) Invoice dated May 31, 1951, rendered to Barkey by Iravani, covering 40 bales of wool shipped per "Messrs Perse Express S.A." makes no reference to color or condition of the wool covered by Pers Express' bill of lading #2677, but refers to an "average price FOB Khorramshahr" of $1428.57 per metric ton for a total of $5885.70. The entire descriptive portion of the invoice reads as follows:

"40 bales Iranian Carpet Wool
Total gross weight: 9,315 lbs.
" nett " 9,081 " (4.12 metric tons)
@ $1428.57 per metric ton of 2204 lbs.,
average price, FOB Khorramshahr." (Plaintiff's Exh. 211).

(7 & 8–21) Iravani, on direct examination concerning the wool shipped under the $100,000 letter of credit referred to in fact #7 & 8–9, testified that the invoices referred to in facts 7 & 8–16 through 7 & 8–20 represented shipments under that letter of credit. (S.M. p. 222). He stated that the price of $1428.-50 (or $1428.57) per metric ton for the wool was arrived at by dividing $100,-000 by 70 tons (S.M. p. 223). Simple arithmetic establishes that the five invoices cover 70 tons of wool and that $100,000 divided by 70 equals the invoiced price per ton.

(7 & 8–22) In his testimony on cross examination, Mr. Julius Lavis, being asked about the average price arrangement used in Iravani's invoices referred to in facts #7 & 8–16 through 7 & 8–20, and, more specifically, having been asked whether the price wasn't "unusual", replied as follows:

"A. Well, he simply was complying with the terms of a letter of credit which called for $100,000 for 70 tons of wool, and the only way he could avail himself was by this computation. It wasn't that any agreement was made on such kind of price.

"Q. The question I asked you, which you did not respond to, was whether or not it was an unusual price? A. It is, surely.

"Q. And isn't it a fact that this is the first time in all your experience in the wool business that you ever saw a price like that on an invoice? A. Yes.

"Q. And isn't it a fact that Exhibit 190, the letter of credit for $100,000 of March 26, 1951, is an unusual letter of credit? A. It is unusual, but that is the way Mr. Iravani wanted us to open the letter of credit for him. * * *"

"Q. In all the letters of credit that were issued to Mr. Iravani he was supposed to pay freight, was he not? A. No, we were supposed to pay freight.

"Q. But the freight was considered as part of the letter of credit? A. Yes, I think so.

"Q. And the freight was to be deducted from the invoices and the drafts that were drawn? A. Yes.

"Q. And with respect to this letter of credit, the freight was not to be deducted, was it? A. I don't know. I don't see anything about freight here.

"Q. Which means in your experience— A. Apparently there is some failure here to mention about the freight. There is nothing about freight.

"Q. You think there is a failure. Does the same failure exist in regard to the $300,000 letter of credit of March 9th, Exhibit 189? That is with another bank, isn't it? A. Yes, sir.

"Q. The first one is the First National Bank of Boston and the second one is the Irving Trust Company, isn't it? A. there is nothing about freight here." (S.M. pp. 977–979).

(7 & 8–23) Barkey account #18, dated October 29, 1951, covered 52 bales shipped aboard the SS Steel Designer of which the account listed 26 as washed white and 24 as greasy white with a combined net weight for the 50 (minus the tare) of 24,574 lbs. which, at an average yield of 63.8% yielded 15,678 net clean lbs. credited to Iravani, at $1.10 per net clean lb. (total $17,245.80). In addition, 1 bale was listed as greasy cream wool with a net weight (minus tare) of 543 lbs. and a yield of 59%. This bale, therefore, yielded 320 clean lbs. for which Barkey credits Iravani @ $1.35 for a total of $432.00. The 52nd bale was listed as short and notice was given that a claim had been filed with the Steamship Company. For the missing bale, the defendant credited Iravani with $215.41. (Plaintiff's Exh. 187).

(7 & 8–24) Barkey account #20, dated October 29, 1951, covering 264 bales of wool shipped aboard the SS Leonekerk- Westerdam contains the following calculations:

"199 Bales Greasy White Iranian Wool—46837 lbs. Gross
11 " Washed " " " — 2169 " "

49006 " "
1260 " tare

47746 lbs. net

| | | |
|---|---|---|
| Yield as per A.C.H. #9056—51.40% | | |
| 24541 net scoured lbs. @ $1.10 per lb. | | $ 26995.10 |

Originally 54 Bales Cream Wool
 Sorted @ E & L
51 Bags Cream Wool—E & L #2505—Net 10494 lbs.
12 " #2 White " " " " 2061 "

12555 "

Shrinkage in manipulation
during sorting— 0.54% E & L #2505 68 "

12623

| | |
|---|---|
| Yield as per A.C.H. #9057—50% | |
| 6312 net clean lbs. @ $1.35 per lb. | 8521.20 |
| 2 Bags Dark Wool—E & L #2505—Net 265 lbs. | |
| Yield as per A.C.H. #9057—50% | |
| 133 net scoured lbs. @ $.45 per lb. | 59.85 |
| | $ 35576.15 |

Due you 95% on cream wool, net on white wool $35147.10"
(Plaintiff's Exh. 216).

(7 & 8–25) Barkey Account #21, dated October 29, 1951, covering 159 bales of greasy white wool weighing 55,341 net lbs. (minus tare) with a yield of 49.6% or 27,449 net clean lbs. credited to Iravani at $1.10 per net clean lb. for a total of $30193.90. There is also reference to 1 additional bale lost at the point of shipment for which Barkey credited Iravani with $175.57. (Plaintiff's Exh. 217).

(7 & 8–26) Barkey Account #22, dated October 29, 1951, covering 40 bales of wool shipped aboard the SS Steel Voyager contained the following calculations:

"31 Bales Greasy White Wool—Gr. Lbs. 7294
 2 " " " " " " 487

7781
Tare 198
Net 7583

| | | |
|---|---|---|
| Yield as per A.C.H. #9204—58.90%—net sc. lbs. | | 4466 |
| 1 Bales—Not Weighed—average | | 135 |
| 6 Bales—Washed White Wool—Gr. lbs. | 1316 | |
| Tare | 36 | |
| Net | 1280 | |
| No test made—agreed on 75% yield—net sc. lbs. | | 960 |
| | | 5561 @ $1.10 per lb. |

(Plaintiff's Exh. 218). $6117.10"

(7 & 8–27) Iravani, on cross examination as to the alleged joint venture, stated that the agreement was made on February 24 or 25, 1951, in Mr. Barkey's home, that no one except himself and Barkey was present, and that, at that time, he still owed Barkey a considerable quantity of wool on his previous commitments. (S.M. pp. 383–385). He testified that in June of 1951, when he went to Barkey in order to get money to finance the purchase of some wool, Barkey denied ever having agreed to a joint venture. Accordingly, he asserts that as of June of 1951, he (Iravani) considered the joint venture at an end. (S.M. pp. 387–389).

(7 & 8–28) With respect to the value of that portion of the wool which Iravani allegedly bought for what is referred to as the joint venture and which Barkey admittedly refused to accept, Iravani gave the following testimony on direct examination, after stating that he actually paid out only 2,320,000 rials:

"The Court: * * * The price you agreed to pay was 15 million-odd rials?

"The Witness: Yes.

"The Court: The price at which you sold it was 11 million-odd rials?

"The Witness: Yes.

"The Court: Of the purchase price you actually paid out as a down payment or on account, 2,300,000 and some-odd rials?

"The Witness: Yes." (S.M. p. 686).

(7 & 8–29) One Fedele Carlo Dordella, a foreign exchange expert called by the plaintiff testified that the value of the rial at that time (October 25, 1954) in New York was 110 to the U. S. Dollar. He stated that he believed the rate was lower (fewer rials to the dollar) in 1950–1951. (S.M. pp. 632–635a).

On direct examination Iravani testified that the commercial rate of exchange in March of 1951 was 47.50 rials to the dollar. (S.M. p. 228).

(7 & 8–30) Photostat of a draft dated May 11, 1951, in the amount of $208,830.-55 negotiated by Iravani through the Irving Trust Co. in New York. Of that amount, Barkey paid $170,000 in the course of a settlement with the Irving Trust Company in exchange for certain documents of title to shipment of wool. The draft states that it is drawn under an Irving Trust Co. letter of credit dated March 9, 1951, and numbered 33872. (Defendant's Exh. JJ—see also Defendant's Exh. LL and S.M. pp. 908–909).

(7 & 8–31) The shipments of wool for which the plaintiff seeks recovery in his seventh cause of action are those shipped aboard the SS Steel Designer (arrival in New York on June 5, 1951), SS Leonekerk-Westerdam (arrival in New York on July 9, 1951), SS Saporea-Blydendyk (arrival in New York on July 21, 1951), and SS Steel Voyager (arrival in New York on July 20, 1951), [Complaint, paragraphs 28, 29, 30 and 31]; the shipments of wool for which the draft to which we refer in fact #7 & 8–30 was drawn were those aboard the SS Steel Designer and vessels not mentioned in the complaint (Defendant's Exh. LL).

(7 & 8–32) In his complaint the plaintiff, referring to the shipment aboard the SS Steel Designer, states that it amounted to 15,678 scoured lbs. of wool at $1.37 per lb., that it was sold by the defendant at $1.7894 per scoured lb. and that the defendant only paid the plaintiff $1.10 per lb. for the wool (complaint—paragraph 28).

(7 & 8–33) The shipping documents of the shipment on the SS Steel Designer covered by the draft to which we referred in fact #7 & 8–30 describe those goods as 140 bales weighing 62,668 lbs. and invoiced at $26,992.60. Iravani's invoice of these goods dated May 11, 1951, describes them as 40 bales weighing 18,-678 lbs. net in the grease with an estimated yield of 50% (thus totalling approximately 9339 net clean lbs.), and 100 bales weighing 43,133 lbs. net in the grease with an estimated yield of 80% (thus totalling approximately 34,506 net clean lbs.). The total weight of scoured wool in the shipment would therefore approximate 43,845 lbs. The bill of lading

is dated May 1, 1951. (Defendant's Exh. LL).

Plaintiff's Exh. 256 lists a voyage of the SS Steel Designer from Iran to New York from March 31, 1951 to June 5, 1951.

(7 & 8–34) Julius Lavis, on both direct and cross examination, stated that the documents composing defendant's Exhibit LL had to do with transactions other than the shipments listed in the complaint regarding the instant causes of action. Hence, the draft of $208,830.55 referred to in fact #7 & 8–30 was issued on the $300,000 letter of credit referred to in our fact #7 & 8–8. Thus, the bulk of the documents composing defendant's Exh. LL cover shipments which were not even claimed to be under the joint venture, although the $208,000 draft drawn against the $300,000 letter of credit is alleged by the plaintiff to have covered shipments made pursuant to the joint venture. (S.M. pp. 929–930 and 986). See also fact 7 & 8–31.

(7 & 8–35) Letter dated September 12, 1951, by Lavis for Barkey to Irving Trust Co. warning the bank that Barkey had not contracted, and would not pay, for certain shipments of wool including those documented by defendant's Exh. LL. (Plaintiff's Exh. 269).

### Conclusory Remarks

From the above-listed facts it is the opinion of this court that there was at least a mention of a possible joint venture between Barkey and Iravani. Although Valensi did not claim to have quoted the exact wording of Barkey, he is too experienced a businessman to draw such a conclusion unless he believed that it was warranted.

It must be noted, however, that his memorandum did not state that the parties to this action had actually entered into a joint venture. Rather he stated that Barkey said future business relations "probably would assume the form of a profit-sharing venture". Thus the memorandum quoted in fact #7 & 8–2 cannot serve as the basis for the then existence of the alleged joint venture.

Next we have the cable referred to in fact #7 & 8–6 in which Iravani instructs his office to buy wool. In view of his precarious financial condition, the mere fact that the words "Don't Worry Regarding Money" were used, might be significant. However, a simple negotiation for a specific amount of wool to be purchased by Barkey would also serve to explain the words. Furthermore, the cable was sent the day before the meeting with Valensi.

The two letters of credit referred to in facts 7 & 8–8 and 7 & 8–9, in which for the first time no mention is made of payment of freight by the shipper, are alleged by the plaintiff to have been opened by Barkey for the use of Iravani in the joint venture. The plaintiff asserts that the reason for the failure to mention payment of freight by the shipper is proof of the existence of a joint venture, since the cost of the freight would come out of the joint profit. Barkey and Lavis are unable to explain the absence of the provision for payment of freight by the shipper except to state that it was an oversight. While this is possible, it is highly coincidental and does raise an inference favorable to the plaintiff's version of the controversy.

Although Iravani testified that he did not draw against the $300,000 letter of credit, but rather requested the $100,000 letter which could be satisfied by inland bills of lading, the $208,830.55 draft referred to in fact 7 & 8–30 is clearly drawn against the former credit. Furthermore, one of the shipments covered by the draft was the same as one allegedly made under the joint venture, while the other shipments were entirely different from those which Iravani alleges were made pursuant to the alleged joint venture.

Barkey's explanation of the letters of credit being issued to cover other transactions is, therefore, the more probable of the two.

As to the $100,000 letter of credit to which we referred in our fact #7 & 8–9, it appears obvious that it was intended to be applied to the purchase of 70 tons, but

794

these 70 tons might well be, as Lavis testified, a portion of the wool involved in the final settlement agreement. (S.M. pp. 915–916).

Since the January letter of credit for $200,000 (see facts 7 & 8–11 and 7 & 8–12) was not shown to have been drawn against before its expiration date, the $100,000 and/or the $300,000 letters of credit might well have been drawn to cover a portion of the shipments contemplated by the opening of the $200,000 letter of credit.

The letter sent by Eftekhari from the office of Albisher in Kuwait (7 & 8–13) and Barkey's radiogram (7 & 8–14) serve to indicate that Iravani was keeping Barkey posted on the price he was paying for wool, and also that Barkey took a high degree of interest in such purchases, even to the extent of directly wiring the buyer about the goods and offering to open a letter of credit in his favor. This method of doing business favors the theory of a joint venture, but is also amenable to the proposition that Barkey, tired of Iravani's delays, was attempting to hasten delivery by intervening—or possibly even by by-passing Iravani entirely.

On the question then, of the existence of a joint venture, we have the above situation; added to it, the court cannot overlook the prior dealings, misunderstandings, and hard feelings that had arisen between the parties. Under those circumstances, while a contemplated mutual profit might be a sufficient motive to account for their joining in such a joint venture, we do not find it highly probable.

 In conclusion, as to all of the evidence listed above, and bearing in mind all that had gone before, it is the opinion of this court that Iravani has not established the joint venture by a preponderance of the credible evidence. While he has succeeded in raising certain inferences of its existence, this court does not believe that he has sustained the burden of proof in that regard. Accordingly, and since both the seventh and the eighth causes of action require the existence of a joint venture, this court finds for the defendant on both of those causes.

## Ninth Cause of Action

The ninth cause of action concerns a color allowance of some $8,733.95 made in connection with the alleged consignment of 395 tons.

Iravani asserts and the defendant admits that Barkey made that allowance to the Bigelow-Sanford Co., to which some of this wool was sold, for certain color discrepancies. The notation of the allowance appears on Account #12 (Plaintiff's Exh. 147). The allowance was made at a time when Iravani was in this country, but he was never consulted about it, nor was his permission obtained. (S.M. pp. 239–240). This is not denied.

Barkey paid this amount, evidenced by its check (Defendant's Exh. MM), and Higley testified as to the reason for it. (S.M. pp. 626–627).

 Regardless of the consignment and agency question implicit in this cause of action, this court can see nothing wrong in what clearly appears to be an honest correction for an erroneous shipment of colored wool. In the absence of any showing by the plaintiff that this correction should not have been made, and that the plaintiff was improperly damaged thereby, this court must find for the defendant on this cause of action.

## Tenth Cause of Action

The plaintiff's tenth cause of action concerns a settlement between the parties. The terms of this settlement are very much in dispute, and the direct evidence pertaining thereto is quite sparse. Much of the evidence was taken up by this court in its decision as to the sixth cause of action, and, according to the defendant, its terms dispose of the plaintiff's first four and his sixth causes of action.

The evidence pertaining to this tenth cause of action is found in the following enumerated facts:

(10 – 1) Cablegram dated March 20, 1951, from the Irving Trust Company in New York to Bank Melli in Teheran, pre-

viously quoted in fact #6 – 15, is incorporated as if fully set forth herein. It informed Bank Melli that Barkey would honor drafts by Iravani for 85% value of white and cream wool shipments on the Steel Worker, Alamac and Laurenskerk at $1.25 for ⅓ of the shipments and $1.-60 for ⅔. Price for colors was $1.00. (Plaintiff's Exh. 169).

(10–2) On direct examination Iravani testified with regard to the cable referred to in fact #10–1 as quoted or referred to previously in facts ##6–35 and 6–48.

He also testified with regard to the 150 tons as follows:

"Q. Unless you showed the cable to Mr. Barkey, but if you did not you can't tell us about it. You sent some cable to Teheran, but don't tell us about it, just tell us about the conversation. A. I said that both of us agreed to deliver 120 tons of wool and receive $150,000.

"Q. Well, you testified this morning about one-third of a shipment, under Exhibit 169. A. Yes, sir.

"Q. Now, that one-third, was that the 150 tons at $1.25, is that the tons you have reference to? A. Yes, sir.

"Q. Was that actually 150 tons? A. 120 tons, $100,000.

"Q. The 150-ton arrangement, whatever it was, as you testified, at $1.25, was substituted for 120 tons for $150,000; is that what you are saying? A. Yes, sir." (S.M. pp. 195–196).

"A. Yes. Beginning of June 1951 Mr. Barkey asked for the wool of the final settlement.

"Q. What do you mean by the final settlement? A. The final settlement of 150 tons against old contracts.

"Q. At what price? A. At $1.25.

"Q. And in June Mr. Barkey asked for the wool, you say? A. Yes.

"Q. Now, give us the discussion. A. He said that still he has some wool, and I promised to ship 120 tons which I have in Khorramshahr in Iran or afloat, then after many discussions—

"Q. Wait. We have to take it slowly. You promised to ship 120 tons. Was any price mentioned? A. I asked for $1.25 and then he said $1.25 is too much and at last he agreed to pay against 120 tons $150,-000. (S.M. p. 241).

"Q. Mr. Iravani, the 80 tons—did you ship a quantity of merchandise which was the subject matter of your discussion that you testified to, of 120 tons? A. Yes, sir, I did.

"Mr. Kresel: Do you mean on account of the 150 tons?

"Mr. Kunen: I mean on account of the 120 tons.

"Mr. Kresel: Or on account of the 120 tons.

"The Witness: Yes, sir, I did.

"Q. And was it shipped—

"Mr. Kresel: Do not tell him. Please ask him.

"Q. I show you this account of Barkey (handing to witness), and can you tell us what wool that covers? A. That covered the 80 tons of the settlement of 120 tons.

"Mr. Kresel: Is that in evidence?

"Mr. Kunen: I am going to put it in now.

"Q. Can you tell me whether it is account 22–A and 22–B, or just account 22–A? A. It is account 22–A and account 22–B.

"Mr. Kresel: There is no objection to these. (Marked Plaintiff's Exhibits 254 and 254–A.)

"Mr. Kunen: This last exhibit shows that on June 4, 1951, Barkey paid Murad $30,000 and on July 30, 1951, Barkey paid Murad $70,000, making a total of $100,000." (S.M. pp. 243–244).

Of the 40 ton balance of the 120 ton amount, Iravani testified that Barkey refused to accept it. (S.M. pp. 244–247).

(10–3) On direct examination, Mr. Barkey testified as follows:

"Q. Mr. Barkey, Mr. Iravani has testified that on one occasion in his presence he heard you telephone to Mr. Murad, saying to him in substance that you would be willing to pay $150,000 for 120 tons of the 150 tons that he had agreed to sell you at $1.10 a pound. Is that the fact? A. That is a fact.

"Q. You did make such a statement over the telephone to Mr. Murad? A. I did.

"Q. And how did you telephone him and— A. He telephoned me and informed me that he had received a cable from his father in Iran to the effect that he tried to ascertain from us whether we would be willing to pay $150,000 against such a shipment, and I told him I was going to pay the $150,000.

"Q. Mr. Murad testified yesterday that with reference to the 4000 tons that were offered to you in September— A. Forty tons, not 4000.

"Q. —40 tons, excuse me, that were offered to you in September, 1951, that you told him that you would take those 40 tons and would pay $37,000 against the documents. Did you say that to him? A. Yes, that is true.

"Q. Were the documents ever offered to you? A. No, never." (S. M. pp. 768–769).

He also testified as quoted heretofore in facts ##6–20, 6–37 and 6–46.

(10–4) Letter dated May 26, 1954, from the Director of Fiber Purchasing of Alexander Smith Co. indicates that wool prices were at their highest in early March of 1951 when the settlement took place. The letter lists the asking price for Iranian wool at $2.10 for "good White Wools" on March 10, 1951. (Defendant's Exh. NN). The price in Iran had also risen sharply. (Plaintiff's Exhibits ##38, 43, 52, 59, 69, and see also S.M. p. 266.).

(10–5) Barkey testified as to the terms of the settlement agreement that Iravani was to ship 150 tons of white wool at $1.10 per lb., the half-and-half agreement was to be set aside, Iravani was to get billed values less 5% for wool in fulfilling his second formal contract, and the fourth formal contract was to be cancelled. (S.M. pp. 756–758. See also S.M. pp. 888, 889 and 999).

(10–6) Iravani testified that the terms of the settlement were as follows:

He was to ship 150 tons of white wool at $1.25, the half-and-half agreement and the four formal contracts as amended were to remain in effect as far as already executed and be cancelled to the extent that he still owed wool under them and the 395 ton consignment arrangement remained valid with prices at 95% of Barkey's prices. (S.M. pp. 565–567).

(10–7) As discussed in facts ##6–43 and 6–44, there were various disputes existent between the parties before the settlement which called for some over-all settlement.

(10–8) Iravani substantially overdelivered cream and colored wools. (Defendants Exhibits GG, QQ and SS).

(10–9) There was a practice in the trade by which Bigelow accepted relatively small quantities of cream wool in place of white wool contracted for, provided a proper color allowance was made. (S.M. pp. 604–605) (See also the Ninth Cause of Action herein, infra, and the additional schedule cited in fact 6–54, prepared by Mr. Higley of Bigelow and submitted to the court after trial by stipulation made during the trial, and see facts #6–25 through 6–27).

(10–10) Lavis' testimony heretofore quoted in fact ##6–45 and 6–47 is incorporated herein.

(10–11) With regard to the cable to which we refer in fact #10–1, Barkey testified as follows:

"Q. Read it (handing to witness), and then tell me whether you authorized the Irving Trust Company to send that cable? A. Let me read it, please.

"Q. Yes. A. Yes. Yes, that is true. That cable was sent by the Irving at our instance.

"Q. How did you come to authorize the Irving Trust Company to send that cable? A. Well, I don't quite—

"Q. What led up to it? A. The same usual thing, that Iravani needed money and credit to make shipments, and he requested us to establish the credit from the values herein described, and we saw no objection to it because this was part of our—this goods was going to form part of the billed values of the final arrangement, so we notified the Irving to instruct the bank we would honor those drafts.

"Q. Were the prices there about the market prices at the time? A. No, I would say that they were less than the market price at the time, but it had no bearing on market prices. We already had made a deal with Mr. Iravani that we were going to give him billed values, and the prices indicated here were ample protection, because the differential was large enough.

"Q. You mean the prices in the cable were lower than the billed prices that you were going to give him? A. Oh, yes, definitely.

"Mr. Kresel: I do not know whether your Honor has that cable in mind (handing same to Court).

"Q. Who suggested the prices that are mentioned in that cable? A. Mr. Iravani." * * *

"Q. Now, isn't it a fact that in Plaintiff's Exhibit 169 you had the Irving Trust Company telegraph the Bank Melli that you would pay for one-third of the shipment at $1.25? A. This is a cable sent before March 20th, after the final agreement was reached between Mr. Iravani and myself. It has no bearing upon the $1.25 refusal of mine. That was just in execution of the request from Mr. Iravani that we authorize the bank at Teheran to pay him on the basis of the prices indicated in this cable, and had no relation, no bearing whatsoever on the $1.25 request of Mr. Iravani.

"Q. At the time of this cable in March, what was the market price of the wool that Mr. Iravani was shipping to you? A. What was the market price of the wool? The market price of the wool in 1951 was pretty high.

"Q. Much more than $1.25? A. Oh, yes.

"Q. Well, what—

"Mr. Kresel: White or dark?

"Mr. Kunen: We have been talking white, and there is a difference between white and cream, and I think Mr. Higley helped us out on that.

"The Witness: The market price was much higher.

"Q. Well, how much higher. A. It is very hard for me to say at this time how much higher. I think you can easily say that it must have been at that time anywhere in the neighborhood between 1.65 and 1.95 a pound.

"Q. And isn't it a fact that Mr. Iravani, under these Exhibits 173, 174, 175 and 176 was billing you for one-third of the shipment at $1.25?

"Mr. Kresel: Don't they speak for themselves, your Honor?

"The Court: He is asking him for his understanding. It is cross examination.

"A. Please repeat the question. (Question read.)

"A. Well, the invoices here say that he billed them at $1.25.

"Q. And those invoices were paid by you, were they not? A. All our invoices to Mr. Iravani were paid, yes." (S.M. pp. 777–778 and 809–811).

With regard to the same cable, Lavis testified as follows:

"Q. I ask you is there any question about the fact that telegram—never mind what the exhibit says—that that telegram was sent by the Irving Trust Company to the Bank Melli pursuant to the instructions of the Barkey Importing Company? A. Yes. Yes, it must have been through our instructions, otherwise it would not mention it.

"Q. You know you had correspondence with the Irving Trust Company instructing them to send that telegram? A. Yes.

"Q. And you did receive Exhibits 173, 174, 175 and 176 when Mr. Iravani invoiced one-third at $1.25? A. I think these are the invoices were received with considerable delay, months after the shipments had arrived.

"Mr. Kresel: Just that they were received. That is enough.

"Q. And they were paid. A. Yes." (S.M. pp. 980–981).

(10–12) Invoices by Iravani covering certain shipments with wool invoiced at $1.25 for ⅓ of the quantity are incorporated as if fully set forth herein. (Plaintiff's Exhibits 174, 175 and 176).

(10–13) Valensi's memorandum quoted previously in fact #7 & 8–2 is incorporated as if fully set forth herein.

(10–14) Mr. Murad testified as follows regarding the 40 ton shipment (part of the 120 or 150 settlement shipment):

"Q. All right. Well, the way you learned about these 40 tons is that you got some documents in connection therewith? A. I did not have the documents here myself. My father had the documents at that time.

"Q. Then before you got the documents did you talk to Mr. Barkey? A. Yes.

"Q. About this 40 tons? A. Yes, I talked to him.

"Q. Did you call him on the subject or did he call you? A. No, I called him the same day.

"Q. You called him. Now, what did you say to Mr. Barkey? A. I told him I am going to get documents for $40,000. 'If I give the documents I am to collect $40,000 from you on those documents.'

"Q. The documents were to be shipped to you by your father? A. That's right.

"Q. And is that all you said to Mr. Barkey? That you expected documents covering 40 tons? A. That is all that I spoke, because I am not doing the transaction myself.

"Q. You did not know anything about the transaction? A. So far as I knew I just collect the money, if I collect I transit it to my father.

"Q. Do you say that Mr. Barkey said he would pay $40,000 for the documents representing these 40 tons? Is that what you are stating? A. That's right.

"Q. Did you ask him how much he would pay? A. I think I recall he told me about $37,000.

"Q. No, that is subsequent. I am talking about your first talk with him. A. First it was supposed to be 40.

"Q. When you called him, I understand you to say that you said to him you are supposed to collect $40,000 against 40 tons of wool; right? A. That's right.

"Q. But did you ask him whether he would pay that? A. Well, he told me he is going to pay me 37 against it, not 40.

"Q. Not 40? A. No.

"Q. So you mean that he did not promise to pay 40? A. No, sir.

"Q. At no time? A. At no time.

"Q. Did he ask you what kind of wool he was going to get? A. Well, even if he asked me, I wouldn't know about it.

"Q. And so far as you recall he did not ask you; isn't that right? A. He didn't ask me. Then—

"Q. You have answered my question; thank you.

"And the time came when those documents came to you, right? A. Well, I knew before the documents came in, I knew that Mr. Barkey is not going to pay me because he told me he has some kind of trouble with Mr. Iravani.

"Q. Will you please repeat what you said, and repeat it slowly. A. Before I got the documents from Iran?

"Q. Yes. A. I knew beforehand that we are not going to collect any money from Barkey.

"Q. How did you learn that? A. I talked to Mr. Barkey before I received the documents.

"Q. Yes; and now tell us about that conversation. What did you say to Mr. Barkey? A. Well, I called him up and told him I am going to get documents from Iran; he is going to pay me this amount of money against the documents if I present them to him, and he said, 'No, I am not going to pay you any money for it.' So I cabled to my people—". (S.M. pp. 699–702).

(10–15) Lavis testified as follows with respect to the 120 or 150 ton settlement arrangement:

"Q. Now with reference to the arrangement for Iravani to ship 150 tons at $1.10, did he ship 150 tons? A. About 148 tons.

"Q. 148 tons. And did you credit him for those at $1.10? A. We did.

"Q. Now, there has been evidence here that your company paid $100,000 for 80 tons of the 150 tons. Is that correct? A. Yes.

"Mr. Kunen: May I hear the question? (Question read.)

"Q. Can you give us, please, the poundage both before cleaning and after cleaning of those 80 tons that you there received for which you paid $100,000?. A. Well, you have that memorandum I gave you.

"Q. Yes. You have made up a memorandum on that? A. Yes.

"Q. Is this it (exhibiting)? A. Yes, sir.

"Q. Now will you tell the Court, using that to refresh your recollection, how many greasy pounds did you receive in that 80 ton shipment? A. We received 171,606 pounds of greasy.

"Q. And how much of scoured wool did that produce?

"Mr. Kunen: Can't we just mark the statement, your Honor?

"Mr. Kresel: Yes, I will do that. Let him say it, and then I will give it—

"Mr. Kunen: I would like to see it before he testifies, to know what he is talking about.

"Mr. Kresel: All right. I think you are right about that. I offer it in evidence.

"Mr. Kunen: There is no objection (Marked Defendant's Exh. HH in evidence).

"Q. I shall ask you some questions about it, but first Mr. Kunen would like to know whether you can tell us what percentage of yield— A. The percentage of yield is in the accounts. It is down now on the respective accounts covering these lots, and the total cleaned weights we received was 91,223 pounds. And that is a matter of record on the accounts. This is according to the test reports. And $100,000 for 91,223 pounds comes to $1.096 per pound cleaned, which is very near to $1.10.

"Mr. Kresel: Well, do you want him to tell you the yield—

"Mr. Kunen: That is perfectly all right. I can look at the exhibit.

"Mr. Kresel: All right.

"Q. Mr. Lavis, do you know anything about an offer by Mr. Iravani to deliver to your firm an additional

40 tons of wool? A. I understand an additional 40 tons arrived in September.

"Q. September of what year? A. September 1951.

"Q. And was it offered to the Barkey Company on account of those 150 tons? A. I think it was.

"Q. Did the Barkey Company accept it? A. No.

"Q. Do you know why the Barkey Company rejected it? A. Because our relations with Mr. Iravani were strained at the time and we did not want to accept them. Furthermore—

"The Court: At that time had the 148 or 149 tons been—

"The Witness: Had been taken in and we had no more contracts with Iravani and we had no interest in buying the merchandise.

"Q. Well, I want to make one thing clear. Had you by that time received 148 or 149 tons that you speak of? A. Well, I said that we had already received the 150 tons that we had expected to receive, and there was nothing else to receive from Iravani, we had no more interest in doing business with him." (S.M. pp. 896–899).

(10–16) The $100,000 letter of credit referred to earlier in fact #7 & 8–9 is incorporated herein as if its terms were fully set forth. (Plaintiff's Exh. 190).

(10–17) Dr. Klein's chart indicating defendant's application of the wool received on the last four ships is incorporated as if fully set forth herein. (Defendant's Exh. RR).

(10–18) Barkey's refusal to accept the 40 ton lot, which it claims was in excess of the 150 ton settlement shipment and which Iravani claims was a part of what was a 120 ton settlement agreement, took place in September of 1951. (See fact #10–15). By this time, the asking price of wool had been going down steadily from the high price referred to in the letter from Alexander Smith, which was previously referred to in fact #10–4 (Defendant's Exh. NN). See also resale contract listing price in December 1951 at 84 cents for white wool (Plaintiff's Exhibit 255). There is no evidence of the market price of wool as of the date of Barkey's refusal to accept the 40 tons.

(10–19) The drafts referred to in fact #6–19 are incorporated herein together with the information that they were paid. (Plaintiff's Exhibits 79 and 135).

(10–20) The Alexander Smith contract referred to earlier in fact #6–51 is incorporated as if fully set forth herein. (Plaintiff's Exh. 188).

(10–21) Barkey's final accounts ##14, 15, 16, 18 and 19 incorporated previously in fact #6–24 are incorporated fully at this point as well.

(10–22) Iravani's cable to his office quoted heretofore in fact #6–56 is fully incorporated herein.

(10–23) The $300,000 letter of credit previously cited in fact #7 & 8–8 is fully incorporated herein.

(10–24) On cross-examination, Lavis testified as follows:

"Q. Mr. Lavis, I just have one or two more questions in connection with these documents. By May of 1951, according to your testimony, you had already made a settlement with Mr. Iravani. A. Yes.

"Q. And in that settlement the contracts, the old contracts, were wiped out, were they not? A. The old contracts?

"Q. Yes. A. No.

"Q. Wasn't the 150 tons for $1.-25 taken to wipe out the old contracts? A. He was to execute the first three contracts in quantity, I believe, and give us 150 tons at $1.-10.

"Q. He was to continue executing the first three contracts; is that your testimony? A. What is the question you are putting to me? (Previous question read).

"A. Wipe out all the contracts?

"Q. All the old existing contracts. A. The only contract we were to release him from completion was the fourth contract.

"Q. He was in that settlement, according to you, to complete all the other contracts? A. The three contracts, and we were to give him billed value for them.

"Q. I do not understand that. He was to complete the three contracts and you were to give him billed values; does that mean he was not supposed to ship at 70 cents under the old contract—if you were supposed to give him billed values? A. No.

"Q. My question is: Was he supposed to fulfil the old contract, the first contract which you say was not fulfilled?

"Mr. Kresel: He said the first contract was not fulfilled, and on the contrary he testified it had been fulfilled.

"The Court: This is cross-examination. Let him testify himself.

"Q. Do you understand my question? A. Not yet, no.

"Q. Wasn't it part of your settlement that Mr. Iravani was obligated to make shipments to you at the prices mentioned in the first, second or third contracts? A. Not after Account 12.

"Q. Account 12 was the Steel Artisan which arrived in February? A. Yes.

"Q. Your settlement arrangement was made in March? A. Yes.

"Q. So that is it your testimony now that Mr. Iravani, under that settlement, was not supposed to ship wool to you under the old contracts at the prices mentioned in the old contracts? A. I don't know whether he was supposed to do anything about it.

"Q. You participated in all these discussions. A. I do not quite understand you, Mr. Kunen.

"Q. I am trying to understand the settlement that you claim was made with Mr. Iravani. There were, as you testified, deliveries due under some of the first earlier contracts at 60 cents and 70 cents. A. Yes.

"Q. Was Mr. Iravani supposed, under that settlement to make shipments to you at 60 cents and 70 cents, or was that wiped out? A. We were supposed to give him credit at billed value.

"Q. You were supposed to give him credit at billed value for everything that he shipped? A. From Account 12 and on.

"Q. And you were not supposed to credit any shipments that he made after that Artisan against any of the old contracts; is that correct? A. Not at those prices, no.

"Q. Billed value. Did you discuss with Mr. Iravani what was supposed to be billed value? A. The value as per our contracts outstanding at that time.

"Q. Whether the contract went back to April 1950 or March 1950? A. Whatever contracts we had outstanding.

"Q. Did you explain that to Mr. Iravani? A. Mr. Barkey did. (S. M. pp. 992–995).

Conclusory Remarks

Iravani's main prop to this cause of action is the cable referred to herein in fact #10–1. He asserts that it bears out his claim of the $1.25 price, and Barkey asserts that it does not.

In this controversy, Iravani's explanation of the significance of the two prices ($1.25 and $1.60) seems the most probable and would be most likely to prevail were it not for the dates involved in this explanation.

Iravani asserts that the price of $1.25 applicable to ⅓ of the shipment was a result of the settlement figure of $1.25. This appears logical, but he also asserts that the figure of $1.60 was arrived at by averaging the Bigelow and Smith prices.

Yet the available evidence indicates that the settlement occurred on or about March 7, 1951 (see facts ##10–13 and 10–22), while the Alexander Smith contract was not made until March 16th.

Therefore, since Iravani cabled his office on March 7th, using the figures $1.25 and $1.60, the latter could hardly have been arrived at by any averaging-in of the Alexander Smith contract price.

The cable by the Irving Trust Company dated March 20th, used the same figures as Iravani used in his cable of March 7th. Hence Barkey's explanation now seems the more probable of the two.

As to Iravani's later claim that the 150 ton agreement was subsequently reduced to 120 tons, we do not believe that that has been born out by the preponderance of the credible evidence in the case.

We believe that Iravani contracted to ship 150 tons at $1.10, that he did so (substantially) as Barkey has testified, and was duly paid therefor.

Similarly, we believe that Barkey's contentions as to the entire settlement agreement should prevail. The half-and-half arrangement was set aside ab initio and 95% billed prices were paid to the plaintiff for his shipments following the arrival of the Steel Artisan as indicated in Barkey's testimony.

■ Inasmuch as the first three causes of action involve disputes that were out in the open before the settlement arrangement was reached, it does not seem likely to this court that these disputes would not have been disposed of by the final settlement. This is especially true in view of paragraph 1 of Valensi's memorandum referred to herein in fact #10–13.

Accordingly, this court finds that Barkey's contentions as to the terms of the settlement agreement are valid, that Barkey complied with the terms thereof, and that the defendant is entitled to judgment on this cause of action. This decision, therefore, disposes of all claims the plaintiff has asserted in his first, second, third, fourth and sixth causes of action as well.

### Defendant's Counterclaim

In his brief, the plaintiff admits as a credit to which the defendant is entitled, the sum of $139,724.21. In the defendant's brief its figures indicate it is entitled to $139,723.31.

Accordingly, this court awards the defendant judgment on its counterclaim in the amount of $139,723.31.

### Gums

With reference to the gums of the plaintiff which Mr. Lavis admitted the defendant was holding, it is apparently uncontroverted that these gums are the property of the plaintiff. However, in view of the court's decision on the counterclaim in this action, the plaintiff's right to the return of the gums might very well be affected by the judgment which the defendant will undoubtedly enter.

### Conclusion

The defendant herein is entitled to judgment dismissing all of the plaintiff's ten causes of action, and further, the defendant is entitled to judgment on its counterclaim in the amount of $139,723.-31. Let judgment enter accordingly.